# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA
### DURHAM DIVISION

AMY BRYANT, MD,      )
        )
    Plaintiff,      )
        )
v.        )
        )
JOSHUA H. STEIN, in his official )
capacity as Attorney General for the State )
of North Carolina; JEFF NIEMAN, in his )
official capacity as District Attorney for )
North Carolina 18th Prosecutorial District; )
KODY H. KINSLEY, in his official )
capacity as the North Carolina Secretary )
of Health and Human Services; )
MICHAUX R. KILPATRICK, MD, PhD, )
in her official capacity as President of the )      Case No.: 1:23-cv-77
North Carolina Medical Board; and )
CHRISTINE M. KHANDELWAL, DO; )      **COMPLAINT**
DEVDUTTA G. SANGVAI, MD, MBA; )
JOHN W. RUSHER, MD, JD; WILLIAM )
M. BRAWLEY; W. HOWARD HALL, )
MD; SHARONA Y. JOHNSON, PhD, )
FNP-BC; JOSHUA D. MALCOLM, JD; )
MIGUEL A. PINEIRO, PA-C, MHPE; )
MELINDA H. PRIVETTE, MD, JD; )
ANURADHA RAO-PATEL, MD; and )
ROBERT RICH, JR., MD, in their official )
capacities as Board Members of the North )
Carolina Medical Board, )
        )
    Defendants.      )
        )
_____ )

## <u>INTRODUCTION</u>

1.    Under well-settled principles of preemption that preserve American

federalism, a State cannot impose laws that conflict with and frustrate the objectives of federal law. When Congress enacted the Risk Evaluation and Mitigation Strategies ("REMS") provisions of the Federal Food, Drug, and Cosmetic Act ("FDCA"), its clear objective was to ensure that REMS drugs are regulated in a way that is commensurate with their risks while not imposing undue burdens on the healthcare system or patient access. The U.S. Food and Drug Administration ("FDA" or the "Agency") has acted pursuant to this authority to impose a precise set of controls on an FDA-approved drug, mifepristone. A State may not impose additional controls—including restrictions that FDA has specifically rejected—that upset the carefully balanced regulatory scheme established by federal law.

2. In the FDCA, Congress granted FDA exclusive authority to impose restrictions on the prescribing, dispensing, and administration of drugs that the Agency deems to pose particular risks but for which the importance of patient access justifies imposition of special controls. FDA imposes those controls by way of a REMS, which sometimes includes special Elements to Assure Safe Use ("ETASU"). *See* 21 U.S.C. § 355-1. In granting FDA (and only FDA) authority to impose drug-specific REMS and ETASU, Congress expressly charged the Agency with striking a balance between access to treatments and protection from identified risks, instructing FDA to impose only those restrictions necessary to ensure safety without imposing undue burdens on access or on the healthcare delivery system. *See id.* § 355-1(f).

2

3. In 2000, after several years of review of voluminous data, FDA concluded that mifepristone is safe and effective and approved the drug for use under the trade name Mifeprex. Specifically, FDA approved mifepristone for the medical termination of intrauterine pregnancy, in a two-drug regimen with misoprostol. Exercising its authority first under regulation and subsequently under its exclusive REMS statutory authority, FDA has subjected Mifeprex to a carefully crafted set of regulatory controls that the Agency concluded were commensurate with the drug's risks while not unduly burdening patient access or the healthcare system. In doing so, FDA determined that any risk-mitigation benefits from additional restrictions would be outweighed by added burdens on patient access and the healthcare system.

4. During the more than two decades since FDA's approval of mifepristone as a safe and effective option for ending early pregnancy, medication abortion has been used by more than 5 million patients and now accounts for more than half of abortions nationwide. *See* Rachel K. Jones et al., Guttmacher Inst., *Medication Abortion Now Accounts for More than Half of All US Abortions* (updated Dec. 1, 2022), https://www. guttmacher.org/article/2022/02/medication-abortion-now-accounts-more-half-all-us-abortions. Over that time, substantial additional evidence of safe and effective use has accumulated.

5. As more data and evidence have emerged, the Agency has revised and fine-tuned the Mifepristone REMS numerous times as part of its ongoing obligation under the

REMS provisions of the FDCA. In its current form, the Mifepristone REMS requires providers to prescribe mifepristone under an FDA-approved Certified Prescriber Agreement, and to dispense mifepristone either directly or by issuing the prescription to a certified pharmacy. The Prescriber Agreement requires that providers be specially certified and possess certain qualifications. The Mifepristone REMS also requires providers to ensure that medication abortion patients receive specific counseling and information, including a copy of the mifepristone Medication Guide, and that they consent by using an FDA-approved Patient Agreement Form. *See* FDA, Single Shared System for Mifepristone 200 MG, Risk Evaluation and Mitigation Strategy (REMS) ("2023 Mifepristone REMS") (2023), attached as Ex. A. The Mifepristone REMS does *not* require, because FDA has affirmatively determined it should not, that mifepristone be provided by physicians only, that it be provided in person or in specially certified facilities, or that it be preceded by an ultrasound in all cases.

6. Rejecting the regulatory framework imposed by Congress and FDA, North Carolina has imposed a complex web of requirements relating to the provision of mifepristone that apply to all patients and medical providers in the state, including Plaintiff. Unlike FDA's framework, North Carolina's requirements state that abortion medications may be provided only in person, only by a physician, and only in a specially certified facility after state-mandated counseling, a 72-hour waiting period, and (in certain circumstances) an ultrasound. *See* N.C. Gen. Stat. §§ 14-44, 14-45, 14-45.1, 90-21.82, 90-

4

21.90; 10A N.C. Admin. Code Subchapter 14E. North Carolina's restrictions conflict with federal law and upset the regulatory balance struck by FDA, creating an obstacle to the congressional objectives that FDA carried out in imposing the Mifepristone REMS.

7.     Plaintiff is a physician who regularly provides care to patients of reproductive age and ability and who regularly prescribes mifepristone, as she is certified to do under the Mifepristone REMS. When prescribing mifepristone, Plaintiff complies with all of the Mifepristone REMS requirements, as she must to maintain her prescriber certification.

8.     As a medical provider in North Carolina, Plaintiff is also subject to North Carolina's requirements relating to providing mifepristone. Under the North Carolina restrictions, instead of seeing patients in an office setting (or remotely via telehealth) and having the option of either dispensing the medications or providing a prescription for a patient to fill from a pharmacy so that the patient may take the medication at the place of their choosing, as FDA expressly authorizes, Plaintiff must herself provide the mifepristone for medication abortion in person and be present when it is administered in a specially certified facility. And Plaintiff must navigate an arcane system of delays, compelled statements, and unnecessary burdens on her patients and her practice that are not part of the Medication Guide, FDA-approved Patient Agreement Form, or any other part of the Mifepristone REMS.

9.     These restrictions impose significant costs and burdens on both Plaintiff and

5

her patients. As a North Carolina licensed physician, Plaintiff has a professional, legal, and ethical obligation to "use h[er] best judgment in the treatment and care of h[er] patient[s]" and to "exercise reasonable care and diligence in the application of h[er] knowledge and skill to [each] patient's case." *Hunt v. Bradshaw*, 88 S.E.2d 762, 765 (N.C. 1955); *see* N.C. Med. Bd., Position Statements, *The Licensee-Patient Relationship* 2.1.1: (Mar. 2022) ("N.C. Med. Bd. Position Statement")[1] ("All licensees should exercise their best professional judgement when making patient care decisions" regardless of "the health care system or setting in which a licensee practices.").

10. The challenged restrictions impose unnecessary costs on Plaintiff and her practice and interfere with her ability to provide medical care to her patients according to her best medical judgment and in accordance with federal law. But for those restrictions, Plaintiff would be able to provide medication abortion care to a larger number of patients at lower cost. Further, medication abortion is inherently time-critical, and delaying such care can unnecessarily increase risk or even push patients outside the window for use of mifepristone, potentially forcing patients to have more involved and more expensive procedures (which will present heightened risks for some patients). Patients also must bear all of the risks and costs of pregnancy during the delays caused by the challenged restrictions.

---

[1] *Available at* https://www.ncmedboard.org/images/uploads/other_pdfs/Compendium_Final_03.25.2022.pdf.

11. As part of its congressionally mandated regulatory balancing, FDA specifically considered and rejected the idea that mifepristone must be provided in person by a physician in a particular type of facility. FDA instead concluded that mifepristone can be safely prescribed by any certified healthcare provider either in person or via telehealth, obtained by the patient directly from or under the supervision of the healthcare provider or from a certified pharmacy, and taken by the patient in her home or other place of her choosing. And FDA expressly concluded that requirements like those imposed by North Carolina are unnecessary to ensure patient safety and contrary to the regulatory balance that Congress and FDA sought to achieve.

12. For North Carolina to impose restrictions that go beyond those FDA deemed warranted as part of its regulatory balancing, including restrictions that FDA specifically rejected, frustrates the objectives of federal law. In light of FDA's heightened oversight and scrutiny of REMS drugs, as instructed by Congress in the REMS provisions of the FDCA, there is no room for North Carolina to impose additional restrictions and specific conditions for use that FDA, in the exercise of its congressionally delegated REMS authority, concluded are unwarranted and inappropriate. Simply put, North Carolina cannot stand in the shoes of FDA to impose restrictions on medication access that FDA determined are not appropriate and that upset the careful balance FDA was directed by Congress to strike.

13. Plaintiff seeks a declaratory judgment that North Carolina's restrictions on

mifepristone are preempted insofar as they are inconsistent with the federal REMS, and an injunction prohibiting Defendants from enforcing those restrictions or taking any other action to restrict the ability of a provider to provide, or a patient to access, mifepristone in accordance with federal law.

**PARTIES**

14.     Plaintiff, Dr. Amy Bryant, is a North Carolina board-certified and licensed physician with a medical practice in Orange County, North Carolina.  Dr. Bryant regularly provides medical care to patients of reproductive age and ability.  In that capacity, she regularly counsels patients about the option of mifepristone for medical termination of intrauterine pregnancy, in a regimen with misoprostol.  She also provides care through telemedicine for other patients, and she would provide telehealth abortion care if she could do so free from the risk of enforcement action by Defendants.  She is certified to prescribe mifepristone as required by the REMS, and she regularly prescribes and dispenses mifepristone in accordance with the REMS.  Plaintiff brings this action in her personal capacity.

15.     Defendant Joshua Stein is the Attorney General for the State of North Carolina.  He is the chief law enforcement officer of the State with the power to enforce the North Carolina restrictions at issue.  He is sued in his official capacity.

16.     Defendant Jeff Nieman is the District Attorney for North Carolina's 18th Prosecutorial District.  He is responsible for criminal prosecutions under relevant North Carolina law occurring within Prosecutorial District 18, including in Orange County.  *See*

N.C. Const. art. IV, § 18(1); N.C. Gen. Stat. §§ 7A-60, 7A-61.  He is sued in his official capacity.

17.     Defendant Kody H. Kinsley is the North Carolina Secretary of Health and Human Services, whose department is charged with licensing of hospitals and certification of clinics that provide abortion; denial, suspension, and revocation of facility certifications; and investigations of complaints relating to clinics that provide abortion.  *See* 10A N.C. Admin. Code 14E.0101, *et seq.*  He is sued in his official capacity.

18.     Defendant Michaux R. Kilpatrick, MD, PhD, is the President of the North Carolina Medical Board, an entity created by the North Carolina legislature and which establishes procedures and requirements for licensure as a physician in North Carolina. N.C. Gen. Stat. §§ 90-2, 90-9.1.  The Medical Board has the power to sanction physicians, including placing them on probation and suspending or revoking their licenses, for "[p]roducing or attempting to produce an abortion contrary to law."  *Id*. § 90-14(a)(2).  She is sued in her official capacity.

19.     Defendant Christine M. Khandelwal, DO, is a member and President-Elect of the North Carolina Medical Board.  She is sued in her official capacity.

20.     Defendant Devdutta G. Sangvai, MD, MBA, is a member and Secretary and Treasurer of the North Carolina Medical Board.  He is sued in his official capacity.

21.     Defendant John W. Rusher, MD, JD, is a member of the North Carolina Medical Board.  He is sued in his official capacity.

9

22.     Defendant William M. Brawley is a member of the North Carolina Medical Board.  He is sued in his official capacity.

23.     Defendant W. Howard Hall, MD, is a member of the North Carolina Medical Board.  He is sued in his official capacity.

24.     Defendant Sharona Y. Johnson, PhD, FNP-BC, is a member of the North Carolina Medical Board.  She is sued in her official capacity.

25.     Defendant Joshua D. Malcolm, JD, is a member of the North Carolina Medical Board.  He is sued in his official capacity.

26.     Defendant Miguel A. Pineiro, PA-C, MHPE, is a member of the North Carolina Medical Board.  He is sued in his official capacity.

27.     Defendant Melinda H. Privette, MD, JD, is a member of the North Carolina Medical Board.  She is sued in her official capacity.

28.     Defendant Anuradha Rao-Patel, MD, is a member of the North Carolina Medical Board.  She is sued in her official capacity.

29.     Defendant Robert Rich, Jr., MD, is a member of the North Carolina Medical Board.  He is sued in his official capacity.

## JURISDICTION AND VENUE

30.     This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Constitution and laws of the United States.

31.     This Court has personal jurisdiction over Defendants because they are domiciled in North Carolina and enactment and enforcement of the state laws at issue

10

occurred and continues to occur within North Carolina.

32. Venue is proper within the Middle District of North Carolina under 28 U.S.C. § 1391(b)(2) because Plaintiff is located and practices medicine in this judicial district.

33. This Court has the authority to enter a declaratory judgment and provide injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, Federal Rules of Civil Procedure 57 and 65, and this Court's inherent equitable powers.

34. Plaintiff has standing because the challenged provisions of North Carolina law directly operate against Plaintiff by regulating her conduct and subjecting her to a threat of enforcement when she prescribes mifepristone or advises patients regarding the use of mifepristone. As a North Carolina licensed physician, Plaintiff has a professional, legal, and ethical obligation to "use h[er] best judgment in the treatment and care of h[er] patient[s]" and to "exercise reasonable care and diligence in the application of h[er] knowledge and skill to [each] patient's case." *Hunt*, 88 S.E.2d at 765; *see* N.C. Med. Bd. Position Statement 2.1.1 ("All licensees should exercise their best professional judgement when making patient care decisions" regardless of "the health care system or setting in which a licensee practices."). The challenged restrictions impose unnecessary costs on Plaintiff, her patients, and her practice and interfere with her ability to provide medical care to her patients according to her best medical judgment and in accordance with federal law. But for those restrictions, Plaintiff would be able to provide a wider range of mifepristone-related services to a larger number of patients at lower cost, including by providing flexible

11

telehealth services to patients and by delegating some tasks related to medication abortion care to non-physician colleagues. Plaintiff would be subject to direct criminal, civil, and administrative penalties under North Carolina law if she were to violate its provisions.

35. Plaintiff's claims are ripe because the challenged North Carolina laws are currently in effect and enforceable and are presently impacting her ability to provide and offer medical advice regarding mifepristone to her patients according to her best medical judgment and in accordance with federal law.

## FACTUAL ALLEGATIONS

### A. Statutory and Regulatory Background

36. Under the FDCA, no drug manufacturer, or "sponsor," can introduce its drug into interstate commerce unless and until that sponsor first obtains marketing approval from FDA. 21 U.S.C. §§ 321(p), 331(d), 355(a).

37. To seek approval under the FDCA, a drug sponsor must undertake a lengthy development program that typically includes, as it did in this case, significant clinical trial data, as well as extensive engagement with FDA in meetings and through written and oral feedback. The drug sponsor then submits a new drug application ("NDA") seeking FDA's authorization to sell and market the drug.

38. FDA reviews NDAs to ensure that they include adequate safety data and substantial evidence of efficacy, among other things. FDA may not approve an NDA unless it determines that the data and information included in the NDA demonstrate that the drug is both safe and effective "for use under the conditions prescribed, recommended,

12

or suggested in the proposed labeling thereof." 21 U.S.C. § 355(d); 21 C.F.R. § 314.125(b).

39. Because all drugs have the potential for adverse effects, demonstrating safety necessary for approval does not require showing that a drug has no potential adverse effects, but rather that the drug's benefits outweigh its risks. *See Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 476 (2013).

40. Congress created REMS as a risk management tool, codifying FDA's authority with respect to drugs that are expected to provide substantial benefits, but which FDA determines also pose risks that would otherwise result in FDA denying an application to sell or market those drugs. *See* Food and Drug Administration Amendments Act of 2007 ("FDAAA"), Pub. L. No. 110-85, § 901, 121 Stat. 823, 926 (enacting 21 U.S.C. § 355-1); 21 U.S.C. § 355-1(a)(2) (extending the REMS authority to already-approved drugs). Within a REMS, FDA may impose requirements, including requiring information for patients and imposing restrictions on prescribers and distribution, that go above and beyond those that FDA is able to require in the absence of a REMS.

41. In enacting the REMS provision, Congress required FDA to consider both the risks associated with the drugs and the burden of imposing various requirements, and to choose the least restrictive set of requirements sufficient to ensure a positive benefit-risk profile, *i.e.*, ensuring safe use of the drug by managing identified safety risks while also maximizing patient access to the drug and minimizing burdens on the healthcare system.

13

*See, e.g.*, 21 U.S.C. § 355-1(a)(1), (f)(2), (f)(5), (g)(2)(C), (g)(4)(B); *see also* FDA, No. FDA-2018-D-4628, Draft Guidance for Industry: REMS Assessment: Planning and Reporting at 13 (Jan. 2019) ("REMS Assessment Draft Guidance")[2] (REMS with ETASU "shall, considering the risk, not be unduly burdensome on patient access, and, to the extent practicable, minimize the burden on the health care delivery system").

42.     Congress provided a series of tools that FDA can incorporate in a particular REMS to strike the right balance between ensuring safe use and avoiding undue burdens on patient access or the healthcare delivery system. For instance, a REMS may include a medication guide or patient package insert, *see* 21 U.S.C. § 355-1(e)(2); a communication plan, including letters to healthcare providers, *see id.* § 355-1(e)(3); and/or packaging and disposal requirements, *see id.* § 355-1(e)(4).

43.     In addition to these relatively more modest requirements, a REMS can also include ETASU that FDA determines are necessary for the drug to be approved. *See* 21 U.S.C. § 355-1(f)(1). These additional elements may require that healthcare providers who prescribe the drug have particular training or experience or be specially certified; that pharmacies, practitioners, or health care settings that dispense the drug be specially certified; that the drug be dispensed to patients only in certain health care settings; that the drug be dispensed to patients with evidence or other documentation of safe-use conditions,

---

[2]     *Available at* https://www.fda.gov/regulatory-information/search-fda-guidance-documents/rems-assessment-planning-and-reporting.

14

such as laboratory test results; or that patients be subject to monitoring or be enrolled in a registry. *Id.* § 355-1(f)(3).

44.     Because ETASU requirements have the potential to unduly restrict access to drugs with meaningful therapeutic benefits, Congress imposed strict limitations on their use.  Any ETASU imposed by FDA must be "commensurate with" a specific serious identified risk of the drug.  21 U.S.C. § 355-1(f)(2)(A).  They must "not be unduly burdensome on patient access to the drug."  *Id.* § 355-1(f)(2)(C).  And they must be designed "to minimize the burden on the health care delivery system" of complying with the requirements. *Id.* § 355-1(f)(2)(D).  In considering burdens on patient access, Congress directed FDA to give particular consideration to "(i) patients with serious or life-threatening diseases or conditions, (ii) patients who have difficulty accessing health care (such as patients in rural or medically underserved areas), and (iii) patients with functional limitations."  *Id.* § 355-1(f)(2)(C)(i)-(iii).

45.     When FDA imposes ETASU requirements, Congress requires the Agency to seek input from patients, physicians, pharmacists, and other healthcare providers about how to design those requirements so as not to be unduly burdensome on patient access to the drug and to minimize the burden on the healthcare delivery system.  21 U.S.C. § 355-1(f)(5)(A).

46.     Congress also charged FDA with continued monitoring and periodic re-assessment of REMS and ETASU to ensure that they continue to reflect the least restrictive

15

set of requirements necessary to ensure safety while protecting patient access, in light of the Agency's evolving understanding of a particular drug's risks and benefits. Every REMS thus includes a timetable for periodic assessments of the effectiveness of the risk mitigation strategy. *See* 21 U.S.C. § 355-1(c)(1), (d). FDA must "periodically evaluate" ETASU requirements to assess whether they are necessary to assure safe use, are not unduly burdensome on patient access to the drug, and minimize the burden on the healthcare delivery system; and the Agency must "modify" those requirements "as appropriate" in light of those evaluations and input received from patients, physicians, pharmacists, and other healthcare providers. 21 U.S.C. § 355-1(f)(5)(B), (C). Further, Congress obligated FDA to institute a REMS review and initiate modification of a REMS if at any time the Agency determines that the REMS should be modified to "minimize the burden on the health care delivery system of complying with the strategy." *Id.* § 355-1(g)(4)(B).

47. FDA guidance states that the process of identifying and minimizing potential burdens on the healthcare system and barriers to patient access "should begin during the REMS design phase," when drug sponsors must demonstrate that they have considered and attempted to minimize potential burdens and barriers; and should continue during the post-approval implementation phase, when sponsors are required, as part of their periodic REMS assessments, to use metrics, data sources, and analytical tools "to assess REMS burdens" and "barriers to patient access." REMS Assessment Draft Guidance at 13-15.

16

48.     Because REMS with ETASU are the most restrictive approach available for ensuring safe use of approved drugs, they are imposed on a very limited number of drugs. Of the more than 20,000 prescription drugs FDA has approved,[3] FDA's website lists only 56 currently approved REMS with ETASU.[4]

## B.     FDA's Approval of Mifepristone and the Mifepristone REMS

49.     Mifepristone is used in medication abortion in a regimen with misoprostol. Typically a patient first takes mifepristone, which works by blocking the hormone progesterone, without which the pregnancy cannot continue; followed by misoprostol 24 to 48 hours later, which causes uterine contractions similar to an early miscarriage. Medication abortion typically involves cramping, pain, and bleeding; more serious complications are extremely rare, "occurring in no more than a fraction of a percent of patients." Nat'l Acads. of Scis., Eng'g, & Med., The Safety and Quality of Abortion Care in the United States 55 (2018), *available at* http://nap.nationalacademies.org/24950. These risks "are both low and similar in magnitude to the reported risks of serious adverse effects of commonly used prescription and over-the-counter medications," such as pain relievers like aspirin and ibuprofen and common antibiotics. *Id.* at 58.

---

[3] *See Fact Sheet: FDA at a Glance*, FDA.gov (Nov. 2021), https://www.fda.gov/about-fda/fda-basics/fact-sheet-fda-glance ("There are over 20,000 prescription drug products approved for marketing.").

[4] *See Approved Risk Evaluation and Mitigation Strategies (REMS)*, FDA.gov (2023), https://www.accessdata.fda.gov/scripts/cder/rems/index.cfm.

Case 1:23-cv-00077   Document 1   Filed 01/25/23   Page 17 of 37

50.     FDA initially approved mifepristone in 2000 under the trade name Mifeprex (an abbreviated new drug application for a generic version of mifepristone was approved in 2019). FDA-approved product labeling specified that mifepristone was approved for the medical termination of intrauterine pregnancy, in a regimen with misoprostol. Mifeprex (mifepristone) Prescribing Information (2000) ("2000 Prescribing Information"), attached as Ex. B.

51.     Since its initial approval in 2000, FDA has closely monitored mifepristone and has made updates to the mix of regulatory controls FDA has imposed on the drug—including changes to the approved labeling, the risk mitigation plan, and the REMS—in 2004, 2005, 2009, 2016, 2019, 2021, and 2023.[5] In so doing, FDA has approved lifting or otherwise modifying certain of the REMS elements and ETASU when it determined that a particular ETASU or other REMS element was unduly burdensome or no longer necessary to maintain a favorable benefit-risk profile for the drug.

52.     Each REMS modification reflects FDA's exercise of its congressionally mandated responsibility to continue to consider scientific evidence regarding the safe and effective use of mifepristone as well as burdens on patient access and the health care delivery system, and to adjust and refine the federal regulatory balance based on such consideration.

---

[5] *See Drugs@FDA: NDA 020687*, FDA.gov, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=020687.

### 1.     FDA's Initial Approval of Mifepristone in 2000

53.     In initially considering whether to approve the Mifeprex NDA, FDA determined that medication abortion provides a meaningful therapeutic benefit to some patients. *See* 21 C.F.R. § 314.500; NDA 020687, Approval Letter from FDA to Sandra P. Arnold, Population Council at 1 (Sept. 28, 2000) ("Mifeprex Approval Letter"), attached as Ex. C (noting that the application was "approved under 21 CFR 314 Subpart H"); Memorandum from FDA to NDA 20-687 MIFEPREX (mifepristone) Population Council at 6 (Sept. 28, 2000) ("Mifeprex Approval Memorandum"), attached as Ex. D.  It has never deviated from that determination.  As FDA has recognized, "[p]regnancy can be a serious medical condition in some women" and is associated with numerous health risks, including preeclampsia and eclampsia; an increased risk of thromboembolic complications, including deep vein thrombophlebitis and pulmonary embolus; disseminated intravascular coagulopathy (a rare but serious complication); amniotic fluid embolism; life-threatening hemorrhage associated with placenta previa, placenta accreta, placental abruption, labor and delivery, or surgical delivery; postpartum depression; and exacerbation or more difficult management of preexisting medical conditions (*e.g.*, diabetes, lupus, cardiac disease, hypertension).  Letter from Janet Woodcock, M.D., Dir., Ctr. for Drug Evaluation & Rsch. to Donna Harrison, M.D., *et al.*, Denying Citizen Petition Asking FDA to Revoke Approval of Mifeprex at 4 (Mar. 29, 2016), attached as Ex. E.  FDA further observed that continued pregnancy carries a significant risk that a patient may require a major surgical procedure and anesthesia, as well as endure depression, anxiety, and other conditions.

Case 1:23-cv-00077   Document 1   Filed 01/25/23   Page 19 of 37

*Id.* at 4-5.

54. In reviewing the NDA for Mifeprex, FDA determined that distribution restrictions were necessary in order to approve Mifeprex. The approved NDA for Mifeprex thus included a risk mitigation plan that included distribution restrictions under the regulations that predated the 2007 REMS statute. *See* 21 C.F.R. § 314.520; Mifeprex Approval Letter at 2 (Ex. C); Mifeprex Approval Memorandum at 6 (Ex. D).

55. FDA's initial 2000 approval required that Mifeprex could only be "provided by or under the supervision of a physician" who had signed a Prescriber Agreement Form. Mifeprex Approval Letter at 2 (Ex. C). The Prescriber Agreement Form specified the qualifications that FDA had determined were necessary for a physician to become certified to prescribe mifepristone, including the ability to (a) assess duration of pregnancy (although, as described in the Mifeprex 2000 Prescribing Information (Ex. B), an ultrasonographic scan need only be used if the duration of pregnancy is uncertain or if ectopic pregnancy is suspected); (b) diagnose ectopic pregnancies; (c) provide surgical intervention in cases of incomplete abortion or severe bleeding, or have made plans to provide such care through others; and (d) assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary. Mifeprex (Mifepristone) Tablets, 200 mg Prescriber's Agreement (2000), attached as Ex. F ("2000 Prescriber Agreement").

56. The Prescriber Agreement Form required the signatory to have read and

Case 1:23-cv-00077   Document 1   Filed 01/25/23   Page 20 of 37

understood the prescribing information and to follow guidelines for use, including: (a) providing the patient with a copy of the Patient Agreement Form and the Medication Guide; (b) fully explaining the procedure to each patient; (c) answering any questions the patient had about the procedure; and (d) signing and obtaining the patient's signature on the Patient Agreement Form. 2000 Prescriber Agreement (Ex. F).

57. According to FDA, the purpose of the Patient Agreement Form was to make sure that patients "understand the type of regimen they are about to commit to and its risks and benefits." Mifeprex Approval Memorandum at 3 (Ex. D). To that end, the form specified that the patient had been told about the risks and benefits of mifepristone and that she fully understood the treatment and its potential complications. It also included statements regarding the administration of mifepristone, *e.g.*, "I understand that I will take Mifeprex in my provider's office." Mifeprex (mifepristone) Tablets Patient Agreement (2000), attached as Ex. G.

58. The Prescriber Agreement Form and Patient Agreement Form remain part of the ETASU under the Mifepristone REMS today, with modifications including those described below.

### 2. FDA's Approval of the Mifepristone REMS in 2011

59. When Congress enacted the statutory REMS provision in 2007, it expressly deemed certain drugs (including mifepristone) that had in effect an approved risk mitigation plan under 21 C.F.R. Subpart H to have approved REMS in effect, and it required those drugs' sponsors to submit proposed REMS for approval under the new

Case 1:23-cv-00077  Document 1  Filed 01/25/23  Page 21 of 37

statute. *See* FDAAA § 909(b), 121 Stat. at 950-51; FDA, Identification of Drug and Biological Products Deemed to Have Risk Evaluation and Mitigation Strategies for Purposes of the Food and Drug Administration Amendments Act of 2007, 73 Fed. Reg. 16,313 (Mar. 27, 2008).

60.     In June 2011, FDA approved the first REMS for mifepristone under the FDAAA. The 2011 Mifepristone REMS carried forward the distribution restrictions FDA had previously imposed on mifepristone and included as ETASU the restrictions previously imposed in the 2000 Mifeprex risk mitigation plan: Physicians were required to be "specially certified" by completing the Prescriber Agreement; mifepristone was to be dispensed "only in certain health care settings, specifically clinics, medical offices, and hospitals"; and it was to be dispensed only with documentation of safe use conditions, including obtaining the patient's signature on the Patient Agreement. The 2011 REMS also specified as a REMS element that the Medication Guide be provided with each Mifeprex prescription. FDA, NDA 20-687 Mifeprex (mifepristone) Tablets, 200 mg, Risk Evaluation and Mitigation Strategy (REMS) at 1-2 (2011) ("2011 Mifepristone REMS"), attached as Ex. H.; *see also* NDA 020687/S-014, Supplement Approval Letter from FDA to Danco Labs., LLC at 1 (June 8, 2011), attached as Ex. I.

### 3.     FDA's Modification of the Mifepristone REMS in 2016

61.     In 2016, FDA "assessed the current REMS program to determine whether each Mifeprex REMS element remains necessary to ensure that the drug's benefits outweigh the risks" in light of the extensive data and information about clinical practice

22

collected since the original approval 16 years earlier. NDA 020687/S-020, Supplement Approval Letter from FDA to Danco Labs., LLC at 2 (Mar. 29, 2016), attached as Ex. J; *see also* FDA, NDA 020687/S-020, Risk Evaluation and Mitigation Strategy (REMS) Memorandum, REMS Modification at 2 (Mar. 29, 2016) ("2016 REMS Memorandum"), attached as Ex. K; FDA, NDA 020687/S-020, REMS Modification Review at 5, 10 (Mar. 29, 2016) ("2016 REMS Modification Review"), attached as Ex. L; FDA, NDA 020687/S-020, Addendum to REMS Modification Review § 3 (Mar. 29, 2016) ("2016 REMS Modification Review Addendum"), attached as Ex. M.

62. In light of its review, FDA approved several changes to the Mifepristone REMS that expanded the provision of medication abortion. *See* FDA, NDA 20-687 Mifeprex (mifepristone) Tablets, 200 mg, Risk Evaluation and Mitigation Strategy (REMS) (2016) ("2016 Mifepristone REMS"), attached as Ex. N. Among other things, the 2016 REMS allowed qualified healthcare providers other than physicians to become certified to prescribe mifepristone. *Compare* 2016 Mifepristone REMS, Prescriber Agreement Form (Ex. N) (stating that "Mifeprex must be provided by or under the supervision of *a healthcare provider* who prescribes and meets the following qualifications" (emphasis added)) *with* 2011 Mifepristone REMS, Prescriber's Agreement (Ex. H) (stating that "Mifeprex must be provided by or under the supervision of *a physician* who meets the following qualifications" (emphasis added)).

63. In addition, the 2016 modification revised the Patient Agreement to no longer

23

state that the patient understood mifepristone would be *administered* in-person in the provider's office (while retaining the requirement that it be *dispensed* in-person in a clinic, medical office, or hospital). *Compare* 2016 Mifepristone REMS, Patient Agreement (Ex. N) (stating simply, "I understand . . . I will take Mifeprex on Day 1," with no location specified) *with* 2011 Mifepristone REMS, Patient Agreement (Ex. H) (stating, "I understand that I will take Mifeprex *in my provider's office*" (emphasis added)); *see also* 2016 Mifepristone REMS § II.A.2 (Ex. N) (continuing to specify locations where mifepristone could be dispensed); 2016 REMS Memorandum at 1-2 (Ex. K); 2016 REMS Modification Review at 5-7 (Ex. L); 2016 REMS Modification Review Addendum §§ 2.1.1.1, 2.2.1 (Ex. M). Consistent with its congressional mandate to assure safe use without burdening access, FDA concluded that in-person administration should not be required. *See* 2016 REMS Modification Review Addendum § 2.1.1.1 (Ex. M) (noting that the Patient Agreement was being modified to "revis[e] where Mifeprex . . . should be taken").

64. In considering the 2016 modifications, FDA also rejected certain REMS modifications the sponsor requested because FDA concluded those modifications would be inappropriate. For example, FDA did not approve the sponsor's application to remove the Patient Agreement Form requirement from the REMS because FDA determined that the form "would not interfere with access and would provide additional assurance that the patient is aware of the nature of the procedure, its risks, and the need for appropriate follow-

up care." Memorandum from Janet Woodcock, M.D., Dir., Ctr. for Drug Evaluation & Rsch. regarding NDA 020687/S-020 (Mar. 28, 2016), attached as Ex. O.

### 4. FDA's Further Modification of the Mifepristone REMS in 2023

65. In April 2021, FDA communicated its intent to exercise enforcement discretion during the COVID-19 public health emergency regarding the REMS ETASU requiring that mifepristone be dispensed only in certain healthcare settings (*i.e.*, the in-person dispensing requirement). Joint Motion to Stay Case Pending Agency Review, *Chelius v. Becerra*, No. 1:17-cv-00493-JAO-RT (D. Haw. May 7, 2021), Doc. 148 ("*Chelius* Stay Motion"); *see* Letter from Patrizia A. Cavazzoni, M.D., Dir., Ctr. For Drug Evaluation & Rsch. to Donna Harrison, M.D., *et al.*, Denying Citizen Petition at 5 (Dec. 16, 2021) ("AAPLOG Citizen Petition Denial Letter"), attached as Ex. P.

66. Also in 2021, FDA "undertook a full review of the Mifepristone REMS Program," reviewing multiple sources of information, including published literature, safety information submitted to the Agency during the COVID-19 public health emergency, FDA Adverse Event Reporting System reports, the REMS assessment reports for mifepristone submitted in April 2020, and information provided by the sponsors, advocacy groups, and individuals. AAPLOG Citizen Petition Denial Letter at 6 (Ex. P); *see Chelius* Stay Motion at 2 ("FDA is reviewing the elements of the REMS for Mifeprex and its approved generic . . . in accordance with the REMS assessment provisions of Section 505-1 of the [FDCA]."); *see also* FDA, NDA 020687 & ANDA 91178, REMS Modification Rationale Review at 10, 19-36 (Dec. 16, 2021) ("REMS Modification Rationale Review"),

attached as Ex. Q.

67. Following that review, on December 16, 2021, FDA sent REMS modification notification letters to the mifepristone drug sponsors. In those letters, FDA stated that "[i]n accordance with section 505-1(g)(4)(B) of the [FDCA], we have determined that your approved REMS for mifepristone must be modified to minimize the burden on the healthcare delivery system of complying with the REMS and to ensure that the benefits of the drug outweigh the risks." NDA 020687, REMS Modification Notification Letter from FDA to Danco Labs., LLC at 1 (Dec. 16, 2021), attached as Ex. R.

68. In particular, FDA required that the Mifepristone REMS be modified to (1) remove the in-person dispensing requirement and (2) add a requirement that pharmacies that dispense the drug be specially certified. *Id*. at 1-2. FDA explained that "[r]emoval of the requirement for in-person dispensing" was "necessary" to "minimize the burden on the healthcare delivery system of complying with the REMS," and that the requirement was "no longer necessary to ensure the benefits of mifepristone outweigh the risks." *Id.* at 1-2; *see also* AAPLOG Citizen Petition Denial Letter at 6 (Ex. P) ("Removing the in-person dispensing requirement will render the REMS less burdensome to healthcare providers and patients, and . . . the REMS will continue to ensure that the benefits of mifepristone for medical abortion outweigh the risks.").

69. In January 2023, FDA approved a modification of the Mifepristone REMS that effectuated these changes. *See* 2023 Mifepristone REMS (Ex. A); *see also* NDA

020687/S-025, Supplement Approval Letter from FDA to Danco Labs., LLC (Jan. 3, 2023), attached as Ex. S. Consistent with FDA's 2021 directive, the 2023 modification removed the requirement that mifepristone be dispensed only in certain healthcare settings, specifically clinics, medical offices, and hospitals (*i.e.*, the "in-person dispensing" requirement). It also added a certification requirement for pharmacies that dispense mifepristone in order to "ensure[] that pharmacies are aware of and agree to follow applicable REMS requirements, and [] that mifepristone is only dispensed pursuant to prescriptions that are written by certified prescribers." FDA, NDA 020687/S-025 and ANDA 091178/S-004, Review of proposed Major REMS Modification at 13 (Jan. 3, 2023) ("2023 REMS Modification Review"), attached as Ex. T; *see also id*. at 4, 9. The 2023 modification also updated the REMS goals to add that mifepristone can be dispensed "by or under the supervision of certified prescribers, *or* by certified pharmacies on prescriptions issued by certified prescribers." 2023 Mifepristone REMS at 1 (Ex. A) (emphasis added).

70. FDA left in place the REMS requirement of healthcare provider certification, while concluding that the "[t]he burden of prescriber certification has been minimized to the extent possible." 2023 REMS Modification Review at 10 (Ex. T); REMS Modification Rationale Review at 14 (Ex. Q). FDA also determined that the Patient Agreement Form remains "an important part of standardizing the medication information on the use of mifepristone that prescribers communicate to their patients." 2023 REMS Modification Review at 11 (Ex. T); REMS Modification Rationale Review at 18 (Ex. Q).

Case 1:23-cv-00077   Document 1   Filed 01/25/23   Page 27 of 37

71.     FDA did not substantively change the prescriber certification requirements, but it did add requirements related to pharmacy certification to facilitate pharmacy dispensing.  For example, for a pharmacy to become certified, the authorized representative must sign a "Pharmacy Agreement Form" attesting that they have read and understood the Prescribing Information and that each location of the pharmacy will be able to receive Prescriber Agreement Forms, ship mifepristone under certain conditions, and adopt processes and procedures to fulfill the REMS requirements.  2023 REMS Modification Review at 12-15 (Ex. T); *see also* 2023 Mifepristone REMS at 3-4 & Pharmacy Agreement Form (Ex. A); REMS Modification Rationale Review at 40-41 (Ex. Q).

72.     FDA explained that the 2023 modifications "will continue to ensure the benefits of mifepristone for medical abortion outweigh the risks while minimizing the burden imposed by the REMS on healthcare providers and patients."  2023 REMS Modification Review at 13 (Ex. T); *see also id*. at 19-20.

73.     Thus, as it currently stands, FDA's Mifepristone REMS requires (among other things) that: (1) mifepristone can only be prescribed by or under the supervision of a certified provider, *i.e.*, a healthcare provider who has signed and submitted a Prescriber Agreement Form; (2) mifepristone can be provided either directly by or under the supervision of a certified prescriber or through a certified pharmacy to which a certified prescriber has sent a prescription; and (3) the patient must sign a Patient Agreement Form, including an attestation that the prescribing healthcare provider has provided information

28

as necessary to comply with the Mifepristone REMS and that the patient has received a copy of the Medication Guide.

74. This means that under federal law, a certified healthcare practitioner (who need not be a physician) can prescribe mifepristone to a patient (either in person or through telemedicine), and either she or someone under her supervision can dispense the medication to the patient or she can provide a prescription for the patient to obtain the medication from a certified pharmacy and take the medication at home or another place of her choosing. FDA has concluded that this specific package of regulatory requirements is, in the Agency's view, commensurate with the risks of mifepristone and sufficient to ensure its safe use while not unduly burdening patient access or the healthcare delivery system. *See* 21 U.S.C. § 355-1(f)(2).

75. On January 22, 2023, President Biden issued a memorandum noting that FDA, "after an independent and comprehensive review of the risks and benefits" of mifepristone pursuant to the REMS statute, had taken "evidence-based action" to modify the Mifepristone REMS to ensure that "healthcare providers and patients can continue to use telehealth to prescribe and receive mifepristone by mail" and that "pharmacies can now choose to become certified to dispense mifepristone to patients." President Biden explained: "These changes seek to reduce the burden on the healthcare delivery system while ensuring the benefits of the medication outweigh the risks. These changes also help ensure that patients can access mifepristone similarly to how they would access other

Case 1:23-cv-00077   Document 1   Filed 01/25/23   Page 29 of 37

prescribed medications." Memorandum on Further Efforts to Protect Access to Reproductive Healthcare Services (Jan. 22, 2023), https://www.whitehouse.gov/briefing-room/presidential-actions/2023/01/22/memorandum-on-further-efforts-to-protect-access-to-reproductive-healthcare-services/. And the President decried efforts by some state officials to "impose restrictions to limit access to this evidence-based, safe, and effective medication." *Id.*

### C. North Carolina Law Imposes Unnecessary and Burdensome Requirements on Plaintiff's Prescribing of Mifepristone that Conflict with the FDA-Approved Regulatory Scheme

76. North Carolina's broad web of abortion laws imposes additional restrictions on the prescription and distribution of mifepristone that conflict with the regulatory balance struck by FDA's precisely calibrated REMS.

77. In North Carolina, medication abortion is legal only when performed in compliance with specific, onerous conditions and restrictions imposed by the State; otherwise it is a felony. *See* N.C. Gen. Stat. §§ 14-44, 14-45, 14-45.1. North Carolina law imposes, among others, the following restrictions on medication abortion, including abortions performed using mifepristone: North Carolina provides that an abortion, including a medication abortion with mifepristone, is lawful only "when the procedure is performed by a qualified physician . . . in a hospital or clinic certified by the Department of Health and Human Services to be a suitable facility for the performance of abortions." N.C. Gen. Stat § 14-45.1(a); *see also id.* § 14-45.1(g) (defining "qualified physician"). The State also specifically provides, with respect to medication abortion, that "[t]he physician

30

prescribing, dispensing, or otherwise providing any drug or chemical for the purpose of inducing an abortion shall be physically present in the same room as the patient when the first drug or chemical is administered to the patient." *Id.* § 90-21.82(1)(a).

78. In addition to requiring that mifepristone be provided in person by a physician, North Carolina strictly regulates the locations where such activities can take place. A physician can provide mifepristone only in a facility that the State deems "suitable," which means either a facility physically attached to or operated by a licensed hospital or a freestanding clinic certified by the State to provide abortion services. *See* N.C. Gen. Stat. § 14-45.1(a); 10A N.C. Admin. Code § 14E.0101(2). A hospital must meet numerous requirements to obtain and maintain state licensure, including facility requirements. *See generally* N.C. Gen. Stat. §§ 131E-75 *et seq.* A clinic not attached to or operated by a licensed hospital must likewise meet numerous facility requirements in order to be considered "a suitable facility for the performance of abortions," N.C. Gen. Stat. § 14-45.1(a), including (among other things) plan approval prior to construction, 10A N.C. Admin. Code §§ 14E.0104, .0105; regular facility inspections, *id.* § 14E.0111; N.C. Gen. Stat. § 14-45.1(a1); and specific building code requirements and specifications unnecessary for providing medication abortion, such as elevators, corridors, and doors large enough to accommodate a stretcher (N.C. Admin. Code §§ 14E.0203, .0204, .0205), ventilation and air supply requirements (*id.* § 14E.0206), and a "nourishment station with storage and preparation area for serving meals or in-between meal snacks"

31

(*id.* § 14E.0207(14)).

79.     North Carolina law also imposes onerous requirements that must be satisfied before any abortion, including a medication abortion with mifepristone.  It requires that a physician or qualified professional provide specific, state-mandated information to the patient prior to the abortion, including statements that are inconsistent with FDA-approved patient labeling for mifepristone and Plaintiff's expert medical judgment and irrelevant to the patient's care, and then wait at least 72 hours before performing the abortion.  *See* N.C. Gen. Stat. §§ 90-21.82, 90-21.90.  North Carolina law also requires that, for abortions performed in a clinic not attached to or operated by a licensed hospital, "[a]n ultrasound examination shall be performed and the results, including gestational age, placed in the patient's medical record for any patient who is scheduled for an abortion procedure."  10A N.C. Admin. Code § 14E.0305(d).

80.     For those who fail to comply with these restrictions, North Carolina law threatens myriad and severe consequences, including criminal prosecution.  A physician who "[p]roduce[s] or attempt[s] to produce an abortion contrary to law" is further subject to disciplinary action by the North Carolina Medical Board, including fines and suspension or revocation of the physician's medical license.  N.C. Gen. Stat. § 90-14(a)(2).  In addition, a physician who performs an abortion that does not fall within the narrow exception in § 14-45.1(a) may be guilty of a felony, *see id.* §§ 14-44, 14-45, and a physician who performs an abortion in knowing or reckless violation of the requirements in § 90-

32

21.82 may be subject to a civil action for damages and attorneys' fees. Failure to comply with the facility certification requirements also may subject a provider to administrative action, including denial, suspension, or revocation of certification. *See* 10A N.C. Admin. Code § 14E.0110.

81. As explained above, in imposing and administering the Mifepristone REMS and performing its congressionally mandated balancing to ensure safety while minimizing burdens on patient access and the healthcare system, FDA has made a deliberate choice not to impose restrictions on mifepristone that are the same as or highly similar to restrictions imposed by North Carolina. In particular, FDA specifically considered, initially imposed, and ultimately rejected requirements that mifepristone be provided in person by physicians in a specific type of medical facility. FDA has concluded that such requirements are not necessary to ensure safety and would unduly burden patient access and the healthcare delivery system. Instead, FDA concluded that it is appropriate for certified physicians, other certified healthcare providers, and healthcare providers operating under their supervision to prescribe mifepristone in any type of facility or by telehealth, after providing the specific counseling information that is listed in the FDA-approved Patient Agreement and Medication Guide and without any waiting period; and for patients to obtain mifepristone directly from a certified prescriber or a healthcare provider working under the supervision of a certified prescriber, or from a certified pharmacy upon prescription of a certified prescriber, and take the medication in a place of the patient's choosing. FDA also

33

has required that pregnancy be assessed by ultrasound only if the duration of the pregnancy is uncertain or an ectopic pregnancy is suspected.  *See* ¶¶ 49-75, *supra*.

## CAUSE OF ACTION

82.     Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though set forth fully herein.

83.     Under the Supremacy Clause of the United States Constitution, federal laws made under the authority of the United States are "the supreme Law of the Land," the "Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  Federal law thus preempts state law where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of federal law.

84.     The restrictions imposed by North Carolina on the provision of mifepristone—including the in-person requirement, the specially certified facility requirement, the counseling and 72-hour waiting period requirement, the physician-only requirement, and the ultrasound requirement—conflict with and stand as an obstacle to the accomplishment and execution of the full purposes of objectives of federal law, as reflected in the FDCA and FDA's Mifepristone REMS.

85.     Congress has directed FDA, when imposing REMS, and in particular REMS with ETASU, to strike a precise and careful balance between managing the risks of a drug and ensuring patient access to the drug.  FDA is required to calibrate its restrictions to ensure patient safety while eschewing unnecessary restrictions that would unduly burden patient access or the healthcare delivery system.  In exercising that authority with respect

34

to mifepristone, FDA has crafted, and regularly revisited and revised, a precise set of regulatory controls that the Agency views as striking the appropriate balance between safety and patient access, and has included only those ETASU that the Agency has deemed to be commensurate with the drug's risks and not unduly burdensome on patients or healthcare providers. In so doing, FDA has concluded that restrictions of the type imposed by North Carolina are unnecessary, inappropriate, and unduly burdensome.

86. The REMS are not a minimum standard on which states are free to build. Rather, as Congress instructed, they reflect FDA's expert conclusion as to the appropriate level of regulatory control for drugs that are expected to provide substantial benefits, but which FDA determines also pose risks that would otherwise result in FDA denying an application to sell or market those drugs. By attempting to impose a different regulatory balance from the one crafted by FDA under its REMS authorities, including by imposing restrictions on the provision of mifepristone that FDA itself has specifically rejected, North Carolina law frustrates Congress's objective of empowering FDA to ensure safety while minimizing burdens on patient access and on the healthcare delivery system; upsets the deliberate and fine-tuned regulatory balance contemplated by federal law; and thus stands as an obstacle to the accomplishment and execution of the full purposes and objectives of federal law.

87. Plaintiff is accordingly entitled to a declaratory judgment that North Carolina's restrictions on mifepristone are preempted insofar as they are inconsistent with

the federal Mifepristone REMS. Plaintiff is also entitled to an injunction prohibiting Defendants from enforcing those restrictions to prevent Plaintiff from providing mifepristone in accordance with federal law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for the following relief.

1.  A declaration pursuant to 28 U.S.C. § 2201 that North Carolina's restrictions on the provision of mifepristone are in conflict with and preempted by federal law;

2.  Injunctive relief enjoining Defendants from enforcing North Carolina's restrictions on providing mifepristone or taking any other action to restrict the ability of a provider to provide, or a patient to access, mifepristone in accordance with federal law;

3.  An order awarding Plaintiff her costs, expenses, and attorneys' fees; and

4.  Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury on all issues so triable.

36

Dated: January 25, 2023

Respectfully submitted,

*/s/ Chelsea Corey*
Chelsea Corey (NC Bar No. 48838)
KING & SPALDING LLP
300 S Tryon Street, Suite 1700
Charlotte, NC 28202
Ph: (704) 503-2600
Fax: (704) 503-2622
ccorey@kslaw.com

Eva A. Temkin
(DC Bar No. 985494)
(Special Appearance forthcoming)
Paul Alessio Mezzina
(DC Bar No. 999325)
(Special Appearance forthcoming)
Jessica Greenbaum*
(NY Bar No. 5112214)
(Special Appearance forthcoming)
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Suite 900
Washington, DC 20006
Ph: (202) 737-0500
Fax: (202) 626-3737
etemkin@kslaw.com
pmezzina@kslaw.com
jgreenbaum@kslaw.com

*Counsel for Plaintiff*

*\*Admitted only in the state of New York;
practice directly supervised by principals
of the firm*

37