| | |
|---|---|
| AMY BRYANT, M.D., | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| JOSHUA H. STEIN in his | ) |
| official capacity as Attorney | ) |
| General for the State of North | ) **DEFENDANT SEC. KINSLEY'S** |
| Carolina, *et. al.*, | ) **RESPONSE TO INTERVENOR-** |
| | ) **DEFENDANTS' MOTION TO** |
| Defendants, | ) **DISMISS** |
| | ) |
| and | ) |
| | ) |
| PHILIP E. BERGER, in his | ) |
| official capacity as President | ) |
| Pro Tempore of the North | ) |
| Carolina Senate, and TIMOTHY | ) |
| K. MOORE, in his official | ) |
| capacity as Speaker of the | ) |
| North Carolina House of | ) |
| Representatives, | ) |
| | ) |
| Defendant- | ) |
| Intervenors. | ) |

Defendant Kody H. Kinsley, in his official capacity as

Secretary of the North Carolina Department of Health and

Human Services ("NCDHHS"), responds to Intervenor-

Defendants' Rule 12(b)(6) Motion to Dismiss [D.E. 53], as

follows.

NCDHHS is the State executive agency that manages the delivery of health- and human-related services for all North Carolinians, especially our most vulnerable citizens – children, elderly, disabled and low-income families.  The Department works closely with health care professionals, community leaders and advocacy groups; local, state and federal entities; and many other stakeholders to make this happen.

Part of the NCDHHS mission is ensuring that health care is accessible for all North Carolinians, and that includes reproductive health services.  Access to reproductive health services has a profound impact on women's lives and is an essential part of comprehensive health care.  It is also an equity issue.  Research shows that restrictions on reproductive health care rights have harmful consequences on individuals' health, safety, and economic stability.

For example, the Turnaway Study from the University of California, San Francisco (Foster *et al.*) showed restrictions on reproductive health care for women:

- Increase the risk of poverty, not being able to cover basic living expenses, having a lower credit score, increased debt, bankruptcies and evictions;

2

- Increase the risk of raising a child alone;

- Increase the risk of physical violence, and
  increase the likelihood of staying in contact with
  a violent partner;

- Increase the risk of more serious health problems,
  *e.g.*, eclampsia, postpartum hemorrhage,
  gestational hypertension, chronic
  headaches/migraines, joint pain;

- Increase the risk of children having to live in
  poverty, and enduring poorer maternal bonding.

*See Advancing New Standards in Reproductive Health, The Turnaway Study,* UNIV. OF CAL. S.F., www.ansirh.org/research/turnaway-study (last visited Apr. 27, 2023).

Research shows that restrictions to reproductive health care can increase infant mortality[1] and are associated with

---

[1]    Karletsos, *Association of State Gestational Age Limit Abortion Laws with Infant Mortality*, American Journal of Preventive Medicine, (Aug. 4, 2021), https://doi.org/10.1016/j.amepre.2021.05.022 (last visited Apr. 27, 2023). *See also* Krieger, *Reproductive Justice and the Pace of Change: Socioeconomic Trends in US Infant Death Rates by Legal Status of Abortion, 1960-1980*, American Journal of Public Health*, (Apr. 1, 2015)*, https://doi.org/10.2105/AJPH.2014.302401 (last visited Apr.

3

higher risks of low birth weight, especially for children

born to black women.[2] Research also shows restrictions on

reproductive health care can increase maternal mortality.[3]

Reproductive health restrictions disproportionately

impact people of color, people with disabilities, people

with low incomes, and people who live in rural areas.  *Id*.

_____

27, 2023); Pabayo, *Laws Restricting Access to Abortion Services and Infant Mortality Risk in the United States*, Int. Journal of  Environmental Research and Public Health, (May 26, 2020), https://www.mdpi.com/1660-4601/17/11/3773 (last visited Apr. 27, 2023).

[2]    Wallace *et al.*, *The Status of Women's Reproductive Rights and Adverse Birth Outcomes*, *Women's Health Issues,* (*Jan. 25,* 2017), https://doi.org/10.1016/j.whi.2016.12.013 (last visited Apr. 27, 2023).  *See also* Sudhinaraset, *Women's Reproductive Rights Policies and Adverse Birth Outcomes: A State-Level Analysis to Assess the Role of Race and Nativity Status*, American Journal of Preventive Medicine, (Oct. 13, 2020), https://doi.org/10.1016/j.amepre.2020.07.025 (last visited Apr. 27, 2023).

[3]    Ronsmans, *Maternal Mortality: Who, When, Where, and Why*, The Lancet, (Sept. 28, 2006), https://doi.org/10.1016/S0140-6736(06)69380-X (last visited Apr. 27, 2023); Latt, *Abortion laws reform may reduce maternal mortality: an ecological study in 162 countries*, BMC Women's Health, (Jan. 5, 2019), https://doi.org/10.1186/s12905-018-0705-y (last accessed Apr. 27, 2023); Vilda, *State Abortion Policies and Maternal Death in the United States, 2015—2018*, American Journal of Public Health, (Sept. 22, 2021), https://doi.org/10.2105/AJPH.2021.306396 (last visited Apr. 27, 2021).

4

Black and Hispanic women get abortions at higher rates than
their peers.  In North Carolina, black people make up 23%
of the population, but black women account for 49% of
abortions.  Latinos make up 10% of the population, but
Latina women account for 13% of abortions.[4]  Black women are
more likely to have low birth weight babies in states with
more restriction to reproductive rights.[5]  Women of color
experience higher poverty rates and are less likely to have
health insurance providing access to contraception, leading
to a greater occurrence of unintended pregnancies.[6]  The
North Carolina Maternal Mortality Review Committee revealed
that black women were 1.8x more likely to die from

---

[4]     *Reported Legal Abortions by Race of Women Who
Obtained Abortion by the State of Occurrence*, Kaiser Family
Foundation, https://www.kff.org/womens-health-policy/state-
indicator/abortions-by-
race/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Locati
on%22,%22sort%22:%22asc%22%7D (last visited Apr. 27, 2023).

[5]     *See* Sudhinaraset, n.2, *supra.*

[6]     *See* Kerby, *The State of Women of Color in the
United States,* The Center for American Progress, (July 17,
2012), https://www.americanprogress.org/article/the-state-
of-women-of-color-in-the-united-states/ (last accessed Apr.
27, 2023).

5

pregnancy-related causes than white women in North

Carolina.[7]

Access to reproductive health services is a public

health issue.  Reducing reproductive access runs counter to

substantial evidence from public health and preventive

medicine researchers regarding the considerable health

benefits associated with access to reproductive health

services.  *See citations supra.*

NCDHHS is charged with licensing of hospitals and

certification of clinics that provide abortion; denial,

suspension, and revocation of facility certifications; and

investigations of complaints relating to clinics that

provide abortion.  *See* Compl. [DE 1], ¶ 17; Answer of Kody

H. Kinsley [DE 41], ¶ 17; *see also, e.g.,* N.C. Gen. Stat. §

14.45.1(a1); 10A N.C.A.C. §§ 14E .0101 *et seq.*  NCDHHS

believes that it is crucial to the promotion of public

health and reproductive health to follow the FDA's expert

judgment on the conditions that are necessary to balance

drug safety, efficacy and access to mifepristone, including

---

[7]     *See North Carolina Maternal Mortality Review Report*, Dec. 2021, at 13,
https://wicws.dph.ncdhhs.gov/docs/2014-16-MMRCReport_web.pdf (Last accessed Apr. 27, 2023).

those in the FDA's 2023 modification of the Risk Evaluation

and Mitigation Strategy.  Compl., ¶ 69; Answer of Kody

H.Kinsley, ¶ 69; *see also* 21 U.S.C. § 355-1(a)(1) & (f).

Within the applicable law, NCDHHS will do everything it

can to safeguard access to reproductive health services.

This is consistent with the FDA REMS requirements that the

restrictions on mifepristone must not be "unduly burdensome

on patient access to the drug" and must seek to "minimize

the burden on the health care delivery system," 21 U.S.C. §

355-1(f)(2)(A), (C), (D).  It is equally consistent with

the agency's mandate from the General Assembly.  *See* N.C.

Sess. Law 2013-366(4)(c) (directing NCDHHS to "ensure that

standards for clinics certified by the Department address

the on-site recovery phase of patient care at the clinic,

protect patient privacy, provide quality assurance, and

ensure that patients with complications receive the

necessary medical attention, <u>while not unduly restricting</u>

<u>access.</u>") (emphasis added).

7

Respectfully submitted, this 28th day of April, 2023.

                              /s/ Michael T. Wood
                              Michael T. Wood
                              Special Deputy Attorney General
                              N.C. Bar No. 32427

                              N.C. Dept. of Justice
                              P.O. Box 629
                              Raleigh, NC 27602
                              Phone: 919-716-0186
                              Fax: 919-716-6758
                              Email: MWood@ncdoj.gov

8

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing response complies with Local Rule 7.3(d) because, excluding the parts of the brief exempted by Rule 7.3(d) (cover page, caption, signature lines, and certificates of counsel), this brief contains fewer than 6250 words.

/s/ Michael T. Wood
Michael T. Wood
Special Deputy Attorney General
N.C. Bar No. 32427

N.C. Dept. of Justice
P.O. Box 629
Raleigh, NC 27602
Phone: 919-716-0186
Fax: 919-716-6758
Email: MWood@ncdoj.gov

9