**Exhibit C**

SESSION LAW 2023-14
SENATE BILL 20

AN ACT TO MAKE VARIOUS CHANGES TO HEALTH CARE LAWS AND TO
APPROPRIATE FUNDS FOR HEALTH CARE PROGRAMS.

The General Assembly of North Carolina enacts:

**PART I. ABORTION LAW REVISIONS**
      **SECTION 1.1.** G.S. 14-45.1 is repealed.
      **SECTION 1.2.** Article 1I of Chapter 90 of the General Statutes reads as rewritten:
                   "Article 1I.
            "~~Woman's Right to Know Act.~~Abortion Laws.
"**§ 90-21.80. Short title.**
    This act may be cited as ~~the "Woman's Right to Know Act."~~"Abortion Laws."
"**§ 90-21.81. Definitions.**
    The following definitions apply in this Article:
          (1)     Abortion. – A surgical abortion or a medical abortion, as those terms are defined in this section, respectively.
          (1a)   Abortion-inducing drug. – A medicine, drug, or any other substance prescribed or dispensed with the intent of terminating the clinically diagnosable pregnancy of a woman, with knowledge that the termination will, with reasonable likelihood, cause the death of the unborn child. This includes the off-label use of drugs such as mifepristone (Mifeprex), misoprostol (Cytotec), and methotrexate, approved by the United States Food and Drug Administration to induce abortions or known to have abortion-inducing properties, prescribed specifically with the intent of causing an abortion, whether or not there exists a diagnosed pregnancy at the time of prescription or dispensing, for the purposes of the woman taking the drugs at a later date to cause an abortion rather than contemporaneously with a clinically diagnosed pregnancy. This definition shall not include drugs that may be known to cause an abortion but are prescribed for other medical indications, such as chemotherapeutic agents and diagnostic drugs.
          (1b)   Adverse event. – Any untoward medical occurrence associated with the use of a drug in humans, whether or not considered drug related.
          (1c)   ~~Abortion. –~~ Surgical abortion. – The use or prescription of any ~~instrument, medicine, drug, or other substance~~ instrument or device intentionally to terminate the pregnancy of a woman known to be pregnant with an intention other than to do any of the following:
               a.    Increase the probability of a live birth.
               b.    Preserve the life or health of the child.
               c.    Remove a dead, unborn child who died as the result of (i) natural causes in utero, (ii) accidental trauma, or (iii) a criminal assault on the pregnant woman or her unborn child which causes the premature termination of the pregnancy.



    d.    Remove an ectopic pregnancy.

(2)    Attempt to perform an abortion. – An act, or an omission of a statutorily required act, that, under the circumstances as the ~~actor~~ physician believes them to be, constitutes a substantial step in a course of conduct planned to culminate in the performance of an abortion in violation of this Article or Article 1K of this Chapter.

(2a)    Complication. – Any physical or psychological conditions which, in the reasonable medical judgment of a licensed health care professional, arise as a primary or secondary result of an induced abortion, including:

    a.    Uterine perforation.
    b.    Cervical laceration.
    c.    Infection.
    d.    Bleeding or vaginal bleeding that qualifies as a Grade 2 or higher adverse event according to the Common Terminology Criteria for Adverse Events.
    e.    Pulmonary embolism.
    f.    Deep vein thrombosis.
    g.    Failure to actually terminate the pregnancy.
    h.    Incomplete abortion due to retained tissue.
    i.    Pelvic inflammatory disease.
    j.    Endometritis.
    k.    Missed ectopic pregnancy.
    l.    Cardiac arrest.
    m.    Respiratory arrest.
    n.    Renal failure.
    o.    Shock.
    p.    Amniotic fluid embolism.
    q.    Coma.
    r.    Free fluid in abdomen.
    s.    Allergic reactions to anesthesia and abortion-inducing drugs.
    t.    Psychological complications as described by the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM).

(3)    Department. – The Department of Health and Human Services.

(4)    Display a real-time view of the unborn child. – An ultrasound or any more scientifically advanced means of viewing the unborn child in real time.

(4a)    Health care provider. – As defined in G.S. 90-410.

(4b)    Hospital. – As defined in G.S. 131E-76.

(4c)    Incest. – The criminally injurious conduct in the nature of the conduct described in G.S. 14-178.

(4d)    Life-limiting anomaly. – The diagnosis by a qualified physician of a physical or genetic condition that (i) is defined as a life-limiting disorder by current medical evidence and (ii) is uniformly diagnosable.

(4e)    Medical abortion. – The use of any medicine, drug, or other substance intentionally to terminate the pregnancy of a woman known to be pregnant with an intention other than to do any of the following:

    a.    Increase the probability of a live birth.
    b.    Preserve the life or health of the child.
    c.    Remove a dead, unborn child who died as a result of (i) natural causes in utero, (ii) accidental trauma, or (iii) a criminal assault of the pregnant woman or her unborn child which causes the premature termination of the pregnancy.

          d.        Remove an ectopic pregnancy.

(5)      Medical emergency. – A condition which, in reasonable medical judgment, so complicates the medical condition of the pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible physical impairment of a major bodily function, not including any psychological or emotional conditions. For purposes of this definition, no condition shall be deemed a medical emergency if based on a claim or diagnosis that the woman will engage in conduct which would result in her death or in substantial and irreversible physical impairment of a major bodily function.

(5a)    Partial-birth abortion. – As defined in 18 U.S.C. § 1531(b)(1) as it exists on January 1, 2023.

(6)      Physician. – An individual licensed to practice medicine in accordance with this Chapter.

(7)      Probable gestational age. – What, in the judgment of the physician, will, with reasonable probability, be the gestational age of the unborn child at the time the abortion is planned to be performed.

(7a)    Qualified physician. – Any of the following: (i) a physician who possesses, or is eligible to possess, board certification in obstetrics or gynecology, (ii) a physician who possesses sufficient training based on established medical standards in safe abortion care, abortion complications, and miscarriage management, or (iii) a physician who performs an abortion in a medical emergency as defined by this Article.

(8)      Qualified professional. – An individual who is a registered nurse, nurse practitioner, or physician assistant licensed in accordance with Article 1 of this Chapter, or a qualified technician acting within the scope of the qualified technician's authority as provided by North Carolina law and under the supervision of a physician.

(9)      Qualified technician. – A registered diagnostic medical sonographer who is certified in obstetrics and gynecology by the American Registry for Diagnostic Medical Sonography (ARDMS) or a nurse midwife or advanced practice nurse practitioner in obstetrics with certification in obstetrical ultrasonography.

(9a)    Rape. – The criminally injurious conduct in the nature of the conduct described in G.S. 14-27.21, 14-27.22, 14-27.23, 14-27.24, and 14-27.25.

(10)   ~~Stable Internet Web site.~~ Website. – A ~~Web site~~ website that, to the extent reasonably practicable, is safeguarded from having its content altered other than by the Department.

(10a)  Unborn child. – As defined in G.S. 14-23.1.

(11)   Woman. – A female human, whether or not she is an adult.

"**§ 90-21.81A.  Abortion.**

(a)    Abortion. – It shall be unlawful after the twelfth week of a woman's pregnancy to advise, procure, or cause a miscarriage or abortion.

(b)    Partial-Birth Abortion Prohibited. – It shall be unlawful for a qualified physician, any health care provider, or any person to perform a partial-birth abortion at any time.

"**§ 90-21.81B.  When abortion is lawful.**

Notwithstanding any of the provisions of G.S. 14-44 and G.S. 14-45, and subject to the provisions of this Article, it shall not be unlawful to advise, procure, or cause a miscarriage or an abortion in the following circumstances:

(1)      When a qualified physician determines there exists a medical emergency.

(2) During the first 12 weeks of a woman's pregnancy, when the procedure is performed by a qualified physician licensed to practice medicine in this State in a hospital, ambulatory surgical center, or clinic certified by the Department of Health and Human Services to be a suitable facility for the performance of abortions, in accordance with G.S. 90-21.82A or during the first 12 weeks of a woman's pregnancy when a medical abortion is procured.

(3) After the twelfth week and through the twentieth week of a woman's pregnancy, when the procedure is performed by a qualified physician in a suitable facility in accordance with G.S. 90-21.82A when the woman's pregnancy is a result of rape or incest.

(4) During the first 24 weeks of a woman's pregnancy, if a qualified physician determines there exists a life-limiting anomaly in accordance with this Article.

"**§ 90-21.81C. Abortion reporting, objection, and inspection requirements.**

(a) Procedure Information. – A qualified physician who advises, procures, or causes a miscarriage or abortion after the twelfth week of a woman's pregnancy shall record all of the following: (i) the method used by the qualified physician to determine the probable gestational age of the unborn child at the time the procedure is to be performed, (ii) the results of the methodology, including the measurements of the unborn child, and (iii) an ultrasound image of the unborn child that depicts the measurements. The qualified physician shall provide this information, including the ultrasound image, to the Department of Health and Human Services pursuant to subsection (c) of this section.

(b) Recording of Findings. – A qualified physician who procures or causes a miscarriage or abortion after the twelfth week of a woman's pregnancy shall record the findings and analysis on which the qualified physician based the determination that there existed a medical emergency, life-limiting anomaly, rape, or incest and shall provide that information to the Department of Health and Human Services pursuant to subsection (c) of this section. Materials generated by the physician or provided by the physician to the Department of Health and Human Services pursuant to this section shall not be public records under G.S. 132-1. The information provided under this subsection shall be for statistical purposes only, and the confidentiality of the patient and the physician shall be protected. It is the duty of the qualified physician to submit information to the Department of Health and Human Services that omits identifying information of the patient and complies with Health Insurance Portability and Accountability Act of 1996 (HIPAA).

(c) Reports. – The Department of Health and Human Services shall prescribe and collect on an annual basis, from hospitals, ambulatory surgical facilities, or licensed clinics where abortions are performed, statistical summary reports concerning the medical and demographic characteristics of the abortions provided for in this section, including the information described in subsection (b) of this section as it shall deem to be in the public interest. Hospitals, ambulatory surgical facilities, or licensed clinics where abortions are performed shall be responsible for providing these statistical summary reports to the Department of Health and Human Services. The reports shall be for statistical purposes only, and the confidentiality of the patient relationship shall be protected. Materials generated by the physician or provided by the physician to the Department of Health and Human Services pursuant to this section shall not be public records under G.S. 132-1.

(d) Fetal Death Reporting. – The requirements of G.S. 130A-114 are not applicable to abortions performed pursuant to this section.

(e) Medical Personnel Objection. – No physician, nurse, or any other health care provider who shall state an objection to abortion on moral, ethical, or religious grounds shall be required to perform or participate in medical procedures which result in an abortion. The refusal of a physician, nurse, or health care provider to perform or participate in these medical procedures shall not be a basis for damages for the refusal or for any disciplinary or any other recriminatory action against the physician, nurse, or health care provider.

(f)    Requirement of Services. – Nothing in this section shall require a hospital, other health care institution, or other health care provider to perform an abortion or to provide abortion services.

(g)    Clinic Inspection. – The Department of Health and Human Services shall annually inspect any clinic, including ambulatory surgical facilities and any suitable facility under G.S. 90-21.82A, where abortions are performed. The Department of Health and Human Services shall publish on the Department's website and on the State website established under this Article the results and findings of all inspections conducted on or after January 1, 2013, of suitable facilities, including ambulatory surgical facilities, where abortions are performed, including any statement of deficiencies and any notice of administrative action resulting from the inspection. No person who is less than 18 years of age shall be employed at any clinic, including ambulatory surgical facilities, where abortions are performed. The requirements of this subsection shall not apply to a hospital required to be licensed under Chapter 131E of the General Statutes.

"**§ 90-21.81D.  Life-limiting anomaly procedure; informed consent.**

(a)    Procedure; Informed Consent. – If a qualified physician has determined there exists a life-limiting anomaly in accordance with this Article, in order to procure or cause a miscarriage or abortion, the qualified physician who made that determination must (i) procure or cause the miscarriage or abortion during the first 24 weeks of a woman's pregnancy and (ii) explain in writing and orally or provide to the woman all of the following information:

(1)    The basis of the determination that the diagnosis qualifies as life limiting.

(2)    The risks associated with the life-limiting anomaly and any procedure or treatment, medical, surgical, or otherwise, to perform the abortion.

(3)    While there exists a risk of stillbirth with life-limiting anomalies, life-limiting anomalies have resulted in live births of infants with unpredictable and variable lengths of life.

(4)    The woman has been provided by the qualified physician with current information on the life-limiting anomaly, including the likelihood of survival and length of survival, if known, after birth based on current medical evidence. The qualified physician proposing the abortion will offer referrals to the woman for neonatal and perinatal palliative care consultations. Neonatal consultation will discuss options for medical stabilization, evaluation, and possible treatments to support the infant after birth. Perinatal palliative care will discuss a plan for comfort care interventions that include the possibility of home discharge on palliative care.

(5)    The woman has been provided all information contained in G.S. 90-21.82 if the abortion is a surgical abortion or all information contained in G.S. 90-21.83A if the abortion is a medical abortion, and her informed consent has been obtained in accordance with those sections.

(6)    The woman has been provided all information, in addition to the information provided under subdivision (5) of this subsection, regarding her options and the spectrum of care, including all of the following:

a.    Continuation of the pregnancy.

b.    Referrals offered to perinatal palliative comfort care service providers to discuss palliative care, neonatal specialists, and other appropriate specialists, as indicated by the particular life-limiting anomaly, and those service providers can discuss those options, including the stabilization of the infant in the labor and delivery room, transfer to the Neonatal Intensive Care Unit for further evaluation and treatment, and support for the mother and her family should they choose to continue the pregnancy.

Case 1:23-cv-00077-WO-LPA   Document 73-3   Filed 06/02/23   Page 6 of 48

(b)      Affirmation. – All additional information provided to the woman under this section shall be signed and initialed by both the woman and the qualified physician.

(c)      Report. – The qualified physician who performs an abortion due to the determination of a life-limiting anomaly under this section shall submit a report to the Department of Health and Human Services for statistical purposes. The report shall include, at a minimum, all of the following:

(1)      Identification of the qualified physician who diagnosed the baby with a life-limiting anomaly.

(2)      The probable gestational age of the unborn child.

(3)      Identification of the qualified physician who performed the abortion.

(4)      The pregnant woman's age and race.

(5)      The number of previous pregnancies, number of live births, and number of previous abortions of the pregnant woman.

(d)      Public Records. – Materials generated by the physician or provided by the physician to the Department of Health and Human Services pursuant to this section shall not be public records under G.S. 132-1.

"§ 90-21.82.  Informed consent to surgical abortion.

(a)      No surgical abortion shall be performed upon a woman in this State without her voluntary and informed consent. consent as described in this section.

(b)      Except in the case of a medical emergency, consent to an a surgical abortion is voluntary and informed only if all of the following conditions are satisfied:

(1)      At least 72 hours prior to the surgical abortion, a physician or qualified professional has orally informed the woman, by telephone or in person, of the information contained in the consent form.

(1a)     The consent form shall include, at a minimum, all of the following:

a.      The name of the physician who will perform the surgical abortion to ensure the safety of the procedure and prompt medical attention to any complications that may arise. The physician performing a surgical abortion shall be physically present during the performance of the entire abortion procedure. The physician prescribing, dispensing, or otherwise providing any drug or chemical for the purpose of inducing an abortion shall be physically present in the same room as the patient when the first drug or chemical is administered to the patient.

b.      The particular medical risks associated with the particular surgical abortion procedure to be employed, including, when medically accurate, the risks of infection, hemorrhage, cervical tear or uterine perforation, danger to subsequent pregnancies, including the ability to carry a child to full term, and any adverse psychological effects associated with the surgical abortion.

c.      The probable gestational age of the unborn child at the time the surgical abortion is to be performed.

d.      The medical risks associated with carrying the child to term.

e.      The display of a real-time view of the unborn child and heart tone monitoring that enable the pregnant woman to view her unborn child or listen to the heartbeat of the unborn child are available to the woman. The physician performing the surgical abortion, qualified technician, or referring physician shall inform the woman that the printed materials and Web site website described in G.S. 90-21.83 and G.S. 90-21.84 contain phone numbers and addresses for facilities that offer the services free of charge. If requested by the woman, the

Case 1:23-cv-00077-WO-LPA   Document 73-3   Filed 06/02/23   Page 7 of 48

physician or qualified professional shall provide to the woman the list as compiled by the Department.

f.    If the physician who is to perform the <u>surgical</u> abortion has no liability insurance for malpractice in the performance or attempted performance of ~~an~~ <u>a surgical</u> abortion, that information shall be communicated.

g.    The location of the hospital that offers obstetrical or gynecological care located within 30 miles of the location where the <u>surgical</u> abortion is performed or induced and at which the physician performing or inducing the <u>surgical</u> abortion has clinical privileges. If the physician who will perform the <u>surgical</u> abortion has no local hospital admitting privileges, that information shall be communicated.

If the physician or qualified professional does not know the information required in sub-subdivisions a., f., or g. of this subdivision, the woman shall be advised that this information will be directly available from the physician who is to perform the <u>surgical</u> abortion. However, the fact that the physician or qualified professional does not know the information required in sub-subdivisions a., f., or g. shall not restart the 72-hour period. The information required by this subdivision shall be provided in English and in each language that is the primary language of at least two percent (2%) of the State's population. The information ~~may~~ <u>shall</u> be provided orally ~~either by telephone or~~ in person, <u>by the physician or qualified professional,</u> in which case the required information may be based on facts supplied by the woman to the physician and whatever other relevant information is reasonably available. The information required by this subdivision ~~may~~ <u>shall</u> not be provided by a tape recording but shall be provided during a consultation in which the physician is able to ask questions of the patient and the patient is able to ask questions of the physician. If, in the medical judgment of the physician, a physical examination, tests, or the availability of other information to the physician subsequently indicates a revision of the information previously supplied to the patient, then that revised information may be communicated to the patient at any time before the performance of the <u>surgical</u> abortion. Nothing in this section may be construed to preclude provision of required information in a language understood by the patient through a translator.

<u>(1b)</u>    <u>A consent form shall not be considered valid, and informed consent not obtained by the woman, unless all of the following conditions are satisfied:</u>

<u>a.</u>    <u>The woman signs and initials each entry, list, description, or declaration required to be on the consent form described in sub-subdivisions a. through g. of subdivision (1a) of this subsection.</u>

<u>b.</u>    <u>The woman signs and initials each entry, list, description, or declaration required to be on the acknowledgment of risks and consent statement described in sub-subdivisions a. through n. of subdivision (2) of this subsection.</u>

<u>c.</u>    <u>The physician signs the qualified physician declaration described in subdivision (5) of this subsection.</u>

<u>d.</u>    <u>The physician uses the consent form created by the Department for the purposes of this section.</u>

(2)    ~~The physician or qualified professional has informed the woman, either by telephone or in person, of each of the following~~ <u>Prior to the surgical abortion, an acknowledgment of risks and consent statement must be signed and</u>

initialed by the woman with a physical or electronic signature attesting she has received all of the following information at least 72 hours before the ~~abortion:~~surgical abortion. The acknowledgment of risks and consent statement shall include, at a minimum, all of the following:

a.    That medical assistance benefits may be available for prenatal care, childbirth, and neonatal care.

b.    That public assistance programs under Chapter 108A of the General Statutes may or may not be available as benefits under federal and State assistance programs.

c.    That the father is liable to assist in the support of the child, even if the father has offered to pay for the abortion.

d.    That the woman has other alternatives to abortion, including keeping the baby or placing the baby for adoption.

e.    That the woman has ~~the right to review~~ been told about the printed materials described in G.S. 90-21.83, and that she has been told that these materials are available on a State-sponsored ~~Web site,~~ website, and she has been given the address of the State-sponsored ~~Web site.~~ website. The physician or a qualified professional shall orally inform the woman that the materials have been provided by the Department and that they describe the unborn child and list agencies that offer alternatives to abortion. If the woman chooses to view the materials other than on the ~~Web site,~~ website, the materials shall ~~either~~ be given to her at least 72 hours before the ~~abortion or be mailed to her at least 72 hours before the abortion by certified mail, restricted delivery to addressee.~~surgical abortion.

f.    That the woman (i) is not being forced to have a surgical abortion, (ii) has a choice to not have the surgical abortion, and (iii) is free to withhold or withdraw her consent to the surgical abortion at any time before or during the surgical abortion without affecting her right to future care or treatment and without the loss of any State or federally funded benefits to which she might otherwise be entitled.

g.    Attestation that the woman understands that the surgical abortion is intended to end her pregnancy.

h.    Attestation that the woman understands the surgical abortion has specific risks and may result in specific complications.

i.    Attestation that the woman has been given the opportunity to ask questions about her pregnancy, the development of her unborn child, and alternatives to surgical abortion.

j.    Confirmation that the woman has been provided access to State-prepared, printed materials on informed consent for surgical abortion and the State-prepared and maintained website on informed consent for a surgical abortion.

k.    If applicable, that the woman has been given the name and phone number of a qualified physician who has agreed to provide medical care and treatment in the event of complications associated with the surgical abortion procedure.

l.    Attestation that the woman has received or been given sufficient information to give her informed consent to the surgical abortion.

m.    That the woman has a private right of action to sue the qualified physician under the laws of this State if she feels she has been coerced

or misled prior to obtaining an abortion, and how to access State resources regarding her legal right to obtain relief.

     <u>n.</u>     <u>A statement that she will be given a copy of the forms and materials with all signatures and initials required under this Article, and all other informed consent forms required by this State.</u>

The information required by this subdivision shall be provided in English and in each language that is the primary language of at least two percent (2%) of the State's population. ~~The information may be provided by a tape recording if provision is made to record or otherwise register specifically whether the woman does or does not choose to have the printed materials given or mailed to her. Nothing in this subdivision shall be construed to prohibit the physician or qualified professional from e-mailing a Web site link to the materials described in this subdivision or G.S. 90-21.83.~~

    ~~(3)~~    ~~The woman certifies in writing, before the abortion, that the information described in subdivisions (1) and (2) of this section has been furnished her and that she has been informed of her opportunity to review the information referred to in sub-subdivision (2)e. of this section. The original of this certification shall be maintained in the woman's medical records, and a copy shall be given to her.~~

    ~~(4)~~    ~~Before the performance of the abortion, the physician who will perform the abortion or the qualified technician must receive a copy of the written certification required by subdivision (3) of this section.~~

    <u>(5)</u>    <u>The physician has signed a physician declaration form stating that prior to the surgical abortion procedure, the qualified physician has (i) explained in person the surgical abortion procedure to be used, (ii) provided all of the information required in this section, and (iii) answered all of the woman's questions regarding the surgical abortion.</u>

"**§ 90-21.83.  Printed information required.**

    (a)    Within 90 days after this Article becomes effective, the Department shall publish in English and in each language that is the primary language of at least two percent (2%) of the State's population and shall cause to be available on the ~~State Web site~~ <u>website</u> established under G.S. 90-21.84, the following printed materials in a manner that ensures that the information is comprehensible to a person of ordinary intelligence:

    (1)    Geographically indexed materials designed to inform a woman of public and private agencies and services available to assist her through pregnancy, upon childbirth, and while the child is dependent, including adoption agencies. The information shall include a comprehensive list of the agencies available, a description of the services they offer, including which agencies offer, at no cost to the woman, imaging that enables the woman to view the unborn child or heart tone monitoring that enables the woman to listen to the heartbeat of the unborn child, and a description of the manner, including telephone numbers, in which they might be contacted. In the alternative, in the discretion of the Department, the printed materials may contain a toll-free, 24-hour-a-day telephone number that may be called to obtain, orally or by tape recorded message tailored to the zip code entered by the caller, a list of these agencies in the locality of the caller and of the services they offer.

    (2)    Materials designed to inform the woman of the probable anatomical and physiological characteristics of the unborn child at two-week gestational increments from the time a woman can be known to be pregnant until full term, including pictures or drawings representing the development of the unborn child at two-week gestational increments. The pictures shall contain

Case 1:23-cv-00077-WO-LPA   Document 73-3   Filed 06/02/23   Page 10 of 48

the dimensions of the unborn child, information about brain and heart functions, the presence of external members and internal organs, and be realistic and appropriate for the stage of pregnancy depicted. The materials shall be objective, nonjudgmental, and designed to convey only accurate scientific information about the unborn child at the various gestational ages. The material shall contain objective information describing the methods of abortion procedures employed, the medical risks associated with each procedure, the possible adverse psychological effects of abortion, as well as the medical risks associated with carrying an unborn child to term.

(b)     The materials referred to in subsection (a) of this section shall be printed in a typeface large enough to be clearly legible. The ~~Web site~~ website provided for in G.S. 90-21.84 shall be maintained at a minimum resolution of 70 DPI (dots per inch). All pictures appearing on the ~~Web site~~ website shall be a minimum of 200x300 pixels. All letters on the ~~Web site~~ website shall be a minimum of 12-point font. All information and pictures shall be accessible with an industry-standard browser requiring no additional plug-ins.

(c)     The materials required under this section shall be available at no cost from the Department upon request and in appropriate numbers to any physician, person, health facility, hospital, or qualified professional. <u>The Department shall create the consent forms described in this section to be used by qualified physicians for the purposes of obtaining informed consent for surgical and medical abortions.</u>

(d)     The Department shall cause to be available on the ~~State Web site~~ website a list of resources the woman may contact for assistance upon receiving information from the physician performing the ultrasound that the unborn child may have a disability or serious abnormality and shall do so in a manner prescribed by subsection (b) of this section.

"**<u>§ 90-21.83A. Informed consent to medical abortion.</u>**

<u>(a)     No medical abortion shall be performed upon a woman in this State without her voluntary and informed consent as described in this section.</u>

<u>(b)     Except in the case of a medical emergency, consent to a medical abortion is voluntary and informed only if all of the following conditions are satisfied:</u>

<u>(1)     At least 72 hours prior to the medical abortion, a qualified physician or qualified professional has orally informed the woman, in person, of the information contained in the consent form.</u>

<u>(2)     The consent form shall include, at a minimum, all of the following:</u>

<u>a.     The name of the physician who will prescribe, dispense, or otherwise provide the abortion-inducing drugs to ensure the safety of the procedure and prompt medical attention to any complications that may arise. The physician prescribing, dispensing, or otherwise providing any drug or chemical for the purpose of inducing an abortion shall be physically present in the same room as the woman when the first drug or chemical is administered to the woman.</u>

<u>b.     The probable gestational age of the unborn child as determined by both patient history and by ultrasound results used to confirm gestational age.</u>

<u>c.     A detailed description of the steps to complete the medical abortion.</u>

<u>d.     A detailed list of the risks related to the specific abortion-inducing drug or drugs to be used, including hemorrhage, failure to remove all tissue of the unborn child which may require an additional procedure, sepsis, sterility, and possible continuation of the pregnancy.</u>

<u>e.     The medical risks associated with carrying the child to term.</u>

<u>f.     The display of a real-time view of the unborn child and heart tone monitoring that enable the pregnant woman to view her unborn child</u>

or listen to the heartbeat of the unborn child are available to the woman. The physician performing the abortion, qualified technician, or referring physician shall inform the woman that the printed materials and website described in G.S. 90-21.83 and G.S. 90-21.84 contain phone numbers and addresses for facilities that offer the services free of charge. If requested by the woman, the physician or qualified professional shall provide to the woman the list as compiled by the Department.

g.    Information about Rh incompatibility, including that if the woman has an Rh-negative blood type, she could receive an injection of Rh immunoglobulin at the time of the medical abortion to prevent Rh incompatibility in future pregnancies.

h.    Information about the risks of complications from a medical abortion, including incomplete abortion, increase with advancing gestational age, and that infection and hemorrhage are the most common causes of deaths related to medical abortions.

i.    Notice that the woman may see the remains of her unborn child in the process of completing the abortion.

j.    Notice that the physician who is to perform the medical abortion has no liability insurance for malpractice in the performance or attempted performance of an abortion, if applicable.

k.    The location of the hospital that offers obstetrical or gynecological care located within 30 miles of the location where the medical abortion is performed or induced and at which the physician performing or inducing the medical abortion has clinical privileges. If the physician who will perform the medical abortion has no local hospital admitting privileges, that information shall be communicated.

If the physician or qualified professional does not know the information required in sub-subdivision a., j., or k. of this subdivision, the woman shall be advised that this information will be directly available from the physician who is to perform the medical abortion. However, the fact that the physician or qualified professional does not know the information required in sub-subdivision a., j., or k. shall not restart the 72-hour period. The information required by this subdivision shall be provided in English and in each language that is the primary language of at least two percent (2%) of the State's population. The information shall be provided orally in person, by the physician or qualified professional, in which case the required information may be based on facts supplied by the woman to the physician and whatever other relevant information is reasonably available. The information required by this subdivision shall not be provided by a tape recording but shall be provided during a consultation in which the physician is able to ask questions of the patient and the patient is able to ask questions of the physician. If, in the medical judgment of the physician, a physical examination, tests, or the availability of other information to the physician subsequently indicates a revision of the information previously supplied to the patient, then that revised information may be communicated to the patient at any time before the performance of the medical abortion. Nothing in this section may be construed to preclude provision of required information in a language understood by the patient through a translator.

(3)    A consent form shall not be considered valid, and informed consent not obtained from the woman, unless all of the following conditions are satisfied:

a.  The woman signs and initials each entry, list, description, or declaration required to be on the consent form described in subdivision (2) of this subsection.

b.  The woman signs and initials each entry, list, description, or declaration required to be on the acknowledgment of risks and consent statement described in subdivision (4) of this subsection.

c.  The physician signs the qualified physician declaration described in subdivision (5) of this subsection.

d.  The physician uses the consent form created by the Department for the purposes of this section.

(4)  Prior to the medical abortion, an acknowledgment of risks and consent statement must be signed and initialed by the woman with a physical or electronic signature attesting she has received all of the following information at least 72 hours before the medical abortion. The acknowledgment of risks and consent statement shall include, at a minimum, all of the following:

a.  That medical assistance benefits may be available for prenatal care, childbirth, and neonatal care.

b.  That public assistance programs under Chapter 108A of the General Statutes may or may not be available as benefits under federal and State assistance programs.

c.  That the father is liable to assist in the support of the child, even if the father has offered to pay for the abortion.

d.  That the woman has other alternatives to abortion, including keeping the baby or placing the baby for adoption.

e.  That the woman has been told about the printed materials described in G.S. 90-21.83, and that she has been told that these materials are available on a State-sponsored website, and she has been given the address of the State-sponsored website. The physician or a qualified professional shall orally inform the woman that the materials have been provided by the Department and that they describe the unborn child and list agencies that offer alternatives to abortion. If the woman chooses to view the materials other than on the website, the materials shall be given to her at least 72 hours before the medical abortion.

f.  Attestation that the woman (i) is not being forced to have a medical abortion, (ii) has a choice to not have the medical abortion, and (iii) is free to withhold or withdraw her consent to the abortion-inducing drug regimen even after she has begun the abortion-inducing drug regimen.

g.  Attestation that the woman understands that the medical abortion is intended to end her pregnancy.

h.  Attestation that the woman understands the medical abortion regimen has specific risks and may result in specific complications.

i.  Attestation that the woman has been given the opportunity to ask questions about her pregnancy, the development of her unborn child, and alternatives to medical abortion.

j.  Confirmation that the woman has been provided access to State-prepared, printed materials on informed consent for abortion and the State-prepared and maintained website on informed consent for a medical abortion.

k.  If applicable, that the woman has been given the name and phone number of a qualified physician who has agreed to provide medical

care and treatment in the event of complications associated with the abortion-inducing drug regimen.

      *l.*    Notice that the physician will schedule an in-person follow-up visit for the woman at approximately seven to 14 days after providing the abortion-inducing drug or drugs to confirm that the pregnancy is completely terminated and to assess the degree of bleeding and other complications.

      m.    That the woman has received or been given sufficient information to give her informed consent to the abortion-inducing drug regimen or procedure.

      n.    That the woman has a private right of action to sue the qualified physician under the laws of this State if she feels she has been coerced or misled prior to obtaining an abortion, and how to access State resources regarding her legal right to obtain relief.

      o.    A statement that she will be given a copy of the forms and materials with all signatures and initials required under this Article, and all other informed consent forms required by this State.

The information required by this subdivision shall be provided in English and in each language that is the primary language of at least two percent (2%) of the State's population.

    (5)    The physician has signed a physician declaration form stating that prior to the medical abortion procedure, the qualified physician has (i) explained in person the medical abortion procedure to be used, (ii) provided all of the information required in this section, and (iii) answered all of the woman's questions regarding the medical abortion.

"**§ 90-21.83B.  Distribution of abortion-inducing drugs and duties of physician.**

    (a)    A physician prescribing, administering, or dispensing an abortion-inducing drug must examine the woman in person and, prior to providing an abortion-inducing drug, shall do all of the following:

    (1)    Independently verify that the pregnancy exists.

    (2)    Determine the woman's blood type; offer necessary medical services, treatment, and advice, based on the physician's reasonable medical judgment of any medical risks associated with the woman's blood type, including whether the woman's blood type is Rh negative; and be able to administer Rh immunoglobulin at the time of the abortion, if medically necessary.

    (3)    Provide any other medically indicated diagnostic tests, including iron or hemoglobin/hematocrit tests, to determine whether the woman has a heightened risk of complications.

    (4)    Screen the woman for coercion, abuse, comply with G.S. 90-21.91, and refer the woman to the appropriate health care provider for appropriate treatment, if medically necessary.

    (5)    Inform the patient that she may see the remains of her unborn child in the process of completing the abortion.

    (6)    Verify that the probable gestational age of the unborn child is no more than 70 days.

    (7)    Document in the woman's medical chart the probable gestation age and intrauterine location of the pregnancy, and whether the woman received treatment for an Rh negative condition or any other diagnostic tests.

    (8)    Comply with all provisions of this Article and laws of this State as applicable.

    (b)    The physician providing any abortion-inducing drug, or an agent of the physician, shall schedule a follow-up visit for the woman at approximately seven to 14 days after

Case 1:23-cv-00077-WO-LPA   Document 73-3   Filed 06/02/23   Page 14 of 48

administration of the abortion-inducing drug to confirm that the pregnancy is completely terminated and to assess the degree of bleeding. The physician shall make all reasonable efforts to ensure that the woman returns for the scheduled appointment. A brief description of the efforts made to comply with this subsection, including the date, time, and identification by name of the person making these efforts, shall be included in the woman's medical records.

"**§ 90-21.83C. Additional information provided to the pregnant woman.**

At least 72 hours prior to any medical or surgical abortion performed in accordance with this Article, the physician providing the abortion-inducing drug, performing the surgical abortion, or conducting any other appointment where an abortion is to be induced or performed shall provide the pregnant woman the physician's full name and specific information for the physician's hospital admitting privileges and whether the treatment or procedure to be performed is covered by the pregnant woman's insurance.

"**§ 90-21.84. Internet ~~Web site.~~website.**

The Department shall develop and maintain a stable Internet ~~Web site~~ website to provide the information described ~~under G.S. 90-21.83.~~ in this Article. No information regarding who accesses the ~~Web site~~ website shall be collected or maintained. The Department shall monitor the Web site on a regular basis to prevent and correct tampering.

"**§ 90-21.85. Display of real-time view requirement.**

(a) Notwithstanding G.S. 14-45.1, except in the case of a medical emergency, in order for the woman to make an informed decision, at least four hours before a woman having any part of an abortion performed or induced, and before the administration of any anesthesia or medication in preparation for the abortion on the woman, the physician who is to perform the abortion, or qualified technician working in conjunction with the physician, shall do each of the following:

 (1) Perform an obstetric real-time view of the unborn child on the pregnant woman.

 (2) Provide a simultaneous explanation of what the display is depicting, which shall include the presence, location, and dimensions of the unborn child within the uterus and the number of unborn children depicted. The individual performing the display shall offer the pregnant woman the opportunity to hear the fetal heart tone. The image and auscultation of fetal heart tone shall be of a quality consistent with the standard medical practice in the community. If the image indicates that fetal demise has occurred, a woman shall be informed of that fact.

 (3) Display the images so that the pregnant woman may view them.

 (4) Provide a medical description of the images, which shall include the dimensions of the embryo or fetus and the presence of external members and internal organs, if present and viewable.

 (5) Obtain a written certification from the woman, before the abortion, that the requirements of this section have been complied with, which shall indicate whether or not she availed herself of the opportunity to view the image.

 (6) Retain a copy of the written certification prescribed by subdivision (a)(5) of this section. The certification shall be placed in the medical file of the woman and shall be kept by the abortion provider for a period of not less than seven years. If the woman is a minor, then the certification shall be placed in the medical file of the minor and kept for at least seven years or for five years after the minor reaches the age of majority, whichever is greater.

If the woman has had an obstetric display of a real-time image of the unborn child within 72 hours before the abortion is to be performed, the certification of the physician or qualified technician who performed the procedure in compliance with this subsection shall be included in

the patient's records and the requirements under this subsection shall be deemed to have been met.

(a1)    A pregnant woman has the right to view a real-time view image of the unborn child under this section and shall not be denied a real-time view of the unborn child due to a clinic policy or rule.

(b)    Nothing in this section shall be construed to prevent a pregnant woman from averting her eyes from the displayed images or from refusing to hear the simultaneous explanation and medical description.

(c)    In the event the person upon whom the abortion is to be performed is an unemancipated minor, as defined in G.S. 90-21.6(1), the information described in subdivisions (a)(2) and (a)(4) of this section shall be furnished and offered respectively to a person required to give parental consent under G.S. 90-21.7(a) and the unemancipated minor. The person required to give consent in accordance with G.S. 90-21.7(a), as appropriate, shall make the certification required by subdivision (a)(5) of this section. In the event the person upon whom the abortion is to be performed has been adjudicated mentally incompetent by a court of competent jurisdiction, the information shall be furnished and offered respectively to her spouse or a legal guardian if she is married or, if she is not married, to one parent or a legal guardian and the woman. The spouse, legal guardian, or parent, as appropriate, shall make the certification required by subdivision (a)(5) of this section. In the case of an abortion performed pursuant to a court order under G.S. 90-21.8(e) and (f), the information described in subdivisions (a)(2) and (a)(4) of this section shall be provided to the minor, and the certification required by subdivision (a)(5) of this section shall be made by the minor.

"§ 90-21.86.  Procedure in case of medical emergency.

When a medical emergency compels the performance of an abortion, the physician shall inform the woman, before the abortion if possible, of the medical indications supporting the physician's judgment that an abortion is necessary to avert her death or that a 72-hour delay will create a serious risk of substantial and irreversible impairment of a major bodily function, not including psychological or emotional conditions. As soon as feasible, the physician shall document in writing the medical indications upon which the physician relied and shall cause the original of the writing to be maintained in the woman's medical records and a copy given to her.

"§ 90-21.87.  Informed consent for a minor.

If the woman upon whom an abortion is to be performed is an unemancipated minor, the voluntary and informed written consent required under G.S. 90-21.82 or G.S. 90-21.83A shall be obtained from the minor and from the adult individual who gives consent pursuant to G.S. 90-21.7(a).

"§ 90-21.88.  Civil remedies.

(a)    Any person upon whom an abortion has been ~~performed~~ performed, her personal representative in the event of a wrongful death action in accordance with G.S. 28A-18-1, and any father of an unborn child that was the subject of an abortion may maintain an action for damages against the person who performed the abortion in knowing or reckless violation of this Article. Any person upon whom an abortion has been attempted may maintain an action for damages against the person who performed the abortion in willful violation of this Article.

(a1)    Notwithstanding any other provision of law, (i) a woman upon whom the abortion has been attempted, induced, or performed or (ii) her parent or guardian, if she is a minor at the time of the attempted or completed abortion, may bring an action under this section within three years from the date of the alleged violation or from the date of the initial discovery of harm from an alleged violation. If at the time of the alleged violation the woman is a minor, then the minor shall have three years from the date the minor attains the age of majority to bring an action under this section.

(b)    Injunctive relief against any person who has willfully violated this Article may be sought by and granted to (i) the woman upon whom an abortion was performed or attempted to

be performed in violation of this Article, (ii) any person who is the spouse, parent, sibling, or guardian of, or a current or former licensed health care provider of, the woman upon whom an abortion has been performed or attempted to be performed in violation of this Article, or (iii) the Attorney General. The injunction shall prevent the abortion provider from performing or inducing further abortions in this State in violation of this Article.

(c) If judgment is rendered in favor of the plaintiff in any action authorized under this section, the court shall also tax as part of the costs reasonable attorneys' fees in favor of the plaintiff against the defendant. If judgment is rendered in favor of the defendant and the court finds that the plaintiff's suit was frivolous or brought in bad faith, then the court shall tax as part of the costs reasonable attorneys' fees in favor of the defendant against the plaintiff.

"**§ 90-21.88A.  Violation of this Article.**

A physician who violates any provision of this Article shall be subject to discipline by the North Carolina Medical Board under G.S. 90-14(a)(2) and any other applicable law or rule. Any licensed pharmacist who violates any provision of this Article shall be subject to discipline by the North Carolina Board of Pharmacy under Article 4A of this Chapter. Any other licensed health care provider who violates any provision of this Article shall be subject to discipline under their respective licensing agency or board. No pregnant woman seeking to obtain an abortion in accordance with this Article shall be subject to professional discipline for attempting to do so.

"**§ 90-21.89.  Protection of privacy in court proceedings.**

In every proceeding or action brought under this Article, the court shall rule whether the anonymity of any woman upon whom an abortion has been performed or attempted shall be preserved from public disclosure if she does not give her consent to the disclosure. The court, upon motion or sua sponte, shall make the ruling and, upon determining that her anonymity should be preserved, shall issue orders to the parties, witnesses, and counsel and shall direct the sealing of the record and exclusion of individuals from courtrooms or hearing rooms to the extent necessary to safeguard her identity from public disclosure. Each order issued pursuant to this section shall be accompanied by specific written findings explaining (i) why the anonymity of the woman should be preserved from public disclosure, (ii) why the order is essential to that end, (iii) how the order is narrowly tailored to serve that interest, and (iv) why no reasonable less restrictive alternative exists. In the absence of written consent of the woman upon whom an abortion has been performed or attempted, anyone who brings an action under G.S. 90-21.88 (a) or (b) shall do so under a pseudonym. This section may not be construed to conceal the identity of the plaintiff or of witnesses from the defendant.

"**§ 90-21.90.  Assurance of informed consent.**

(a) All information required to be provided under G.S. 90-21.82 and G.S. 90-21.83A to a woman considering abortion shall be presented to the woman individually ~~and, except for information that may be provided by telephone,~~ and in the physical presence of the woman and in a language the woman understands to ensure that the woman has adequate opportunity to ask questions and to ensure the woman is not the victim of a coerced abortion.

(b) Should a woman be unable to read the materials provided to the woman pursuant to this section, a physician or qualified professional shall read the materials to the woman in a language the woman understands before the abortion.

"**§ 90-21.91.  Assurance that consent is freely given.**

If a physician acting pursuant to this Article has reason to believe that a woman is being coerced into having an abortion, the physician or qualified professional shall inform the woman that services are available for the woman and shall provide the woman with private access to a telephone and information about, but not limited to, each of the following services:

      (1) Rape crisis centers.

      (2) Shelters for victims of domestic violence.

      (3) Restraining orders.

      (4) Pregnancy care centers.

"**§ 90-21.92.  Severability.**

If any one or more provision, section, subsection, sentence, clause, phrase, or word of this Article or the application thereof to any person or circumstance is found to be unconstitutional, the same is hereby declared to be severable, and the balance of this Article shall remain effective, notwithstanding such unconstitutionality. The General Assembly hereby declares that it would have passed this Article, and each provision, section, subsection, sentence, clause, phrase, or word thereof, irrespective of the fact that any one or more provision, section, subsection, sentence, clause, phrase, or word be declared unconstitutional.

"**§ 90-21.93.  Reporting requirements.**

(a)     Report. – After a surgical or medical abortion is performed, the physician or health care provider that conducted the surgical or medical abortion shall complete and transmit a report to the Department in compliance with the requirements of this section. The report shall be completed by either the hospital, clinic, or health care provider in which the surgical or medical abortion was completed and signed by the physician who dispensed, administered, prescribed, or otherwise provided the abortion-inducing drug or performed the procedure or treatment to the woman. Any physician or health care provider shall make reasonable efforts to include all of the required information in this section in the report without violating the privacy of the woman. The report shall be transmitted to the Department within 15 days after either the (i) date of the follow-up appointment following a medical abortion, (ii) date of the last patient encounter for treatment directly related to a surgical abortion, or (iii) end of the month in which the last scheduled appointment occurred, whichever is later. A report completed under this section for a minor shall be sent to the Department and the Division of Social Services within three days of the surgical or medical abortion.

(b)     Contents. – Each report completed in accordance with this section shall contain, at a minimum, all of the following:

(1)     Identifying information of the (i) physician who provided the abortion-inducing drug or performed the surgical abortion and (ii) referring physician, agency, or service, if applicable.

(2)     The location, date, and type of the surgical abortion, or the location of where any abortion-inducing drug was administered or dispensed, including any health care provider facility, at the home of the pregnant woman, or other location.

(3)     The woman's county, state, and country of residence; age; and race.

(4)     The woman's number of live births, previous pregnancies, and number of previous abortions.

(5)     The woman's preexisting medical conditions, which could complicate her pregnancy.

(6)     The probable gestational age of the unborn child, as determined by both patient history and ultrasound, and the date of the ultrasound used to estimate gestational age.

(7)     The abortion-inducing drugs used, and the date in which the abortion-inducing drugs were dispensed, administered, and used.

(8)     Whether the woman returned for the scheduled follow-up appointment or examination to determine the completion of the abortion procedure and to assess bleeding, the results of the follow-up appointment or examination, and the date of any follow-up appointment or examination of the abortion procedure.

(9)     The reasonable efforts of the physician to encourage the woman to attend the follow-up appointment or examination if the woman did not attend.

(10)    Any specific complications the woman suffered from the abortion procedure.

<span style="padding-left:2em;">(11)</span> The amount of money billed to cover the treatment for specific complications, including whether the treatment was billed to Medicaid, private insurance, private pay, or any other method, including ICD-10 diagnosis codes reported, any other codes reported, any charges for hospitals, emergency departments, physicians, prescriptions or other drugs, laboratory tests, and any other costs for treatment.

(c) Adverse Event from Abortion-Inducing Drug Report. – If a woman has an adverse event related to the administration, dispensing, or prescription of an abortion-inducing drug for the purpose of inducing an abortion, the physician who provided the abortion-inducing drug or the physician who diagnosed or treated the woman for the adverse event shall provide a written report of the adverse event within three days of the adverse event to the Food and Drug Administration through the MedWatch Reporting System and to the Department.

(d) Adverse Event or Complication from Abortion Procedure Report. – If a woman has an adverse event or complication related to a surgical abortion or abortion procedure, the physician or health care provider who performed the surgical abortion or abortion procedure or the physician who diagnosed or treated the woman for the adverse event or complication shall make a report of the adverse event or complication, including the diagnosis or treatment that was provided. A report under this subsection shall be transmitted to the Department within 15 days of the end of the month that the adverse event or complication occurred.

(e) Additional Report Contents. – In addition to the information in subsection (b) of this section, a report made under subsection (c) or (d) of this section shall contain all of the following information:

<span style="padding-left:2em;">(1)</span> The date the woman presented for treatment of the adverse event or complication.

<span style="padding-left:2em;">(2)</span> The specific complication that led to the treatment, including any physical or psychological conditions, which, in the reasonable medical judgment of a physician or health care provider, arose as a primary or secondary result of an induced abortion.

<span style="padding-left:2em;">(3)</span> Whether the woman obtained abortion-inducing drugs as a mail order or from an internet website, and, if so, information identifying the name of the source, website or URL address, and telemedicine provider.

(f) Departmental Reports. – The Department shall prepare a comprehensive annual statistical report based upon the data gathered from reports under this Article. The report shall be made available to the public in a downloadable format. On or before October 1, 2023, and each October 1 thereafter, the Department shall submit the report to the Joint Legislative Oversight Committee on Health and Human Services. The Department shall also submit data and the annual report to the Centers for Disease Control and Prevention for inclusion in the annual Vital Statistics Report. Original copies of reports shall be made available to the North Carolina Medical Board, the North Carolina Board of Pharmacy, State law enforcement offices, and the Division of Social Services for official use.

(g) Identifying Information. – A report completed under this section shall not contain the woman's name, any common identifiers of the woman, or any other information that would make it possible to identify the woman subject to a report under this section, including the woman's social security number or drivers license identification number. The Department and any State agency or any contractor thereof shall not maintain statistical information that may reveal the identity of a woman obtaining or seeking to obtain a surgical or medical abortion. Absent a court order, the Department and any State agency or any contractor thereof shall not compare data concerning surgical or medical abortions or resulting complications maintained in an electronic or other information system file or format with data in any other format or information system in an effort to identify a woman obtaining or seeking to obtain a drug-induced abortion.

(h)    Communication of Information. – The Department shall communicate the reporting requirements of this Article to all medical professional organizations, licensed physicians, hospitals, emergency departments, clinics certified to perform abortion services under this Article, other clinics and facilities that provide health care services, and any other health care facility in this State."

      **SECTION 1.3.**  Article 11 of Chapter 14 of the General Statutes is amended by adding a new section to read:

"**§ 14-44.1.  Providing or advertising abortion-inducing drugs to pregnant woman.**

(a)    Offense. – All of the following are unlawful:

      (1)    For any individual within the State, including a physician, an employee or contractor of a physician's office or clinic, or other abortion provider, or organization within the State, including a physician's office or clinic or other abortion provider, to mail, provide, or supply an abortion-inducing drug directly to a pregnant woman in violation of G.S. 90-21.83A(b)(2)a. Lack of knowledge or intent that the abortion-inducing drug will be administered outside the physical presence of a physician shall not be a defense to a violation of this subdivision.

      (2)    For any manufacturer or supplier of an abortion-inducing drug to ship or cause to be shipped any abortion-inducing drug directly to a pregnant woman in violation of G.S. 90-21.83A(b)(2)a. Lack of knowledge or intent that the abortion-inducing drug will be administered outside the physical presence of a physician shall not be a defense to a violation of this subdivision.

      (3)    For any individual or organization to purchase or otherwise procure an advertisement, host or maintain an internet website, or provide an internet service purposefully directed to a pregnant woman who is a resident of this State when the individual or organization knows that the purpose of the advertisement, website, or internet service is solely to promote the sale of an abortion-inducing drug to be administered to a woman in violation of G.S. 90-21.83A(b)(2)a.

(b)    Punishment. – An individual or organization who violates this section commits an infraction as defined in G.S. 14-3.1 and is subject to a fine of five thousand dollars ($5,000) per violation.

(c)    Definitions. – The following definitions apply in this section:

      (1)    Abortion-inducing drug. – As defined in G.S. 90-21.81(1a).

      (2)    Organization. – As defined in G.S. 15A-773(c)."

      **SECTION 1.4.(a)**  G.S. 90-21.120 reads as rewritten:

"**§ 90-21.120.  Definitions.**

The following definitions apply in this Article:

      (1)    Abortion. – As defined in ~~G.S. 90-21.81(1).~~G.S. 90-21.81.

      (2)    Attempt to perform an abortion. – As defined in ~~G.S. 90-21.81(2).~~G.S. 90-21.81.

      (3)    Woman. – As defined in ~~G.S. 90-21.81(11).~~G.S. 90-21.81."

      **SECTION 1.4.(b)**  G.S. 90-21.121 reads as rewritten:

"**§ 90-21.121.  ~~Sex-selective abortion~~ Eugenic abortions prohibited.**

(a)    Notwithstanding any of the provisions of ~~G.S. 14-45.1,~~ G.S. 90-21.81B, no person shall perform or attempt to perform an abortion upon a pregnant woman ~~in this State with knowledge, or an objective reason to know,~~ if the person has knowledge that ~~a significant factor in~~ the pregnant woman is seeking the ~~abortion is related to the~~ abortion, in whole or in part, because of any of the following:

      (1)    The actual or presumed race or racial makeup of the unborn child.

      (2)    The sex of the unborn child.

Case 1:23-cv-00077-WO-LPA   Document 73-3   Filed 06/02/23   Page 20 of 48

     (3)  The presence or presumed presence of Down syndrome.
…."
**SECTION 1.4.(c)** G.S. 90-21.6 reads as rewritten:
"**§ 90-21.6. Definitions.**
  For the purposes of Part 2 only of this Article, unless the context clearly requires otherwise:
     (1)  <u>Abortion. – As defined in G.S. 90-21.81.</u>
     (1a)  ~~"Unemancipated minor" or "minor" means any~~ <u>Unemancipated minor or minor. – Any</u> person under the age of 18 who has not been married or has not been emancipated pursuant to Article 35 of Chapter 7B of the General Statutes.
     ~~(2)  "Abortion" means the use or prescription of any instrument, medicine, drug, or any other substance or device with intent to terminate the pregnancy of a woman known to be pregnant, for reasons other than to save the life or preserve the health of an unborn child, to remove a dead unborn child, or to deliver an unborn child prematurely, by accepted medical procedures in order to preserve the health of both the mother and the unborn child."~~
  **SECTION 1.5.(a)** Section 1.3 of this Part becomes effective July 1, 2023, and applies to offenses committed on or after that date. The remainder of this Part becomes effective on July 1, 2023.
  **SECTION 1.5.(b)** Prosecutions for offenses committed before the effective date of this Part are not abated or affected by this Part, and the statutes that would be applicable but for this Part remain applicable to those prosecutions.

**PART II. SUITABLE FACILITIES FOR THE PERFORMANCE OF SURGICAL ABORTIONS**
  **SECTION 2.1.** Article 1I of Chapter 90 of the General Statutes is amended by adding a new section to read:
"<u>**§ 90-21.82A. Suitable facilities for the performance of surgical abortions.**</u>
  (a) <u>The following definitions apply in this section:</u>
     (1)  <u>Abortion clinic. – As defined in G.S. 131E-153.1.</u>
     (2)  <u>Ambulatory surgical facility. – As defined in G.S. 131E-176.</u>
     (3)  <u>Hospital. – As defined in G.S. 131E-176.</u>
  (b) <u>During the first 12 weeks of pregnancy, a physician licensed to practice medicine under this Chapter may perform a surgical abortion in a hospital, an ambulatory surgical facility, or an abortion clinic; provided, however, that (i) the clinic has been licensed by the Department of Health and Human Services to be a suitable facility for the performance of abortions and (ii) the licensed physician performs the abortion in accordance with this Article and Article 1K of this Chapter.</u>
  (c) <u>After the twelfth week of pregnancy, a physician licensed to practice medicine under this Chapter may not perform a surgical abortion as permitted under North Carolina law in any facility other than a hospital.</u>"
  **SECTION 2.2.** Article 6 of Chapter 131E of the General Statutes is amended by adding a new Part to read:
     "<u>Part 4A. Abortion Clinic Licensure.</u>
"<u>**§ 131E-153. Title; purpose.**</u>
  (a) <u>This Part shall be known as the "Abortion Clinic Licensure Act."</u>
  (b) <u>The purpose of this Part is to provide for the development, establishment, and enforcement of basic standards:</u>
     (1)  <u>For the care and treatment of individuals in abortion clinics; and</u>
     (2)  <u>For the maintenance and operation of abortion clinics so as to ensure safe and adequate treatment of such individuals in abortion clinics.</u>

"**§ 131E-153.1.  Definitions.**
   The following definitions apply in this Part, unless otherwise specified:
      (1)     Abortion clinic. – A freestanding facility, that is neither physically attached nor operated by a hospital, for the performance of abortions during the first 12 weeks of pregnancy.
      (2)     Commission. – The North Carolina Medical Care Commission.
      (3)     Operating room. – A room used for the performance of surgical procedures requiring one or more incisions and that is required to comply with all applicable licensure codes and standards for an operating room.

"**§ 131E-153.2.  Licensure requirement.**
   (a)     No person shall operate an abortion clinic without a license obtained from the Department.
   (b)     Applications shall be available from the Department, and each application filed with the Department shall contain all necessary and reasonable information that the Department may by rule require. A license shall be granted to the applicant upon a determination by the Department that the applicant has complied with the provisions of this Part and the rules adopted by the Commission under this Part. The Department shall charge the applicant a nonrefundable annual base license fee in the amount of eight hundred fifty dollars ($850.00) plus a nonrefundable annual per-operating room fee in the amount of seventy-five dollars ($75.00).
   (c)     A license to operate an abortion clinic shall be annually renewed upon the filing and the Department's approval of a renewal application. The renewal application shall be available from the Department and shall contain all necessary and reasonable information that the Department may by rule require.
   (d)     Each license shall be issued only for the premises and persons named in the application and shall not be transferable or assignable except with the written approval of the Department.
   (e)     Licenses shall be posted in a conspicuous place on the licensed premises.

"**§ 131E-153.3.  Fair billing and collections practices for abortion clinics.**
   All abortion clinics licensed under this Part shall be subject to the fair billing and collections practices set out in G.S. 131E-91.

"**§ 131E-153.4.  Adverse action on a license.**
   (a)     Subject to subsection (b) of this section, the Department is authorized to deny a new or renewal application for a license and to amend, recall, suspend, or revoke an existing license upon a determination that there has been a substantial failure to comply with the provisions of this Part or the rules adopted under this Part.
   (b)     Chapter 150B of the General Statutes, the Administrative Procedure Act, shall govern all administrative action and judicial review in cases where the Department has taken the action described in subsection (a) of this section.

"**§ 131E-153.5.  Rules and enforcement.**
   (a)     The Commission is authorized to adopt, amend, and repeal all rules necessary for the implementation of this Part. These rules shall be no stricter than those issued by the Commission under G.S. 131E-79 of the Ambulatory Surgical Facility Licensure Act.
   (b)     The Department shall enforce the rules adopted or amended by the Commission with respect to abortion clinics.

"**§ 131E-153.6.  Inspections.**
   (a)     The Department shall make or cause to be made inspections of abortion clinics as necessary. The Department is authorized to delegate to a State officer, agent, board, bureau, or division of State government the authority to make inspections according to the rules adopted by the Commission. The Department may revoke this delegated authority in its discretion.
   (b)     Notwithstanding the provisions of G.S. 8-53 or any other provision of law relating to the confidentiality of communications between physician and patient, the representatives of the

Department who make these inspections may review any writing or other record in any recording medium that pertains to the admission, discharge, medication, treatment, medical condition, or history of persons who are or have been patients of the facility being inspected unless that patient objects, in writing, to review of that patient's records. Physicians, psychologists, psychiatrists, nurses, and anyone else involved in giving treatment at or through a facility who may be interviewed by representatives of the Department may disclose to these representatives information related to an inquiry, notwithstanding the existence of the physician-patient privilege in G.S. 8-53 or any other rule of law; provided, however, that the patient has not made written objection to this disclosure. The facility, its employees, and any person interviewed during these inspections shall be immune from liability for damages resulting from the disclosure of any information to the Department. Any confidential or privileged information received from review of records or interviews shall be kept confidential by the Department and not disclosed without written authorization of the patient or legal representative, or unless disclosure is ordered by a court of competent jurisdiction. The Department shall institute appropriate policies and procedures to ensure that this information is not disclosed without authorization or court order. The Department shall not disclose the name of anyone who has furnished information concerning a facility without the consent of that person. Neither the names of persons furnishing information nor any confidential or privileged information obtained from records or interviews shall be considered "public records" within the meaning of G.S. 132-1. Prior to releasing any information or allowing any inspections referred to in this section, the patient must be advised in writing by the facility that the patient has the right to object, in writing, to this release of information or review of the records and that by objecting, in writing, the patient may prohibit the inspection or release of the records.

"**§ 131E-153.7.  Penalties.**

A person who owns in whole or in part or operates an abortion clinic without a license is guilty of a Class 3 misdemeanor and upon conviction will be subject only to a fine of not more than fifty dollars ($50.00) for the first offense and not more than five hundred dollars ($500.00) for each subsequent offense. Each day of continuing violation after conviction is considered a separate offense.

"**§ 131E-153.8.  Injunction.**

(a) Notwithstanding the existence or pursuit of any other remedy, the Department may, in the manner provided by law, maintain an action in the name of the State for injunction or other process against any person or governmental unit to restrain or prevent the establishment, conduct, management, or operation of an abortion clinic without a license.

(b) If any person shall hinder the proper performance of duty of the Secretary or a representative in carrying out the provisions of this Part, the Secretary may institute an action in the superior court of the county in which the hindrance occurred for injunctive relief against the continued hindrance, irrespective of all other remedies at law.

(c) Actions under this section shall be in accordance with Article 37 of Chapter 1 of the General Statutes and Rule 65 of the Rules of Civil Procedure."

**SECTION 2.3.**  G.S. 131E-272 reads as rewritten:

"**§ 131E-272.  Initial licensure fees for new facilities.**

The following fees are initial licensure fees for new facilities and are applicable as follows:

| Facility Type | Number of Beds | Initial License Fee | Initial Bed Fee |
|---|---|---|---|
| Adult Care Licensure | More than 6 | $400.00 | $19.00 |
| | 6 or Fewer | $350.00 | $ - |
| Acute and Home Care | | | |
| General Acute Hospitals | 1-49 | $550.00 | $19.00 |
| | 50-99 | $750.00 | $19.00 |
| | 100-199 | $950.00 | $19.00 |

| | | | |
|---|---|---|---|
| | 200-399 | $1150.00 | $19.00 |
| | 400-699 | $1550.00 | $19.00 |
| | 700+ | $1950.00 | $19.00 |
| Other Hospitals | | $1050.00 | $19.00 |
| | | | |
| Home Care | - | $560.00 | $ - |
| Ambulatory Surgical Ctrs. | - | $900.00 | $85.00 |
| Hospice (Free Standing) | - | $450.00 | $ - |
| Abortion Clinics | - | ~~$750.00~~$850.00 | $ - |
| Cardiac Rehab. Centers | - | $425.00 | $ - |
| | | | |
| Nursing Home & L&C | | | |
| Nursing Homes | | $470.00 | $19.00 |
| All Others | | $ - | $19.00 |
| | | | |
| Mental Health Facilities | | | |
| Nonresidential | | $265.00 | $ - |
| Non ICF/IID | 6 or fewer | $350.00 | $ - |
| ICF/IID only | 6 or fewer | $900.00 | $ - |
| Non ICF/IID | More than 6 | $525.00 | $19.00 |
| ICF/IID only | More than 6 | $850.00 | $19.00." |

**SECTION 2.4.**  No later than October 1, 2023, the Department of Health and Human Services shall adopt the rules necessary to administer this Part.

**SECTION 2.5.**  Section 2.4 of this Part becomes effective July 1, 2023. The remainder of this Part becomes effective on October 1, 2023.

## PART III. BORN-ALIVE ABORTION SURVIVORS PROTECTION

**SECTION 3.(a)**  Chapter 90 of the General Statutes is amended by adding a new Article to read:

"Article 1M.

"Born-Alive Abortion Survivors Protection Act.

"§ 90-21.140.  Definitions.

As used in this Article, the following definitions apply:

(1)  Abortion. – As defined in G.S. 90-21.81.

(2)  Attempt to perform an abortion. – As defined in G.S. 90-21.81.

(3)  Born alive. – With respect to a member of the species Homo sapiens, this term means the complete expulsion or extraction from his or her mother of that member, at any stage of development, who after such expulsion or extraction breathes or has a beating heart, pulsation of the umbilical cord, or definite movement of voluntary muscles, regardless of whether the umbilical cord has been cut, and regardless of whether the expulsion or extraction occurs as a result of natural or induced labor, cesarean section, or induced abortion.

"§ 90-21.141.  Findings.

The General Assembly makes the following findings:

(1)  If an abortion results in the live birth of an infant, the infant is a legal person for all purposes under the laws of North Carolina and entitled to all the protections of such laws.

(2)  Any infant born alive after an abortion or within a hospital, clinic, or other facility has the same claim to the protection of the law that would arise for any newborn, or for any person who comes to a hospital, clinic, or other facility for screening and treatment or otherwise becomes a patient within its care.

Case 1:23-cv-00077-WO-LPA   Document 73-3   Filed 06/02/23   Page 24 of 48

"**§ 90-21.142.  Requirements for health care practitioners.**
     In the case of an abortion or an attempt to perform an abortion that results in a child born alive, any health care practitioner present at the time the child is born alive shall do all of the following:
          (1)     Exercise the same degree of professional skill, care, and diligence to preserve the life and health of the child as a reasonably diligent and conscientious health care practitioner would render to any other child born alive at the same gestational age.
          (2)     Following the exercise of skill, care, and diligence required under subdivision (1) of this section, ensure that the child born alive is immediately transported and admitted to a hospital.
"**§ 90-21.143.  Mandatory reporting of noncompliance.**
     A health care practitioner or any employee of a hospital, a physician's office, or an abortion clinic who has knowledge of a failure to comply with the requirements of G.S. 90-21.142 shall immediately report the failure to comply to an appropriate State or federal law enforcement agency, or both.
"**§ 90-21.144.  Bar to prosecution of mothers of infants born alive.**
     The mother of a child born alive may not be prosecuted for a violation of, or attempt to or conspiracy to commit a violation of, G.S. 90-21.142 or G.S. 90-21.143 involving the child who was born alive.
"**§ 90-21.145.  Penalties.**
     (a)     In General. – Except as provided in subsection (b) of this section, unless the conduct is covered under some other provision of law providing greater punishment, a person who violates G.S. 90-21.142 or G.S. 90-21.143 is guilty of a Class D felony, which shall include a fine of not more than two hundred fifty thousand dollars ($250,000).
     (b)     Unlawful Killing of Child Born Alive. – Any person who intentionally performs or attempts to perform an overt act that kills a child born alive shall be punished as under G.S. 14-17(c) for murder.
"**§ 90-21.146.  Civil remedies; attorneys' fees.**
     (a)     Civil Remedies. – If a child is born alive and there is a violation of this Article, a claim for damages against any person who has violated a provision of this Article may be sought by the woman upon whom an abortion was performed or attempted in violation of this Article. A claim for damages may include any one or more of the following:
          (1)     Objectively verifiable money damage for all injuries, psychological and physical, occasioned by the violation of this Article.
          (2)     Statutory damages equal to three times the cost of the abortion or attempted abortion.
          (3)     Punitive damages pursuant to Chapter 1D of the General Statutes.
     (b)     Attorneys' Fees. – If judgment is rendered in favor of the plaintiff in any action authorized under this section, the court shall also tax as part of the costs reasonable attorneys' fees in favor of the plaintiff against the defendant. If judgment is rendered in favor of the defendant and the court finds that the plaintiff's suit was frivolous or brought in bad faith, then the court shall tax as part of the costs reasonable attorneys' fees in favor of the defendant against the plaintiff."
     **SECTION 3.(b)**  G.S. 14-17(c) reads as rewritten:
     "(c)     For the purposes of this section, it shall constitute murder where a child is born alive but (i) dies as a result of injuries inflicted prior to the child being born ~~alive.~~ alive or (ii) dies as a result of an intentional, overt act performed after the child is born alive. The degree of murder shall be determined as described in subsections (a) and (b) of this section."

Case 1:23-cv-00077-WO-LPA    Document 73-3    Filed 06/02/23    Page 25 of 48

SECTION 3.(c)  Prosecutions for offenses committed before the effective date of this section are not abated or affected by this section, and the statutes that would be applicable but for this section remain applicable to those prosecutions.

SECTION 3.(d)  This section becomes effective July 1, 2023, and applies to offenses committed on or after that date.

## PART IV. REFORMS TO REDUCE INFANT AND MATERNAL MORTALITY AND MORBIDITY AND INCREASE ACCESS TO CONTRACEPTIVES

SECTION 4.1.  Effective July 1, 2023, there is appropriated from the General Fund to the Department of Health and Human Services, Division of Public Health, the sum of three million five hundred thousand dollars ($3,500,000) in recurring funds for each year of the 2023-2025 fiscal biennium to be used to award grants on a competitive basis to local health departments and nonprofit community health centers. Nonprofit community health centers selected to receive these grant funds shall use the funds to purchase and make available long-acting reversible contraceptives for underserved, uninsured, or medically indigent patients. As used in this section, the term "long-acting reversible contraceptives" means a contraceptive drug or device that meets all of the following criteria:

(1)     Is a method of birth control that provides effective contraception for an extended period of time without depending upon user action.
(2)     Is designed as a temporary method of birth control that the user can elect to discontinue.
(3)     Has been approved by the United States Food and Drug Administration for use as a contraceptive.
(4)     Is obtained under a prescription written by a health care provider authorized to prescribe medications under the laws of this State.

SECTION 4.2.(a)  The Department of Health and Human Services, Division of Health Benefits (DHB), shall increase to at least seventy-one percent (71%) of the Medicare rate the Medicaid rate paid for obstetrics maternal bundle payments for pregnancy care. This rate increase shall be implemented as soon as practicable.

SECTION 4.2.(b)  In order to incentivize the use of group prenatal care visits by Medicaid beneficiaries, DHB shall develop an add-on rate to the relevant capitated rates or payments that include prenatal care services. This add-on rate shall include amounts sufficient to make payments to providers that achieve a level of Medicaid beneficiary participation in group prenatal care visits. DHHS shall determine the level of patient participation required for a provider to receive these provider payments. These provider payments may be used by a provider to establish incentives for Medicaid beneficiary patients to attend group prenatal care visits. This rate increase shall be implemented as soon as practicable.

SECTION 4.2.(c)  Effective July 1, 2023, there is appropriated from the General Fund to the Department of Health and Human Services, Division of Health Benefits, the sum of two million eight hundred thousand dollars ($2,800,000) in recuring funds for each year of the 2023-2025 fiscal biennium to implement the Medicaid-related changes outlined in this section. These funds shall provide a State match for five million five hundred thousand dollars ($5,500,000) in recurring federal funds for each year of the 2023-2025 fiscal biennium, and those federal funds are appropriated to the Division of Health Benefits to pay for costs associated with the Medicaid-related changes outlined in this section.

SECTION 4.3.(a)  Article 1 of Chapter 90 of the General Statutes is amended by adding the following new section to read:
"**§ 90-18.8.  Limitations on nurse-midwives.**

(a)     Any Certified Nurse Midwife approved under the provisions of Article 10A of this Chapter to provide midwifery care may use the title "Certified Nurse Midwife." Any other person

who uses the title in any form or holds himself or herself out to be a Certified Nurse Midwife or to be so approved shall be deemed to be in violation of this Article.

(b)     A Certified Nurse Midwife is authorized to write prescriptions for drugs if all of the following conditions are met:

(1)     The Certified Nurse Midwife has current approval from the joint subcommittee established under G.S. 90-178.4.

(2)     The joint subcommittee as established under G.S. 90-178.4 has assigned an identification number to the Certified Nurse Midwife that appears on the written prescription.

(3)     The joint subcommittee as established under G.S. 90-178.4 has provided to the Certified Nurse Midwife written instructions about indications and contraindications for prescribing drugs and a written policy for periodic review of the drugs prescribed.

(c)     The joint subcommittee of the North Carolina Medical Board and the Board of Nursing, established under G.S. 90-178.4, shall adopt rules governing the approval of individual Certified Nurse Midwives to write prescriptions with any limitations the joint subcommittee deems are in the best interest of patient health and safety, consistent with the rules established for nurse practitioners under G.S. 90-18.2(b)(1)."

**SECTION 4.3.(b)**  G.S. 90-178.2 reads as rewritten:

"**§ 90-178.2.  Definitions.**

~~As used in this Article:~~The following definitions apply in this Article:

(1)     Certified Nurse Midwife. – A nurse licensed and registered under Article 9A of this Chapter who has completed a midwifery education program accredited by the Accreditation Commission for Midwifery Education, or its successor, passed a national certification examination administered by the American Midwifery Certification Board, or its successor, and has received the professional designation of "Certified Nurse Midwife" (CNM). Certified Nurse Midwives practice in accordance with the Core Competencies for Basic Midwifery Practice, the Standards for the Practice of Midwifery, the Philosophy of the American College of Nurse-Midwives (ACNM), and the Code of Ethics promulgated by the ACNM.

(1a)    Collaborating provider. – A physician licensed to practice medicine under Article 1 of this Chapter for a minimum of four years and has a minimum of 8,000 hours of practice and who is or has engaged in the practice of obstetrics or a Certified Nurse Midwife who has been approved to practice midwifery under this Article for a minimum of four years and 8,000 hours.

(1b)    Collaborative provider agreement. – A formal, written agreement between a collaborating provider and a Certified Nurse Midwife with less than 24 months and 4,000 hours of practice as a Certified Nurse Midwife to provide consultation and collaborative assistance or guidance.

~~(2)~~(1c)    "Interconceptional care" ~~includes~~ includes, but is not limited ~~to:~~to, the following:

a.      ~~Family planning:~~Gynecologic care, including family planning, perimenopause, and postmenopause care.

b.      Screening for cancer of the breast and reproductive ~~tract;~~tract.

c.      Screening for and management of minor infections of the reproductive ~~organs:~~organs.

~~(3)~~(2)    ~~"Intrapartum care" includes but~~ Intrapartum care. – Care that focuses on the facilitation of the physiologic birth process and includes, but is not limited ~~to:~~to, the following:

Case 1:23-cv-00077-WO-LPA   Document 73-3   Filed 06/02/23   Page 27 of 48

  a. ~~Attending women in uncomplicated labor;~~<u>Confirmation and assessment of labor and its progress.</u>

  b. ~~Assisting with spontaneous delivery of infants in vertex presentation from 37 to 42 weeks gestation;~~<u>Identification of normal and deviations from normal and appropriate interventions, including management of complications, abnormal intrapartum events, and emergencies.</u>

  <u>b1.</u> <u>Management of spontaneous vaginal birth and appropriate third-stage management, including the use of uterotonics.</u>

  c. Performing ~~amniotomy;~~<u>amniotomy.</u>

  d. Administering local ~~anesthesia;~~<u>anesthesia.</u>

  e. Performing episiotomy and ~~repair; and~~<u>repair.</u>

  f. Repairing lacerations associated with childbirth.

~~(4)~~<u>(3)</u> ~~"Midwifery" means the~~ <u>Midwifery. – The</u> act of providing prenatal, intrapartum, postpartum, newborn and interconceptional care. The term does not include the practice of medicine by a physician licensed to practice medicine when engaged in the practice of medicine as defined by law, the performance of medical acts by a physician assistant or nurse practitioner when performed in accordance with the rules of the North Carolina Medical Board, the practice of nursing by a registered nurse engaged in the practice of nursing as defined by ~~law, or the rendering of childbirth assistance in an emergency situation.~~<u>law, or the performance of abortion, as defined in G.S. 90-21.81.</u>

~~(5)~~<u>(4)</u> ~~"Newborn care" includes~~ <u>Newborn care. – Care that focuses on the newborn and includes,</u> but is not limited ~~to:~~<u>to, the following:</u>

  a. Routine assistance to the newborn to establish respiration and maintain thermal ~~stability;~~<u>stability.</u>

  b. Routine physical assessment including APGAR ~~scoring;~~<u>scoring.</u>

  c. Vitamin K ~~administration; and~~<u>administration.</u>

  d. Eye prophylaxis for opthalmia neonatorum.

  <u>e.</u> <u>Methods to facilitate newborn adaptation to extrauterine life, including stabilization, resuscitation, and emergency management as indicated.</u>

~~(6)~~<u>(5)</u> ~~"Postpartum care" includes~~ <u>Postpartum care. – Care that focuses on management strategies and therapeutics to facilitate a healthy puerperium and includes,</u> but is not limited ~~to:~~<u>to, the following:</u>

  a. Management of the normal third stage of ~~labor;~~<u>labor.</u>

  b. Administration of ~~pitocin and methergine~~ <u>uterotonics</u> after delivery of the infant when ~~indicated; and~~<u>indicated.</u>

  c. Six weeks postpartum evaluation exam and initiation of family planning.

  <u>d.</u> <u>Management of deviations from normal and appropriate interventions, including management of complications and emergencies.</u>

~~(7)~~<u>(6)</u> ~~"Prenatal care" includes~~ <u>Prenatal care. – Care that focuses on promotion of normal pregnancy using management strategies and therapeutics as indicated and includes,</u> but is not limited ~~to:~~<u>to, the following:</u>

  a. ~~Historical and physical assessment;~~<u>Obtaining history with ongoing physical assessment of mother and fetus.</u>

  b. Obtaining and assessing the results of routine laboratory ~~tests; and~~<u>tests.</u>

  <u>b1.</u> <u>Confirmation and dating of pregnancy.</u>

        c.      Supervising the use of <u>prescription and nonprescription medications,</u> <u>such as</u> prenatal vitamins, folic acid, ~~iron, and nonprescription medicines.~~<u>and iron.</u>"

      **SECTION 4.3.(c)** G.S. 90-178.3 reads as rewritten:

"**§ 90-178.3. Regulation of midwifery.**

    (a)      No person shall practice or offer to practice or hold oneself out to practice midwifery unless approved ~~pursuant to~~ <u>under</u> this Article.

    (b)      A ~~person~~ <u>Certified Nurse Midwife</u> approved ~~pursuant to~~ <u>under</u> this Article may practice midwifery in a hospital or non-hospital ~~setting and~~ <u>setting. The Certified Nurse Midwife</u> shall ~~practice under the supervision of a physician licensed to practice medicine who is actively engaged in the practice of obstetrics.~~ <u>consult, collaborate with, or refer to other providers licensed under this Article, if indicated by the health status of the patient. A</u> ~~registered nurse~~ <u>Certified Nurse Midwife</u> approved ~~pursuant to~~ <u>under</u> this Article is authorized to write prescriptions for drugs in accordance with ~~the same conditions applicable to a nurse practitioner under G.S. 90-18.2(b).~~<u>G.S. 90-18.8(b).</u>

    <u>(b1)    A Certified Nurse Midwife with less than 24 months and 4,000 hours of practice as a Certified Nurse Midwife shall (i) have a collaborative provider agreement with a collaborating provider and (ii) maintain signed and dated copies of the collaborative provider agreement as required by practice guidelines and any rules adopted by the joint subcommittee of the North Carolina Medical Board and the Board of Nursing. If a collaborative provider agreement is terminated before the Certified Nurse Midwife acquires the level of experience required for practice without a collaborative provider agreement under this Article, the Certified Nurse Midwife shall have 90 days from the date the agreement is terminated to enter into a collaborative provider agreement with a new collaborating provider. During the 90-day period, the Certified Nurse Midwife may continue to practice midwifery as defined under this Article.</u>

    (c)      Graduate nurse midwife applicant status may be granted by the joint subcommittee in accordance with G.S. 90-178.4."

      **SECTION 4.3.(d)** G.S. 90-178.4 is amended by adding the following new subsections to read:

"<u>(a1)    Any Certified Nurse Midwife who attends a planned birth outside of a hospital setting shall discuss with the patient the associated risks and obtain a signed informed consent agreement from the Certified Nurse Midwife's patient that shall include:</u>

        <u>(1)    Information about the risks associated with a planned birth outside of the hospital.</u>

        <u>(2)    A clear assumption of those risks by the patient.</u>

        <u>(3)    An agreement by the patient to consent to transfer to a health care facility when and if deemed necessary by the Certified Nurse Midwife.</u>

        <u>(4)    If the Certified Nurse Midwife is not covered under a policy of liability insurance, a clear disclosure to that effect.</u>

        <u>(5)    The joint subcommittee shall develop the contents of an informed consent agreement form to be used by a Certified Nurse Midwife when obtaining informed consent.</u>

    <u>(a2)    Any Certified Nurse Midwife who attends a planned birth outside of a hospital setting shall provide to each patient a detailed, written plan for emergent and nonemergent transfer, which shall include:</u>

        <u>(1)    The name of and distance to the nearest health care facility licensed under Chapter 122C or Chapter 131E of the General Statutes that has at least one operating room.</u>

        <u>(2)    The procedures for transfer, including modes of transportation and methods for notifying the relevant health care facility of impending transfer.</u>

Case 1:23-cv-00077-WO-LPA   Document 73-3   Filed 06/02/23   Page 29 of 48

(3)    An affirmation that the relevant health care facility has been notified of the plan for emergent and nonemergent transfer by the Certified Nurse Midwife.

(a3)    Planned home births attended by a Certified Nurse Midwife shall be limited to low-risk pregnancies. Pregnancies deemed inadvisable for home births by the American College of Obstetricians and Gynecologists Committee on Obstetric Practice shall be prohibited. The joint subcommittee of the North Carolina Medical Board and the Board of Nursing created under G.S. 90-18.2 shall adopt rules governing the safety of home births attended by a Certified Nurse Midwife."

**SECTION 4.3.(e)**  G.S. 90-178.4(b) reads as rewritten:

"(b)    The joint subcommittee shall adopt rules ~~pursuant to~~ under this Article to ~~establish:~~establish each of the following:

(1)    A fee which shall cover application and initial approval up to a maximum of one hundred dollars ~~($100.00);~~($100.00).

(2)    An annual renewal fee to be paid by January 1 of each year by persons approved ~~pursuant to~~ under this Article up to a maximum of fifty dollars ~~($50.00);~~($50.00).

(3)    A reinstatement fee for a lapsed approval up to a maximum of five dollars ~~($5.00);~~($5.00).

(4)    The form and contents of the applications which shall include information related to the applicant's education and certification by the ~~American College of Nurse Midwives; and~~American Midwifery Certification Board.

(5)    The procedure for establishing ~~physician supervision~~collaborative provider agreements as required by this Article."

**SECTION 4.3.(f)**  G.S. 90-178.5 reads as rewritten:

"**§ 90-178.5.  Qualifications for ~~approval.~~approval; independent practice.**

(a)    In order to be approved by the joint subcommittee ~~pursuant to~~ under this Article, a person ~~shall:~~shall comply with each of the following:

(1)    Complete an application on a form furnished by the joint ~~subcommittee;~~subcommittee.

(2)    Submit evidence of certification by the ~~American College of Nurse Midwives;~~American Midwifery Certification Board or its successor.

(3)    Submit evidence of ~~arrangements for physician supervision; and~~a collaborative provider agreement as required by G.S. 90-178.3(b1).

(4)    Pay the fee for application and approval.

(b)    Upon submitting to the joint subcommittee evidence of completing 24 months and 4,000 hours of practice as a Certified Nurse Midwife pursuant to a collaborative provider agreement, a Certified Nurse Midwife is authorized to practice midwifery independently in accordance with this Article."

**SECTION 4.3.(g)**  G.S. 90-178.7 reads as rewritten:

"**§ 90-178.7.  Enforcement.**

(a)    The joint subcommittee may apply to the Superior Court of Wake County to restrain any violation of this Article.

(b)    ~~Any person who violates G.S. 90-178.3(a) shall be guilty of a Class 3 misdemeanor.~~No person shall perform any act constituting the practice of midwifery, as defined in this Article, or any of the branches thereof, unless the person shall have been first approved under this Article. Any person who practices midwifery without being duly approved and registered, as provided in this Article, shall not be allowed to maintain any action to collect any fee for such services. Any person so practicing without being duly approved shall be guilty of a Class 3 misdemeanor. Any person so practicing without being duly approved under this Article and who is falsely representing himself or herself in a manner as being approved under this Article or any Article of this Chapter shall be guilty of a Class I felony."

SECTION 4.3.(h)  Article 10A of Chapter 90 of the General Statutes is amended by adding the following new section to read:
"**§ 90-178.8.  Limit vicarious liability.**

(a)      No physician or physician assistant, including the physician assistant's employing or supervising physician, licensed under Article 1 of this Chapter or nurse licensed under Article 9A of this Chapter shall be held liable for any civil damages as a result of the medical care or treatment provided by the physician, physician assistant, or nurse when both of the following occur:

(1)      The physician, physician assistant, or nurse is providing medical care or treatment to a woman or infant in an emergency situation.

(2)      The emergency situation arises during the delivery or birth of the infant as a consequence of the care provided by a Certified Nurse Midwife approved under this Article who attends a planned birth outside of a hospital setting.

(b)      No health care facility licensed under Chapter 122C or Chapter 131E of the General Statutes shall be held liable for civil damages as a result of the medical care or treatment provided by the facility when both of the following occur:

(1)      The facility is providing medical care or treatment to a woman or infant in an emergency situation.

(2)      The emergency situation arises during the delivery or birth of the infant as a consequence of the care provided by a Certified Nurse Midwife approved under this Article who attends a planned birth outside of a hospital setting.

(b1)    Notwithstanding the provisions of subsections (a) and (b) of this section, health care providers and health care facilities shall remain liable for their own independent acts of negligence.

(c)      Nothing in this section shall be construed to limit liability when the civil damages to this section are the result of gross negligence or willful or wanton misconduct."

SECTION 4.3.(i)  This section becomes effective October 1, 2023.

SECTION 4.4.(a)  There is appropriated from the General Fund to the Department of Health and Human Services, Division of Public Health, the sum of two hundred fifty thousand dollars ($250,000) in nonrecurring funds for the 2023-2024 fiscal year and the sum of two hundred fifty thousand dollars ($250,000) in nonrecurring funds for the 2024-2025 fiscal year to fund expansion of the Safe Sleep North Carolina Campaign administered by the University of North Carolina Collaborative for Maternal and Infant Health, with the goal of strengthening the adoption of infant safe sleep practices across the State that reduce the risk of Sudden Infant Death Syndrome (SIDS) and other infant sleep-related deaths.

SECTION 4.4.(b)  This section becomes effective July 1, 2023.

**PART V. PAID PARENTAL LEAVE FOR STATE EMPLOYEES**

SECTION 5.1.(a)  Article 2 of Chapter 126 of the General Statutes is amended by adding a new section to read:
"**§ 126-8.6.  Paid parental leave.**

(a)      Definitions. – The following definitions apply in this section:

(1)      Child. – A newborn biological child or a newly placed adopted, foster, or otherwise legally placed child under the age of 18 whose parent is a State employee eligible for leave under subsection (b) of this section.

(2)      Parent. – Includes a parent by adoption, foster care, or another legal placement.

(3)      Qualifying event. – When a State employee becomes a parent to a child.

(b)      Paid Parental Leave. – The State Human Resources Commission shall adopt rules and policies to provide that a permanent, full-time State employee may take the following paid parental leave:

Case 1:23-cv-00077-WO-LPA   Document 73-3   Filed 06/02/23   Page 31 of 48

(1) Up to eight weeks of paid leave after giving birth to a child; or
(2) Up to four weeks of paid leave after any other qualifying event.
(c) Part-Time Employees. – The State Human Resources Commission shall adopt rules and policies to provide that a permanent, part-time State employee may take a prorated amount of paid leave after giving birth, not to exceed four weeks, or paid leave after any other qualifying event, not to exceed two weeks, in addition to any other leave available to the employee.
(d) Requirements. – The paid parental leave authorized by this section:
(1) Is available without exhaustion of the employee's sick and vacation leave and is awarded in addition to shared leave under G.S. 126-8.3, or other leave authorized by State or federal law.
(2) Has no cash value upon termination from employment.
(3) May not be used for calculating an employee's retirement benefits.
(e) The provisions of this section shall apply to employees of State agencies, departments, and institutions, including The University of North Carolina; to public school employees; and to community college employees. The appropriate governing board, officer, or entity shall adopt rules and policies to award paid parental leave to employees that are substantially equivalent to those adopted by the State Human Resources Commission."

**SECTION 5.1.(b)**  G.S. 126-5 is amended by adding a new subsection to read:
"(c19) The provisions of G.S. 126-8.6 shall apply to all exempt and nonexempt State employees in the executive branch; to public school employees; and to community college employees. The legislative and judicial branches shall adopt parental leave policies."

**SECTION 5.1.(c)**  G.S. 115C-302.1(j) reads as rewritten:
"(j) Parental Leave. – A In addition to paid parental leave authorized by G.S. 126-8.6, a teacher may use annual leave, personal leave, or leave without pay to care for a newborn child or for a child placed with the teacher for adoption or foster care. A teacher may also use up to 30 days of sick leave to care for a child placed with the teacher for adoption. The leave may be for consecutive workdays during the first 12 months after the date of birth or placement of the child, unless the teacher and local board of education agree otherwise."

**SECTION 5.1.(d)**  G.S. 115C-336.1 reads as rewritten:
"**§ 115C-336.1.  Parental leave.**
A In addition to paid parental leave authorized by G.S. 126-8.6, a school employee may use annual leave or leave without pay to care for a newborn child or for a child placed with the employee for adoption or foster care. A school employee may also use up to 30 days of sick leave to care for a child placed with the employee for adoption. The leave may be for consecutive workdays during the first 12 months after the date of birth or placement of the child, unless the school employee and the local board of education agree otherwise."

**SECTION 5.1.(e)**  There is appropriated from the General Fund to the Department of Public Instruction the sum of ten million dollars ($10,000,000) in recurring funds for the 2023-2024 fiscal year and the sum of ten million dollars ($10,000,000) in recurring funds for the 2024-2025 fiscal year to fund paid parental leave authorized by this section.

**SECTION 5.1.(f)**  This Part becomes effective July 1, 2023, and applies to requests for paid parental leave related to births occurring on or after that date.

# PART VI. CHILD PERMANENCY, SAFE SURRENDER OF INFANTS, FOSTER CARE, ADOPTION, AND SUPPORT FOR NEW MOTHERS

**SECTION 6.1.**  There is appropriated from the General Fund the sum of seven hundred thousand dollars ($700,000) in recurring funds for each year of the 2023-2025 fiscal biennium to the Department of Health and Human Services to be allocated to the State Maternity Home Fund.

**SECTION 6.2.(a)**  Chapter 7B of the General Statutes is amended by adding a new Article to read:

Case 1:23-cv-00077-WO-LPA   Document 73-3   Filed 06/02/23   Page 32 of 48

"Article 5A.
"Safe Surrender of Infants.
"**§ 7B-520.  Purpose; limitations.**
    (a)    Purpose. – The purpose of this Article is to protect newborn infants by providing a safe alternative for a parent who, in a crisis or in desperation, may physically abandon or harm his or her newborn and to provide information for the parent regarding the parent's rights and alternatives.

    (b)    Limitations. – The provisions of this Article apply exclusively to safely surrendered infants as defined in G.S. 7B-101(19a). No person or agency shall act under the provisions of this Article if it is determined that any of the following are true:

        (1)    A surrendered infant is reasonably believed to be more than 30 days old.

        (2)    The infant shows signs of abuse or neglect.

        (3)    There is reason to believe the individual surrendering the infant was not the infant's parent.

        (4)    At the time the infant was surrendered, there was reason to believe the parent intended to return for the infant.

"**§ 7B-521.  Persons to whom infant may be surrendered.**
    The following individuals shall, without a court order, take into temporary custody an infant reasonably believed to be not more than 30 days of age that is voluntarily delivered to the individual by the infant's parent who does not express an intent to return for the infant:

        (1)    A health care provider, as defined under G.S. 90-21.11, who is on duty or at a hospital or at a local or district health department or at a nonprofit community health center.

        (2)    A first responder, including a law enforcement officer, a certified emergency medical services worker, or a firefighter.

        (3)    A social services worker who is on duty or at a local department of social services.

"**§ 7B-522.  Duties of person taking safely surrendered infant into temporary custody.**
    An individual who takes an infant into temporary custody under G.S. 7B-521 shall perform any act necessary to protect the physical health and well-being of the infant and immediately notify the department of social services in the county where the infant is surrendered. The individual may inquire as to the parents' identities, the date of birth of the infant, any relevant medical history, and the parents' marital status and may advise the parent that if the parent provides that information, it may facilitate the adoption of the child. However, the individual shall notify the parent that the parent is not required to provide the information. The individual, if practical, shall provide the surrendering parent with written information created by the Department of Health and Human Services, Division of Social Services, as set forth in G.S. 7B-528.

"**§ 7B-523.  Immunity for those receiving infant.**
    An individual to whom an infant was surrendered under G.S. 7B-521 is immune from any civil or criminal liability that might otherwise be incurred or imposed as a result of any omission or action taken pursuant to the requirements of this Article as long as that individual was acting in good faith. The immunity established by this section does not extend to gross negligence, wanton conduct, or intentional wrongdoing that would otherwise be actionable.

"**§ 7B-524.  Confidentiality of information and records.**
    (a)    Except as otherwise provided in subsection (b) of this section, unless a parent consents to its release, an individual who takes an infant into temporary custody under this Article and any facility involved in the care of the infant at the time the infant is taken into temporary custody shall keep information regarding the surrendering parent's identity confidential.

(b)     An individual taking an infant into temporary custody under this Article shall provide to the director of the department of social services any information known about the infant, the infant's parents, including their identity, any medical history, and the circumstances of surrender.

(c)     All information about the surrendering parent's identity that is received or obtained by the department of social services shall not be disclosed except for (i) notice to local law enforcement pursuant to G.S. 7B-525(b)(3), (ii) contact with the non-surrendering parent, or (iii) as otherwise ordered by a court of this State.

(d)     All information received by the department of social services related to the circumstances of the infant's safe surrender and the infant's condition shall be held in strictest confidence and shall not be disclosed except as provided in this section.

        (1)     The director may consult with and share information that the director determines is necessary or relevant to the case with (i) a health care provider that provided medical treatment to the safely surrendered infant before, at the time of, or after the safe surrender, (ii) a placement provider, including a foster care placement or pre-adoptive placement, for the infant, (iii) a court exercising jurisdiction over an adoption proceeding for the infant, and (iv) any agency that a court in an adoption proceeding requires to conduct a preplacement assessment, report to the court, or equivalent.

        (2)     A guardian ad litem appointed in a termination of parental rights proceeding resulting from the infant's safe surrender may examine and obtain written copies of the record.

        (3)     A district or superior court judge of this State presiding over a civil, criminal, or delinquency matter in which the department of social services is not a party may order the department to release confidential information after providing the department with reasonable notice and an opportunity to be heard and then determining that the information is relevant and necessary to the trial of the matter before the court and unavailable from any other source. The department of social services shall surrender the requested records to the court, which shall conduct an in-camera review prior to releasing the confidential records.

(e)     This section shall not apply if the department determines the juvenile is not a safely surrendered infant or is the victim of a crime.

"**§ 7B-525.  Social services response.**

(a)     A director of a department of social services who receives a safely surrendered infant pursuant to this Article has, by virtue of the surrender, the surrendering parent's rights to legal and physical custody of the infant without obtaining a court order. A county department of social services to whom an infant has been safely surrendered may, after the notice by publication set forth in G.S. 7B-526 has been completed, apply ex parte to the district court for an order finding that the infant has been safely surrendered and confirming that the county department of social services has legal custody of the minor for the purposes of obtaining a certified copy of the child's birth certificate, a social security number, or federal and State benefits for the minor.

(b)     The director of social services receiving the infant shall do the following in an expeditious manner:

        (1)     Ascertain from a health care provider that the surrendered infant is, to a reasonable medical certainty, not more than 30 days old and without signs of abuse or neglect. If both conditions are not satisfied, the provisions of the Article do not apply and the director shall treat the infant as a juvenile who has been reported to be an abused, neglected, or dependent juvenile.

        (2)     Make an inquiry of the person who received the infant as a safe surrender whether the surrendering parent was provided with information in accordance with G.S. 7B-526 and document the response.

Case 1:23-cv-00077-WO-LPA   Document 73-3   Filed 06/02/23   Page 34 of 48

(3) Notify law enforcement of the safely surrendered infant and provide law enforcement with information necessary to investigate through the North Carolina Center for Missing Persons and other national and State resources whether the infant is a missing child.

(4) Contact the non-surrendering parent when their identity is known to inform the non-surrendering parent that the infant was surrendered.

(5) Respond to any inquiry by a non-surrendering parent about whether their child was safely surrendered.

(6) When a surrendering or non-surrendering parent seeks custody of the infant, arrange for genetic marker testing of that parent and the infant if there is uncertainty as to parentage.

(7) After 60 days from the date of surrender, if the surrendering parent has not sought to regain custody of the infant and the infant is not placed with the non-surrendering parent, initiate a termination of parental rights for the surrendering parent under G.S. 7B-1111(a)(7).

(c) Where the non-surrendering parent's identity is known and the non-surrendering parent has been contacted and located by the director of the department of social services, the director shall place custody of the safely surrendered infant with the non-surrendering parent, and any custodial rights of the department of social services shall terminate only if all of the following apply:

(1) There exists the rebuttable presumption the non-surrendering parent is the safely surrendered infant's parent through (i) the child's legitimation through marriage or (ii) genetic marker testing arranged by the director to establish parentage that indicates the probability of parentage is ninety-seven percent (97%) or higher.

(2) The non-surrendering parent asserts their parental rights to their child.

(3) The director does not have cause to suspect the infant is an abused, neglected, or dependent juvenile due to the circumstances created by the non-surrendering parent.

(d) Where the identity of the non-surrendering parent is known by the director and the director has cause to suspect the infant may be an abused, neglected, or dependent juvenile due to circumstances created by the non-surrendering parent, the director shall proceed as if there was a report of abuse, neglect, or dependency in accordance with G.S. 7B-302. The surrendering parent shall not be part of the department assessment conducted under G.S. 7B-302. If a petition alleging abuse, neglect, or dependency is filed with the district court pursuant to G.S. 7B-302, in accordance with G.S. 7B-401.1(b), the surrendering parent shall not be a party unless the court orders otherwise or a surrendering parent comes forward to regain custody of the child.

(e) If the surrendering parent seeks to regain custody of the infant, the provision of G.S. 7B-527(a) shall apply.

"**§ 7B-526. Notice by publication of the safely surrendered infant.**

(a) Within 14 days from the date of the safe surrender of an infant, the director shall provide notice by publication as specified in subsection (b) of this section that an infant has been surrendered and taken into custody by the department of social services.

(b) The notice shall be published in a newspaper qualified for legal advertising in accordance with G.S. 1-597 and G.S. 1-598 and published in the county in which the surrender was made and in any other county that the director has reason to believe either parent may be residing. The publication shall be once a week for three successive weeks. The notice shall state each of the following:

(1) The infant was surrendered by a person claiming to be the infant's mother or father who did not express an intent to return for the infant and that the infant was surrendered to an individual pursuant to G.S. 7B-521 by specifying (i) the

profession of the individual authorized to accept the surrendered infant, (ii) the name and location of the facility at which the infant was surrendered, and (iii) the date of surrender.

(2)    The physical characteristics of the infant at the time of surrender.

(3)    The infant is now in the physical and legal custody of the department of social services in the county where the infant was surrendered.

(4)    The surrendering mother or father has the right to request the infant's return to their custody by contacting the department of social services in the county where the infant was surrendered before the department initiates an action to terminate their parental rights in district court. If the surrendering parent seeks to regain custody of the infant from the department of social services, the director shall treat the infant as a juvenile who has been reported as a neglected juvenile and requires that the director conduct an assessment, at which point, the surrendering parent's rights to have his or her identity be confidential no longer apply.

(5)    The department is making efforts to identify, locate, and contact the non-surrendering parent. The non-surrendering parent has the right to contact the department of social services to inquire about and seek custody of the infant. The department may place the infant with the non-surrendering parent, terminating the department's custodial rights to the infant, when that parent's identity and location are known and there is no cause to suspect the infant is an abused, neglected, or dependent juvenile due to circumstances created by the non-surrendering parent.

(6)    Each parent has the right to contact the department of social services in the county where the infant was surrendered.

(7)    If neither parent seeks the infant's custody from the department of social services or executes a relinquishment for adoption within 60 days of the date of the surrender, which shall be stated clearly on the notice, the department will initiate a court action to terminate both parents' parental rights. Unless the court orders otherwise, the notice of the petition to terminate parental rights will be published in the same newspaper with the court name "In re Baby Doe."

(8)    How to contact the department of social services about the safely surrendered infant and the parents' rights.

(c)    If a termination of parental rights for the safely surrendered infant is commenced, an affidavit of the publisher of the notice by this section shall be filed with the court at the preliminary hearing required by G.S. 7B-1105.1.

"**§ 7B-527.  Rights of surrendering parent.**

(a)    Right to Regain Custody. – Prior to the filing of a termination of parental rights petition under Article 11 of this Subchapter, a surrendering parent has the right to contact the county department of social services where the infant was surrendered and request the infant's return to his or her custody. The director shall treat any such request as a report of neglect and comply with the provisions of G.S. 7B-302.

(b)    Right of Relinquishment. – The safe surrender of an infant under this Article does not preclude the surrendering parent from executing a relinquishment of their parental rights for adoption with the local department of social services which received the safely surrendered infant.

(c)    Immunity. – A parent surrendering an infant pursuant to this Article is immune from any civil liability or criminal prosecution in accordance with G.S. 14-322.3 as long as the surrendering parent was acting in good faith. The immunity established by this section does not

Case 1:23-cv-00077-WO-LPA   Document 73-3   Filed 06/02/23   Page 36 of 48

extend to gross negligence, wanton conduct, or intentional wrongdoing that would otherwise be actionable.

"**§ 7B-528.  Information to surrendering parent.**

(a)     The Department of Health and Human Services, Division of Social Services, shall create printable and downloadable information about infant safe surrender and the rights of the parents. The information shall be written in a user-friendly manner and translated to commonly spoken and read languages in this State. The Division shall post the information on its website and make the information available for distribution to agencies where persons identified in G.S. 7B-521 are on duty and to other agencies that request the information.

(b)     The information shall explain each of the following:

(1)     Who is a safely surrendered infant, surrendering parent, and non-surrendering parent.

(2)     The requirements for how a safe surrender of an infant may occur under this Article.

(3)     The right to have the surrendering parent's identity remain confidential with the exception of communicating with the non-surrendering parent, known medical providers who provided treatment to the infant prior to the safe surrender, law enforcement for purposes of a missing child assessment, or a court order.

(4)     The information set forth in G.S. 7B-526(b)(3) through (b)(8).

(5)     That the information contains a relevant medical history form for the infant that would assist the department of social services in obtaining any necessary medical services for the infant and in facilitating the infant's placement, including adoption. Completing the form is optional.

(6)     An explanation that services may be available to the surrendering parent and infant accompanied by contact information for the local department of social services.

(c)     The Division shall create a printable and downloadable medical history form as referred to in subsection (b) of this section, and the form must include instructions on how to complete it and where to return it."

SECTION 6.2.(b)  G.S. 7B-101 reads as rewritten:

"**§ 7B-101.  Definitions.**

As used in this Subchapter, unless the context clearly requires otherwise, the following words have the listed meanings:

…

(15)     Neglected juvenile. – Any juvenile less than 18 years of age (i) who is found to be a minor victim of human trafficking under G.S. 14-43.15 or (ii) whose parent, guardian, custodian, or caretaker does any of the following:

a.     Does not provide proper care, supervision, or discipline.

b.     Has abandoned the ~~juvenile.~~juvenile, except where that juvenile is a safely surrendered infant as defined in this Subchapter.

c.     Has not provided or arranged for the provision of necessary medical or remedial care.

d.     Or whose parent, guardian, or custodian has refused to follow the recommendations of the Juvenile and Family Team made pursuant to Article 27A of this Chapter.

e.     Creates or allows to be created a living environment that is injurious to the juvenile's welfare.

f.     Has participated or attempted to participate in the unlawful transfer of custody of the juvenile under G.S.14-321.2.

g.     Has placed the juvenile for care or adoption in violation of law.

Case 1:23-cv-00077-WO-LPA   Document 73-3   Filed 06/02/23   Page 37 of 48

…

(15b)  Non-surrendering parent. – A parent of a safely surrendered infant other than the parent who physically surrenders the parent's infant pursuant to Article 5A of this Subchapter.

…

(19a)  Safely surrendered infant. – An infant reasonably believed to be not more than 30 days of age and without signs of abuse or neglect who is voluntarily delivered to an individual in accordance with Article 5A of this Subchapter by the infant's parent who does not express an intent to return for the infant. In determining whether there are signs of neglect, the act of surrendering the infant, in and of itself, does not constitute neglect.

(19a)(19b)  Serious neglect. – Conduct, behavior, or inaction of the juvenile's parent, guardian, custodian, or caretaker that evidences a disregard of consequences of such magnitude that the conduct, behavior, or inaction constitutes an unequivocal danger to the juvenile's health, welfare, or safety, but does not constitute abuse.

…

(21a)  Surrendering parent. – A parent who physically surrenders the parent's infant pursuant to Article 5A of this Subchapter.

…."

**SECTION 6.2.(c)**  G.S. 7B-401.1(b) reads as rewritten:

"(b)  Parents. – The juvenile's parent shall be a party unless one of the following applies:

…

(2)  The parent has relinquished the juvenile for adoption, or safely surrendered the infant and has not sought the return of the infant prior to the filing of a termination of parental rights, unless the court orders that the parent be made a party.

…."

**SECTION 6.2.(d)**  G.S. 7B-500 reads as rewritten:

"**§ 7B-500.  Taking a juvenile into temporary custody; civil and criminal immunity.**

(a)  Temporary custody means the taking of physical custody and providing personal care and supervision until a court order for nonsecure custody can be obtained. A juvenile may be taken into temporary custody without a court order by a law enforcement officer or a department of social services worker if there are reasonable grounds to believe that the juvenile is abused, neglected, or dependent and that the juvenile would be injured or could not be taken into custody if it were first necessary to obtain a court order. If a department of social services worker takes a juvenile into temporary custody under this section, the worker may arrange for the placement, care, supervision, and transportation of the juvenile.

(b)  The following individuals shall, without a court order, take into temporary custody an infant under seven days of age that is voluntarily delivered to the individual by the infant's parent who does not express an intent to return for the infant:The process for taking into temporary custody a safely surrendered infant is as provided under Article 5A of this Subchapter.

(1)  A health care provider, as defined under G.S. 90-21.11, who is on duty or at a hospital or at a local or district health department or at a nonprofit community health center.

(2)  A law enforcement officer who is on duty or at a police station or sheriff's department.

(3)  A social services worker who is on duty or at a local department of social services.

(4)  A certified emergency medical service worker who is on duty or at a fire or emergency medical services station.

Case 1:23-cv-00077-WO-LPA    Document 73-3    Filed 06/02/23    Page 38 of 48

(c)        An individual who takes an infant into temporary custody under subsection (b) of this section shall perform any act necessary to protect the physical health and well-being of the infant and shall immediately notify the department of social services or a local law enforcement agency. Any individual who takes an infant into temporary custody under subsection (b) of this section may inquire as to the parents' identities and as to any relevant medical history, but the parent is not required to provide the information. The individual shall notify the parent that the parent is not required to provide the information.

(d)        Any adult may, without a court order, take into temporary custody an infant under seven days of age that is voluntarily delivered to the individual by the infant's parent who does not express an intent to return for the infant. Any individual who takes an infant into temporary custody under this section shall perform any act necessary to protect the physical health and well-being of the infant and shall immediately notify the department of social services or a local law enforcement agency. An individual who takes an infant into temporary custody under this subsection may inquire as to the parents' identities and as to any relevant medical history, but the parent is not required to provide the information. The individual shall notify the parent that the parent is not required to provide the information.

(e)        An individual described in subsection (b) or (d) of this section is immune from any civil or criminal liability that might otherwise be incurred or imposed as a result of any omission or action taken pursuant to the requirements of subsection (c) or (d) of this section as long as that individual was acting in good faith. The immunity established by this subsection does not extend to gross negligence, wanton conduct, or intentional wrongdoing that would otherwise be actionable."

**SECTION 6.2.(e)**  G.S. 7B-501(a) reads as rewritten:

"(a)        A person who takes a juvenile into custody without a court order under G.S. 7B-500 shall proceed as ~~follows:~~follows, except that the person shall proceed in accordance with G.S. 7B-522 for a safely surrendered infant:

…."

**SECTION 6.2.(f)**  Article 11 of Chapter 7B of the General Statutes is amended by adding a new section to read:

"**§ 7B-1105.1.  Preliminary hearing; safely surrendered infant.**

(a)        Within 10 days from the date of filing of a petition to terminate the parental rights of a surrendering or non-surrendering parent of a safely surrendered infant, or during the next term of court in the county where the petition is filed if there is no court in the county in that 10-day period, the court shall conduct a preliminary hearing to address the infant's safe surrender. The preliminary hearing shall be recorded and shall be closed unless the surrendering parent appears and requests that it be open. The purpose of the hearing shall be to ascertain the circumstances of the safe surrender in order to determine any efforts that should be made to ascertain the identity and location of either parent and to establish appropriate notice regarding termination of parental rights proceedings.

(b)        The court shall inquire of the director of the department of social services as to all of the following:

(1)        The circumstances of the safe surrender.

(2)        Whether, at the time of surrender, the surrendering parent was provided the information pursuant to G.S. 7B-528.

(3)        Whether notice of a safe surrender was made by publication as required by G.S. 7B-526. An affidavit of the publisher of that notice shall be filed with the court at this preliminary hearing.

(4)        Whether either parent has made any efforts to contact the department of social services and the nature of those contacts.

(5)        Whether the identities or locations of either parent are known to the director of the department of social services.

Case 1:23-cv-00077-WO-LPA   Document 73-3   Filed 06/02/23   Page 39 of 48

(c)    The court shall determine whether any diligent efforts are required to identify or locate the surrendering parent considering the need to protect the confidentiality of that parent's identity and the parent's due process rights. The court may specify the type of diligent efforts the department of social services is required to take. The court shall determine whether the surrendering parent shall be served pursuant to Rule 4 of the Rules of Civil Procedure and, if so, may specify the type of service that must be provided in lieu of Rule 4 whether the parent shall be served by publication in accordance with subsection (e) of this section.

(d)    When the identity of the non-surrendering parent is known, the court shall order service pursuant to Rule 4 of the Rules of Civil Procedure. When the non-surrendering parent's identity is not known, service shall be by publication in accordance with subsection (e) of this section.

(e)    The court shall specifically order the place or places of publication and the contents of the notice that the court concludes is most likely to identify the juvenile to either of the juvenile's parents without including the name of the surrendering parent. The notice shall be published in a newspaper qualified for legal advertising in accordance with G.S. 1-597 and G.S. 1-598 and published in the counties directed by the court, including in the county where the local department of social services that received the safely surrendered infant is located and where the parent is residing, if known, once a week for three successive weeks. The notice shall do each of the following:

(1)    Designate the court in which the petition is pending.

(2)    Be directed to "the mother (father) (mother and father) of a male (female) juvenile born on or about _____ and if known in
_____(date)
_____ (hospital or health care facility where the infant was born.)
_____ (County),
_____ (City),
_____ , respondent."
_____(State)

(3)    Designate the docket number and title of the case which shall be "In re Baby Doe."

(4)    State that the infant was surrendered by a person claiming to be the infant's mother or father who did not express an intent to return for the infant and that the infant was surrendered to an individual pursuant to G.S. 7B-521 by specifying (i) the profession of the person authorized to accept the surrendered infant, (ii) the facility at which the infant was surrendered, and (iii) the date of surrender.

(5)    State the physical characteristics of the infant at the time of the surrender.

(6)    State that a petition seeking to terminate the parental rights of the respondent has been filed and the purpose of the termination hearing.

(7)    Notice that if the parent is indigent, the parent is entitled to appointed counsel and may contact the clerk immediately to request counsel.

(8)    State the date and time of the pretrial hearing pursuant to G.S. 7B-1108.1 and notice that the parent may attend the hearing.

(9)    Direct the respondent to file with the clerk a written answer to the petition within 30 days after a date stated in the notice, exclusive of such date, which date so stated shall be the date of first publication of notice and be substantially in the form as set forth in G.S. 1A-1, Rule 4(j1).

(10)    State that if the parent fails to answer the petition within the time prescribed and the court determines the ground for termination has been proved and that termination of that parent's rights is in the best interests of the juvenile, the respondent's parental rights to the juvenile will be terminated.

Case 1:23-cv-00077-WO-LPA   Document 73-3   Filed 06/02/23   Page 40 of 48

Upon completion of the service by publication, an affidavit of the publisher shall be filed with the court.

(f) The court shall issue the order required by this section within 30 days from the date of the preliminary hearing unless the court shall determine that additional time for investigation is required.

(g) No summons is required for a parent who is served by publication."

**SECTION 6.2.(g)** G.S. 7B-1111(a) reads as rewritten:

"(a) The court may terminate the parental rights upon a finding of one or more of the following:

…

(7) The parent has willfully abandoned the juvenile for at least six consecutive months immediately preceding the filing of the petition or motion, or the parent has voluntarily abandoned an infant as a safely surrendered infant pursuant to G.S. 7B-500 Article 5A of this Subchapter for at least 60 consecutive days immediately preceding the filing of the petition or motion.

…

(9) The parental rights of the parent with respect to another child of the parent have been terminated involuntarily by a court of competent jurisdiction and the parent lacks the ability or willingness to establish a safe home. This ground shall not apply to a parent whose parental rights were terminated as a result of the other child being a safely surrendered infant.

…."

**SECTION 6.2.(h)** G.S. 115C-47(52) reads as rewritten:

"**§ 115C-47. Powers and duties generally.**

In addition to the powers and duties designated in G.S. 115C-36, local boards of education shall have the power or duty:

…

(52) To Ensure That Certain Students Receive Information Annually on Lawfully Abandoning a Newborn Baby. – Not later than August 1, 2008, local boards of education shall adopt policies to ensure that students in grades nine through 12 receive information annually on the manner in which a parent may lawfully abandon a newborn baby with a responsible person, in accordance with G.S. 7B-500.Article 5A of Chapter 7B of the General Statutes."

**SECTION 6.2.(i)** G.S. 115C-218.75(a) reads as rewritten:

"(a) Health and Safety Standards. – A charter school shall meet the same health and safety requirements required of a local school administrative unit. The Department of Public Instruction shall ensure that charter schools provide parents and guardians with information about meningococcal meningitis and influenza and their vaccines at the beginning of every school year. This information shall include the causes, symptoms, and how meningococcal meningitis and influenza are spread and the places where parents and guardians may obtain additional information and vaccinations for their children.

…

The Department of Public Instruction shall also ensure that charter schools provide students in grades nine through 12 with information annually on the manner in which a parent may lawfully abandon a newborn baby with a responsible person, in accordance with G.S. 7B-500.Article 5A of Chapter 7B of the General Statutes.

…."

**SECTION 6.2.(j)** G.S. 115C-548 reads as rewritten:

"**§ 115C-548. Attendance; health and safety regulations.**

…

Case 1:23-cv-00077-WO-LPA   Document 73-3   Filed 06/02/23   Page 41 of 48

The Division of Nonpublic Education, Department of Administration, shall also ensure that information is available to these schools so that they can provide information on the manner in which a parent may lawfully abandon a newborn baby with a responsible person, in accordance with ~~G.S. 7B-500.~~Article 5A of Chapter 7B of the General Statutes."

**SECTION 6.2.(k)**  G.S. 115C-556 reads as rewritten:

"**§ 115C-556.  Attendance; health and safety regulations.**

…

The Division of Nonpublic Education, Department of Administration, shall also ensure that information is available to each qualified nonpublic school so that the school can provide information on the manner in which a parent may lawfully abandon a newborn baby with a responsible person, in accordance with ~~G.S. 7B-500.~~Article 5A of Chapter 7B of the General Statutes."

**SECTION 6.2.(*l*)**  G.S. 115C-565 reads as rewritten:

"**§ 115C-565.  Requirements exclusive.**

…

The Division of Nonpublic Education, Department of Administration, shall also provide to home schools information on the manner in which a parent may lawfully abandon a newborn baby with a responsible person, in accordance with ~~G.S. 7B-500.~~ Article 5A of Chapter 7B of the General Statutes. This information may be provided electronically or on the Division's Web page."

**SECTION 6.2.(m)**  This section becomes effective October 1, 2023, and applies to infants safely surrendered on or after that date.

**SECTION 6.3.(a)**  The Legislative Research Commission shall study streamlining the laws surrounding adoption and foster care and report its findings and any legislative proposals to the 2024 Regular Session of the 2023 General Assembly upon its convening.

**SECTION 6.3.(b)**  This section is effective when it becomes law.

**SECTION 6.4.(a)**  G.S. 14-322.3 reads as rewritten:

"**§ 14-322.3.  Abandonment of an infant ~~under seven~~ not more than 30 days of age.**

When a parent abandons an infant ~~less~~ not more than ~~seven~~ 30 days of age by voluntarily delivering the infant as provided in ~~G.S. 7B-500(b) or G.S. 7B-500(d)~~ Article 5A of Chapter 7B of the General Statutes and does not express an intent to return for the infant, that parent shall not be prosecuted under G.S. 14-322, 14-322.1, or 14-43.14."

**SECTION 6.4.(b)**  This section becomes effective December 1, 2023, and applies to offenses committed on or after that date.

**SECTION 6.5.(a)**  G.S. 48-3-203 reads as rewritten:

"**§ 48-3-203.  Agency placement adoption.**

…

(a1)    No agency shall deny or delay (i) the opportunity to become an adoptive parent or (ii) the placement of a child for adoption on the basis of race, color, or national origin of the person or the child involved.

…."

**SECTION 6.5.(b)**  G.S. 131D-10.1 is amended by adding a new subsection to read:

"(a1)    No agency or other State entity shall deny or delay (i) the opportunity to become a foster parent or (ii) the placement of a child in foster care on the basis of race, color, or national origin of the person or the child involved."

**SECTION 6.5.(c)**  This section is effective when it becomes law.

**SECTION 6.6.(a)**    Effective six months after this bill becomes law, and notwithstanding any other provision of law or rule to the contrary, the Department of Health and Human Services, Division of Social Services (Division), shall develop and implement a policy that allows an individual who is related by blood, marriage, or adoption to a child and providing foster care, as defined under G.S. 131D-10.2(9), to a child in a family foster home to be

Case 1:23-cv-00077-WO-LPA   Document 73-3   Filed 06/02/23   Page 42 of 48

reimbursed for the provision of care without having to meet the requirements for licensure under G.S. 131D-10.3 pursuant to rates set forth in subsection (b) of this section. For purposes of this section, "family foster home" means the private residence of one or more individuals who permanently reside as members of the household and who provide continuing full-time foster care for a child or children who are related to the adult members of the household by blood, marriage, or adoption.

**SECTION 6.6.(b)** The maximum rates for State participation in reimbursement for unlicensed kinship foster care are established on a graduated scale as follows:

    (1)    $351.00 per child per month for children from birth through 5 years of age.

    (2)    $371.00 per child per month for children 6 through 12 years of age.

    (3)    $405.00 per child per month for children at least 13 but less than 18 years of age.

**SECTION 6.6.(c)** The State and a county participating in unlicensed kinship care shall each contribute fifty percent (50%) of the nonfederal share of the cost of care for a child placed by a county department of social services or child-placing agency in a family foster home.

**SECTION 6.6.(d)** There is appropriated from the General Fund to the Department of Health and Human Services, Division of Social Services, the sum of five million seven hundred sixty-six thousand three hundred ninety dollars ($5,766,390) in recurring funds for each year of the 2023-2025 fiscal biennium to provide funds for the State portion of unlicensed kinship care reimbursement rates set forth in subsection (b) of this section.

**SECTION 6.7.(a)** G.S. 108A-49.1 reads as rewritten:

"**§ 108A-49.1. Foster care and adoption assistance payment rates.**

    (a)    The maximum rates for State participation in the foster care assistance program are established on a graduated scale as follows:

    (1)    ~~$514.00~~ $702.00 per child per month for children from birth through five years of age.

    (2)    ~~$654.00~~ $742.00 per child per month for children six through 12 years of age.

    (3)    ~~$698.00~~ $810.00 per child per month for children at least 13 but less than 21 years of age.

    (b)    The maximum rates for the State adoption assistance program are established consistent with the foster care rates as follows:

    (1)    ~~$514.00~~ $702.00 per child per month for children from birth through five years of age.

    (2)    ~~$654.00~~ $742.00 per child per month for children six through 12 years of age.

    (3)    ~~$698.00~~ $810.00 per child per month for children at least 13 but less than 21 years of age.

….."

**SECTION 6.7.(b)** There is appropriated from the General Fund to the Department of Health and Human Services, Division of Social Services, the sum of ten million ninety-four thousand three hundred sixty-four dollars ($10,094,364) in recurring funds for each year of the 2023-2025 fiscal biennium to implement the foster care and adoption assistance rate increases set forth in subsection (a) of this section.

**SECTION 6.8.** There is appropriated from the General Fund to the Department of Health and Human Services, Division of Social Services, the sum of one million seven hundred twenty-five thousand five hundred thirty-one dollars ($1,725,531) in recurring funds for each year of the 2023-2025 fiscal biennium to provide the State portion of the total cost of care to implement, with the associated county and federal shares, an increase to the administrative rate for foster care and adoption assistance.

**SECTION 6.9.** There is appropriated from the General Fund to the Department of Health and Human Services, Division of Social Services, the sum of eleven million eight hundred thousand dollars ($11,800,000) in nonrecurring funds for the 2023-2024 fiscal year to provide

additional funding to cover a loss in federal receipts from the Family First Prevention Services Act regarding congregate care for foster care.

**SECTION 6.10.** There is appropriated from the General Fund the sum of one million five hundred thousand dollars ($1,500,000) in recurring funds for each year of the 2023-2025 fiscal biennium to the North Carolina Community College System for allocation to the NC Finish Line Grants Program.

**SECTION 6.11.** Except as otherwise provided, this Part becomes effective July 1, 2023.

## PART VII. EXPANDING ACCESS TO CHILD CARE

**SECTION 7.1.(a)** From July 1, 2023, through September 30, 2023, the Department of Health and Human Services, Division of Child Development and Early Education, shall maintain the child care subsidy market rates at the seventy-fifth percentile as recommended by the 2018 Child Care Market Rate Study for children in three-, four-, and five-star-rated child care centers and homes.

**SECTION 7.1.(b)** Beginning October 1, 2023, the Department of Health and Human Services, Division of Child Development and Early Education, shall increase the child care subsidy market rates to the seventy-fifth percentile as recommended by the 2021 Child Care Market Rate Study for children in three-, four-, and five-star-rated child care centers and homes.

**SECTION 7.1.(c)** There is appropriated from the General Fund to the Department of Health and Human Services, Division of Child Development and Early Education, the sum of thirty-two million dollars ($32,000,000) in recurring funds for the 2023-2024 fiscal year and the sum of forty-three million dollars ($43,000,000) in recurring funds for the 2024-2025 fiscal year to implement the market rate increases set forth in subsections (a) and (b) of this section.

**SECTION 7.1.(d)** It is the intent of the General Assembly to use a portion of the anticipated increase in funds to the Child Care and Development Fund Block Grant to supplement funding for the child care market rate increases described in subsection (b) of this section.

**SECTION 7.2.(a)** The Division of Child Development and Early Education shall decouple private tuition payment rates from the subsidized child care market rates for licensed child care centers and homes.

**SECTION 7.2.(b)** Section 9C.4(c) of S.L. 2021-180 reads as rewritten:

"**SECTION 9C.4.(c)** Payments for the purchase of child care services for low-income children shall be in accordance with the following requirements:

    (1)    Religious sponsored child care facilities operating pursuant to G.S. 110-106 and licensed child care centers and homes that meet the minimum licensing standards that are participating in the subsidized child care program shall be paid the one-star county market rate or the rate they charge privately paying ~~parents, whichever is lower,~~ parents unless prohibited by subsection (f) of this section.

    (2)    Licensed child care centers and homes with two or more stars shall receive the market rate for that rated license level for that age group ~~or the rate they charge privately paying parents, whichever is lower,~~ unless prohibited by subsection (g) of this section.

…."

**SECTION 7.3.** This Part becomes effective July 1, 2023.

## PART VIII. EXPAND SATELLITE-BASED MONITORING FOR VIOLENT AND REPEAT SEXUAL OFFENDERS, INCREASE PUNISHMENT FOR ASSAULT ON A PREGNANT WOMAN, AND ESTABLISH THE CRIME OF MISDEMEANOR DOMESTIC VIOLENCE

**SECTION 8.1.(a)** G.S. 14-208.40A reads as rewritten:

Case 1:23-cv-00077-WO-LPA   Document 73-3   Filed 06/02/23   Page 44 of 48

**"§ 14-208.40A.  Determination of satellite-based monitoring requirement by court.**

(a)       When an offender is convicted of a reportable conviction as defined by G.S. 14-208.6(4), during the sentencing phase, the district attorney shall present to the court any evidence ~~that~~ of the following:

> ~~(i)~~(1)    That the offender has been classified as a sexually violent predator pursuant to ~~G.S. 14-208.20,~~ G.S. 14-208.20.
>
> ~~(ii)~~(2)   That the offender is a ~~reoffender,~~ reoffender.
>
> ~~(iii)~~(3)  That the conviction offense was an aggravated ~~offense,~~ offense.
>
> ~~(iv)~~(4)   That the conviction offense was a violation of G.S. 14-27.23 or ~~G.S. 14-27.28, or~~ G.S. 14-27.28.
>
> ~~(v)~~(5)    That the offense involved the physical, mental, or sexual abuse of a minor.

The district attorney shall have no discretion to withhold any evidence required to be submitted to the court pursuant to this subsection. The offender shall be allowed to present to the court any evidence that the district attorney's evidence is not correct.

(b)       After receipt of the evidence from the parties, the court shall determine whether the offender's conviction places the offender in one of the categories described in G.S. 14-208.40(a), and if so, shall make a finding of fact of that determination, specifying ~~whether~~ each of the following:

> ~~(i)~~(1)    Whether the offender has been classified as a sexually violent predator pursuant to ~~G.S. 14-208.20,~~ G.S. 14-208.20.
>
> ~~(ii)~~(2)   Whether the offender is a ~~reoffender,~~ reoffender.
>
> ~~(iii)~~(3)  Whether the conviction offense was an aggravated ~~offense,~~ offense.
>
> ~~(iv)~~(4)   Whether the conviction offense was a violation of G.S. 14-27.23 or ~~G.S. 14-27.28, or~~ G.S. 14-27.28.
>
> ~~(v)~~(5)    Whether the offense involved the physical, mental, or sexual abuse of a minor.

(c)       ~~If~~ The court shall order that the Department of Adult Correction do a risk assessment of the offender if the court finds any of the following:

> (1)      ~~that the~~ The offender has been classified as a sexually violent ~~predator, is a reoffender,~~ predator.
>
> (2)      The offender has committed an aggravated ~~offense, or~~ offense.
>
> (3)      The offender was convicted of G.S. 14-27.23 or ~~G.S. 14-27.28, the court shall order that the Division of Adult Correction and Juvenile Justice do a risk assessment of the offender.~~ G.S. 14-27.28.
>
> (4)      The offender is a reoffender of a crime under G.S. 14-27.21, 14-27.22, 14-27.23, 14-27.24, 14-27.25(a), 14-27.26, 14-27.27, 14-27.28, 14-27.29, 14-27.30(a), 14-43.11, 14-43.13, 14-178(b)(1) and (b)(2), 14-190.16, 14-205.2(d), 14-205.3(b), 14-318.4(a1), or 14-318.4(a2).

The ~~Division of Adult Correction and Juvenile Justice~~ Department shall have up to 60 days to complete the risk assessment of the offender and report the results to the court. The ~~Division of Adult Correction and Juvenile Justice~~ Department may use a risk assessment of the offender done within six months of the date of the hearing.

(c1)      Upon receipt of a risk assessment from the ~~Division~~ Department of Adult Correction ~~and Juvenile Justice~~ pursuant to subsection (c) of this section, the court shall determine whether, based on the ~~Division of Adult Correction and Juvenile Justice's~~ Department's risk assessment and all relevant evidence, the offender requires the highest possible level of supervision and monitoring. If the court determines that the offender does require the highest possible level of supervision and monitoring, the court shall order the offender to enroll in a satellite-based monitoring program for ~~a period of 10 years.~~ the life of the offender.

(d)       ~~If~~ The court shall order that the Department of Adult Correction do a risk assessment of the offender if the court finds ~~that the~~ each of the following:

Case 1:23-cv-00077-WO-LPA   Document 73-3   Filed 06/02/23   Page 45 of 48

  (1)  The offender committed an offense that involved the physical, mental, or sexual abuse of a ~~minor, that the~~ minor.

  (2)  The offense under subdivision (1) of this subsection is not an aggravated offense or a violation of G.S. 14-27.23 or ~~G.S. 14-27.28 and the~~ G.S. 14-27.28.

  (3)  The offender is not a reoffender, ~~the court shall order that the Department of Adult Correction do a risk assessment of the offender.~~ or is a reoffender of a crime under G.S. 14-27.31, 14-27.32, 14-27.33, 14-178(b)(3), 14-190.6, 14-190.9(a1), 14-190.17, 14-190.17A, 14-202.1, 14-202.3, 14-202.4(a), or 14-205.2(c).

The Department shall have up to 60 days to complete the risk assessment of the offender and report the results to the court. The ~~Division of Adult Correction and Juvenile Justice~~ Department may use a risk assessment of the offender done within six months of the date of the hearing.

  (e)  Upon receipt of a risk assessment from the Department of Adult Correction pursuant to subsection (d) of this section, the court shall determine whether, based on the Department's risk assessment and all relevant evidence, the offender requires the highest possible level of supervision and monitoring. If the court determines that the offender does require the highest possible level of supervision and monitoring, the court shall order the offender to enroll in a satellite-based monitoring program for a period of time to be specified by the court, not to exceed ~~10~~ 50 years."

  **SECTION 8.1.(b)** This section becomes law October 1, 2023, and applies to court orders for enrollment in satellite-based monitoring programs issued on or after that date.

  **SECTION 8.2.(a)** G.S. 14-33(c) reads as rewritten:

"(c)  Unless the conduct is covered under some other provision of law providing greater punishment, any person who commits any assault, assault and battery, or affray is guilty of a Class A1 misdemeanor if, in the course of the assault, assault and battery, or affray, he or she:

  …

  (2a)  Assaults a pregnant woman;

  …."

  **SECTION 8.2.(b)** This section becomes effective December 1, 2023, and applies to offenses committed on or after that date.

  **SECTION 8.3.(a)** Article 8 of Chapter 14 of the General Statutes is amended by adding a new section to read:

"**§ 14-32.5. Misdemeanor crime of domestic violence.**

  (a)  Offense and Punishment. – A person is guilty of a Class A1 misdemeanor if that person uses or attempts to use physical force, or threatens the use of a deadly weapon, against another person and the person who commits the offense is:

  (1)  A current or former spouse, parent, or guardian of the victim.

  (2)  A person with whom the victim shares a child in common.

  (3)  A person who is cohabitating with or has cohabitated with the victim as a spouse, parent, or guardian.

  (4)  A person similarly situated to a spouse, parent, or guardian of the victim.

  (5)  A person who has a current or recent former dating relationship with the victim.

  (b)  Definition. – For purposes of this section, the term "dating relationship" is as defined in 18 U.S.C. § 921."

  **SECTION 8.3.(b)** G.S. 14-415.12(b)(8a) reads as rewritten:

"(8a)  Is or has been adjudicated guilty of or received a prayer for judgment continued or suspended sentence for one or more crimes of violence constituting a misdemeanor under ~~G.S. 14-33(c)(1),~~ G.S. 14-32.5,

Case 1:23-cv-00077-WO-LPA  Document 73-3  Filed 06/02/23  Page 46 of 48

14-33(c)(1), 14-33(c)(2), 14-33(c)(3), 14-33(d), 14-277.3A, 14-318.2, 14-134.3, 50B-4.1, or former G.S. 14-277.3."

**SECTION 8.3.(c)** This section becomes effective December 1, 2023, and applies to offenses committed on or after that date.

# PART IX. EXEMPTION FROM STATUTORY PROVISION CONCERNING ORDER OF APPROPRIATION BILLS

**SECTION 9.** The provisions of G.S. 143C-5-2 do not apply to this act.

# PART X. APPLICABILITY

**SECTION 10.** Nothing in this act shall be construed as creating or recognizing a right to abortion, nor shall the act make lawful an abortion that is otherwise unlawful.

# PART XI. REVISOR OF STATUTES

**SECTION 11.** The Revisor of Statutes is authorized to alphabetize, number, and renumber the definitions listed in G.S. 90-21.120 and G.S. 90-21.81, as amended by this act, to ensure that all of the definitions are listed in alphabetical order and numbered accordingly.

# PART XII. SEVERABILITY CLAUSE

**SECTION 12.** If any provision of this act or its application is held invalid, the invalidity does not affect other provisions or applications of this act that can be given effect without the invalid provisions or application and, to this end, the provisions of this act are severable.

**PART XIII. EFFECTIVE DATE**

    **SECTION 13.** Except as otherwise provided, this act is effective when it becomes law.

    In the General Assembly read three times and ratified this the 4th day of May, 2023.


        s/ Bill Rabon
          Presiding Officer of the Senate


        s/ Tim Moore
          Speaker of the House of Representatives


        VETO Roy Cooper
        Governor


    Became law notwithstanding the objections of the Governor at 8:39 p.m. this 16th day of May, 2023.

        s/ Mr. James White
          House Principal Clerk

Senate Bill 20       Session Law 2023-14       Page 47

Case 1:23-cv-00077-WO-LPA  Document 73-3  Filed 06/02/23  Page 48 of 48