**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF NORTH CAROLINA**
**DURHAM DIVISION**

Case No. 1:23-cv-00077-WO-LPA

| | |
|---|---|
| AMY BRYANT, MD,<br><br>　　Plaintiff,<br><br>v.<br><br>JOSHUA H. STEIN, in his official capacity as Attorney General for the State of North Carolina, *et al.*,<br><br>　　Defendants,<br><br>and<br><br>TIMOTHY K. MOORE and PHILIP E. BERGER,<br><br>　　Intervenors. | **DEFENDANT ATTORNEY GENERAL JOSHUA H. STEIN'S ANSWER TO FIRST AMENDED COMPLAINT** |

## INTRODUCTION

1.　Under well-settled principles of preemption that preserve American federalism, a State cannot impose laws that conflict with and frustrate the objectives of federal law. When Congress enacted the Risk Evaluation and Mitigation Strategies ("REMS") provisions of the Federal Food, Drug, and Cosmetic Act ("FDCA"), its clear objective was to ensure that REMS drugs are regulated in a way that is commensurate with

their risks while not imposing undue burdens on the healthcare system or patient access. The U.S. Food and Drug Administration ("FDA" or the "Agency") has acted pursuant to this authority to impose a precise set of controls on an FDA-approved drug, mifepristone. A State may not impose additional controls —— including restrictions that FDA has specifically rejected —— that upset the carefully balanced regulatory scheme established by federal law.

**ANSWER:** Defendant admits, on information and belief, that the FDA has exercised its statutory authority to enact a REMS plan for mifepristone. Otherwise, the allegations of Paragraph 1 state legal conclusions and require no response from Defendant.


2. In the FDCA, Congress granted FDA exclusive authority to impose restrictions on the prescribing, dispensing, and administration of drugs that the Agency deems to pose particular risks but for which the importance of patient access justifies imposition of special controls. FDA imposes those controls by way of a REMS, which sometimes includes special Elements to Assure Safe Use ("ETASU"). *See*

21 U.S.C. § 355-1.  In granting FDA (and only FDA) authority to impose drug-specific REMS and ETASU, Congress expressly charged the Agency with striking a balance between access to treatments and protection from identified risks, instructing FDA to impose only those restrictions necessary to ensure safety without imposing undue burdens on access or on the healthcare delivery system.  *See id.* § 355-1(f).

**ANSWER:**  The provisions in 21 U.S.C. § 355-1 speak for themselves and serve as the best evidence of their own contents.

3.   In 2000, after several years of review of voluminous data, FDA concluded that mifepristone is safe and effective and approved the drug for use under the trade name Mifeprex. Specifically, FDA approved mifepristone for the medical termination of intrauterine pregnancy, in a two-drug regimen with misoprostol.  Exercising its authority first under regulation and subsequently under its exclusive REMS statutory authority, FDA has subjected Mifeprex to a carefully crafted set of regulatory controls that the Agency concluded were commensurate with the drug's risks while not unduly burdening patient access or the healthcare system.  In

doing so, FDA determined that any risk-mitigation benefits from additional restrictions would be outweighed by added burdens on patient access and the healthcare system.

**ANSWER:** Defendant admits, on information and belief, that the FDA has approved mifepristone for use under the trade name Mifeprex for the medical termination of intrauterine pregnancy, in a two-drug regimen with misoprostol. Defendant lacks sufficient information and knowledge to form a belief as to what data the FDA reviewed. With respect to the FDA's conclusions regarding mifepristone, the REMS plan for mifepristone speaks for itself and serves as the best evidence of the agency's conclusions. Finally, Paragraph 3 states legal conclusions regarding the FDA's authority that require no response from Defendant.

4. During the more than two decades since FDA's approval of mifepristone as a safe and effective option for ending early pregnancy, medication abortion has been used by more than 5 million patients and now accounts for more than half of abortions nationwide. *See* Rachel K. Jones et al., Guttmacher Inst., *Medication Abortion Now Accounts for More*

*than Half of All US Abortions* (updated Dec. 1, 2022), https://www.guttmacher.org/article/2022/02/medication-abortion-now-accounts-more-half-all-us-abortions . Overthat time, substantial additional evidence of safe and effective use has accumulated.

**ANSWER:** The writing in Paragraph 4 speaks for itself and serves as the best evidence of its own contents. Defendant lacks sufficient information and knowledge to form a belief as to the truth or falsity of the allegations regarding the frequency of use of mifepristone. Defendant admits, on information and belief, that mifepristone is a safe and effective option for ending early pregnancy.

5. As more data and evidence have emerged, the Agency has revised and fine-tuned the Mifepristone REMS numerous times as part of its ongoing obligation under the REMS provisions of the FDCA. In its current form, the Mifepristone REMS requires providers to prescribe mifepristone under an FDA-approved Certified Prescriber Agreement, and to dispense mifepristone either directly or by issuing the prescription to a certified pharmacy. The Prescriber Agreement requires that providers be specially certified and possess certain

5

qualifications, and that they agree to report any patient deaths to the drug sponsor. The Mifepristone REMS also requires providers to ensure that medication abortion patients receive specific counseling and information, including a copy of the mifepristone Medication Guide, and that they consent by using an FDA-approved Patient Agreement Form. *See* FDA, Single Shared System for Mifepristone 200 MG, Risk Evaluation and Mitigation Strategy (REMS) (2023) ("2023 Mifepristone REMS"), attached as Ex. A. The Mifepristone REMS does *not* require, because FDA has affirmatively determined it should not, that mifepristone be provided by physicians only; that it be provided in person or in specially certified facilities; that it be preceded by in-person counseling, a 72-hour waiting period, an in-person examination by a physician, an ultrasound in all cases, or a determination of blood type; that the physician schedule an in-person follow-up visit with the patient; or that the physician report all adverse events potentially associated with the drug.

    **ANSWER:** The Mifepristone REMS and Certified Prescriber Agreement speak for themselves and serve as the best evidence of their own contents. Defendant admits, on

information and belief, that the FDA has revised the
Mifepristone REMS on more than one occasion.

6. Rejecting the regulatory framework imposed by
Congress and FDA, North Carolina has imposed (and recently
expanded) a complex web of requirements relating to the
provision of mifepristone that apply to all patients and
medical providers in the state, including Plaintiff. Unlike
FDA's framework, North Carolina's requirements —— including
recent legislative amendments that are scheduled to take
effect on July 1, 2023 —— state that abortion medications may
be provided only in person, only by a physician, and only
after state-mandated in-person counseling, a 72-hour waiting
period, an in-person physician examination, an ultrasound,
and a determination of the patient's blood type. North
Carolina also mandates that physicians use different patient
consent forms than those required by FDA, schedule an in-
person follow-up visit with every patient, and report any and
all adverse events to the State and FDA within 3 days. *See*
N.C. Gen. Stat. §§ 14-44, 14-45, 14-45.1, 90-21.82, 90-21.90;
N.C. Sess. Law 2023-14 ("S.L. 2023-14"), Part I (changes
effective July 1, 2023). North Carolina's restrictions

7

conflict with federal law and upset the regulatory balance
struck by FDA, creating an obstacle to the congressional
objectives that FDA carried out in imposing the Mifepristone
REMS.

   **ANSWER:** Defendant admits that North Carolina has
imposed laws and regulations relating to the provision of
mifepristone and/or abortion generally, including those
listed in Paragraph 6.  Those laws and regulations speak for
themselves and serve as the best evidence of their own
contents.  The remaining allegations state legal conclusions
to which on response is required.


   7.  Plaintiff is a physician who regularly provides care
to patients of reproductive age and ability and who regularly
prescribes mifepristone, as she is certified to do under the
Mifepristone REMS. When prescribing mifepristone, Plaintiff
complies with all of the Mifepristone REMS requirements, as
she must to maintain her prescriber certification.

   **ANSWER:** Defendant lacks knowledge or information
sufficient to form a belief as to the truth or falsity of
the allegations of Paragraph 7.

8.   As a medical provider in North Carolina, Plaintiff
is also subject to North Carolina's requirements relating to
providing mifepristone. Under the North Carolina
restrictions, instead of having the option of seeing patients
remotely via telehealth and either dispensing the medications
or providing a prescription for a patient to fill from a
pharmacy so that the patient may take the medication at the
place of their choosing, as FDA expressly authorizes,
Plaintiff must personally examine the patient; be physically
present when the patient takes the mifepristone (which must
be preceded by an ultrasound, a blood-type determination,
state-mandated in person counseling, and a 72-hour waiting
period); schedule and attempt to ensure that the patient
returns for an in-person follow-up visit; and comply with the
State's onerous and unnecessary reporting requirements.

**ANSWER:**  Defendant admits that North Carolina law
imposes certain requirements on the provision of
mifepristone, including requirements directed at medical
providers.  Those laws and regulations speak for themselves.


9.   These restrictions impose significant costs and
burdens on both Plaintiff and her patients. As a North

Carolina licensed physician, Plaintiff has a professional, legal, and ethical obligation to "use h[er] best judgment in the treatment and care of h[er] patient[s]" and to "exercise reasonable care and diligence in the application of h[er] knowledge and skill to [each] patient's case." *Hunt v. Bradshaw*, 88 S.E.2d 762, 765 (N.C. 1955); *see* N.C. Med. Bd., Position Statements, *The Licensee-Patient Relationship* 2.1.1: (Mar. 2022) ("N.C. Med. Bd. Position Statement")[1] ("All licensees should exercise their best professional judgement when making patient care decisions" regardless of "the health care system or setting in which a licensee practices.").

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations regarding costs and burdens on Plaintiff and her patients. The writings and legal opinion cited in Paragraph 9 speak for themselves and serve as the best evidence of their own contents.

10. The challenged restrictions impose unnecessary costs on Plaintiff and her practice and interfere with her ability

_____

[1] *Available at* https://www.ncmedboard.org/images/uploads/other_pdfs/Compendium_Final_03.25.2022.pdf .

to provide medical care to her patients according to her best medical judgment and in accordance with federal law. But for those restrictions, Plaintiff would be able to provide medication abortion care to a larger number of patients at lower cost. Further, medication abortion is inherently time-critical, and delaying such care can unnecessarily increase risk or even push patients outside the window for use of mifepristone, potentially forcing patients to have more involved and more expensive procedures (which will present heightened risks for some patients). Patients also must bear all of the risks and costs of pregnancy during the delays caused by the challenged restrictions.

**ANSWER:** Defendant admits, on information and belief, that the FDA has approved mifepristone for use through 70 days of gestation and, thus, that use of mifepristone is time-sensitive. Defendant further admits, on information and belief, that individuals who are not able to use mifepristone within the approved window for use may be required to find other alternatives if they wish to terminate an intrauterine pregnancy. Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the other allegations in Paragraph 10.

11.  As part of its congressionally mandated regulatory balancing, FDA specifically considered and rejected the idea that mifepristone must be provided in person by a physician in a particular type of facility.  FDA also considered and rejected more stringent physician adverse-event reporting requirements.  FDA instead concluded that mifepristone can be safely prescribed by any certified healthcare provider either in person or via telehealth, obtained by the patient directly from or under the supervision of the healthcare provider or from a certified pharmacy, and taken by the patient in her home or other place of her choosing. And FDA expressly concluded that requirements like those imposed by North Carolina are unnecessary to ensure patient safety and contrary to the regulatory balance that Congress and FDA sought to achieve.

**ANSWER:**  Defendant admits, on information and belief, that the FDA has repeatedly revised the Mifepristone REMS and has eliminated certain requirements for the provision of mifepristone as part of those revisions.  The Mifepristone REMS speak for themselves and serve as the best evidence of their own contents.

12.   For North Carolina to impose restrictions that go
beyond those FDA deemed warranted as part of its regulatory
balancing, including restrictions that FDA specifically
rejected, frustrates the objectives of federal law.  In light
of FDA's heightened oversight and scrutiny of REMS drugs, as
instructed by Congress in the REMS provisions of the FDCA,
there is no room for North Carolina to impose additional
restrictions and specific conditions for use that FDA, in the
exercise of its congressionally delegated REMS authority,
concluded are unwarranted and inappropriate.  Simply put,
North Carolina cannot stand in the shoes of FDA to impose
restrictions on medication access that FDA determined are not
appropriate and that upset the careful balance FDA was
directed by Congress to strike.

**ANSWER:**  The allegations in Paragraph 12 state legal
conclusions to which no response is required.


13.  Plaintiff seeks a declaratory judgment that North
Carolina's restrictions on mifepristone are preempted insofar
as they are inconsistent with the federal REMS, and an
injunction prohibiting Defendants from enforcing those
restrictions or taking any other action to restrict the

ability of a provider to provide, or a patient to access, mifepristone in accordance with federal law.

**ANSWER:** Defendant admits that Plaintiff seeks the declaratory judgment as described.


## PARTIES

14. Plaintiff, Dr. Amy Bryant, is a North Carolina board-certified and licensed physician with a medical practice in Orange County, North Carolina. Dr. Bryant regularly provides medical care to patients of reproductive age and ability. In that capacity, she regularly counsels patients about the option of mifepristone for medical termination of intrauterine pregnancy, in a regimen with misoprostol. She also provides care through telemedicine for other patients, and she would provide telehealth abortion care if she could do so free from the risk of enforcement action by Defendants. She is certified to prescribe mifepristone as required by the REMS, and she regularly prescribes and dispenses mifepristone in accordance with the REMS. Plaintiff brings this action in her personal capacity.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of

14

the allegations of Paragraph 14.

15. Defendant Joshua Stein is the Attorney General for the State of North Carolina. He is the chief law enforcement officer of the State with the power to enforce the North Carolina restrictions at issue. He is sued in his official capacity.

**ANSWER:** Defendant admits that Defendant Joshua Stein is the Attorney General for the State of North Carolina. He is the chief law enforcement officer of the State with the power to enforce the North Carolina restrictions at issue. He is sued in his official capacity.

16. Defendant Jeff Nieman is the District Attorney for North Carolina's 18th Prosecutorial District. He is responsible for criminal prosecutions under relevant North Carolina law occurring within Prosecutorial District 18, including in Orange County. See N.C. Const. art. IV, § 18(1); N.C. Gen. Stat. §§ 7A-60, 7A-61. He is sued in his official capacity.

**ANSWER:** Defendant admits the allegations in Paragraph 16 on information and belief.

15

17.  Defendant Kody H. Kinsley is the North Carolina
Secretary of Health and Human Services, whose department is
charged with (among other things) development of consent and
physician declaration forms and printed and online materials
required to be referenced in state-mandated pre-abortion
counseling; licensing of hospitals and certification of
clinics that provide abortion; denial, suspension, and
revocation of facility certifications; and investigations of
complaints relating to clinics that provide abortion.  *See*
N.C. Gen. Stat. §§ 90-21.83, 90-21.84; 10A N.C. Admin. Code
14E.0101, *et seq.;* S.L. 2023-14, sec. 1.2, §§ 90-21.83, 90-
21.83A, 90-21.84.  He is sued in his official capacity.

**ANSWER:**  Defendant admits the allegations in Paragraph
17 on information and belief.


18.  Defendant Michaux R. Kilpatrick, MD, PhD, is the
President of the North Carolina Medical Board, an entity
created by the North Carolina legislature and which
establishes procedures and requirements for licensure as a
physician in North Carolina.  N.C. Gen. Stat. §§ 90-2, 90-
9.1.  The Medical Board has the power to sanction physicians,
including placing them on probation and suspending or

16

revoking their licenses, for "[p]roducing or attempting to produce an abortion contrary to law." *Id.* § 90-14(a)(2); S.L. 2023-14, sec. 1.2, § 90-21.88A. She is sued in her official capacity.

**ANSWER:** Defendant admits the allegations in Paragraph 18 on information and belief.

19. Defendant Christine M. Khandelwal, DO, is a member and President-Elect of the North Carolina Medical Board. She is sued in her official capacity.

**ANSWER:** Defendant admits the allegations in Paragraph 19 on information and belief.

20. Defendant Devdutta G. Sangvai, MD, MBA, is a member and Secretary and Treasurer of the North Carolina Medical Board. He is sued in his official capacity.

**ANSWER:** Defendant admits the allegations in Paragraph 20 on information and belief.

21. Defendant John W. Rusher, MD, JD, is a member of the North Carolina Medical Board. He is sued in his official capacity.

**ANSWER:** Defendant admits the allegations in Paragraph 21 on information and belief.

22. Defendant William M. Brawley is a member of the North Carolina Medical Board. He is sued in his official capacity.

**ANSWER:** Defendant admits the allegations in Paragraph 22 on information and belief.

23. Defendant W. Howard Hall, MD, is a member of the North Carolina Medical Board. He is sued in his official capacity.

**ANSWER:** Defendant admits the allegations in Paragraph 23 on information and belief.

24. Defendant Sharona Y. Johnson, PhD, FNP-BC, is a member of the North Carolina Medical Board. She is sued in her official capacity.

**ANSWER:** Defendant admits the allegations in Paragraph 24 on information and belief.

25.  Defendant Joshua D. Malcolm, JD, is a member of the
North Carolina Medical Board.  He is sued in his official
capacity.

**ANSWER:**  Defendant admits the allegations in Paragraph
25 on information and belief.


26.  Defendant Miguel A. Pineiro, PA-C, MHPE, is a member
of the North Carolina Medical Board.  He is sued in his
official capacity.

**ANSWER:**  Defendant admits the allegations in Paragraph
26 on information and belief.


27.  Defendant Melinda H. Privette, MD, JD, is a member
of the North Carolina Medical Board.  She is sued in her
official capacity.

**ANSWER:**  Defendant admits the allegations in Paragraph
27 on information and belief.


28.  Defendant Anuradha Rao-Patel, MD, is a member of the
North Carolina Medical Board.  She is sued in her official
capacity.

**ANSWER:**  Defendant admits the allegations in Paragraph

28 on information and belief.

29.  Defendant Robert Rich, Jr., MD, is a member of the
North Carolina Medical Board.  He is sued in his official
capacity.

**ANSWER:**  Defendant admits the allegations in Paragraph
29 on information and belief.


## JURISDICTION AND VENUE

30.  This Court has original subject matter jurisdiction
over this action pursuant to 28 U.S.C. § 1331 because it
arises under the Constitution and laws of the United States.

**ANSWER:**  The allegations of Paragraph 30 state legal
conclusions to which no response is required.


31.  This Court has personal jurisdiction over Defendants
because they are domiciled in North Carolina and enactment
and enforcement of the state laws at issue occurred and
continues to occur within North Carolina.

**ANSWER:**  The allegations of Paragraph 31 regarding
personal jurisdiction state legal conclusions to which no
response is required.  It is admitted that the Attorney

General is domiciled in North Carolina and that the
enactment and potential enforcement of the state laws at
issues has occurred within North Carolina. Defendant lacks
knowledge or information sufficient to form a belief
regarding the domicile of the other defendants.

32.  Venue is proper within the Middle District of North
Carolina under 28 U.S.C. § 1391(b)(2) because Plaintiff is
located and practices medicine in this judicial district.

**ANSWER:**  The allegations of Paragraph 32 relating to
venue state legal conclusions to which no response is
required.  Defendant lacks knowledge or information
sufficient to form a belief as to the truth or falsity of
the allegations of Paragraph 32 regarding Plaintiff's
location and practice of medicine.

33.  This Court has the authority to enter a declaratory
judgment and provide injunctive relief pursuant to 28 U.S.C.
§§ 2201 and 2202, Federal Rules of Civil Procedure 57 and 65,
and this Court's inherent equitable powers.

**ANSWER:**  The allegations of Paragraph 33 state legal
conclusions to which no response is required.

34.  Plaintiff has standing because the challenged
provisions of North Carolina law directly operate against
Plaintiff by regulating her conduct and subjecting her to a
threat of enforcement when she prescribes mifepristone or
advises patients regarding the use of mifepristone. As a
North Carolina licensed physician, Plaintiff has a
professional, legal, and ethical obligation to "use h[er]
best judgment in the treatment and care of h[er] patient[s]"
and to "exercise reasonable care and diligence in the
application of h[er] knowledge and skill to [each] patient's
case." *Hunt*, 88 S.E.2d at 765; *see* N.C. Med. Bd. Position
Statement 2.1.1 ("All licensees should exercise their best
professional judgement when making patient care decisions"
regardless of "the health care system or setting in which a
licensee practices."). The challenged restrictions impose
unnecessary costs on Plaintiff, her patients, and her
practice and interfere with her ability to provide medical
care to her patients according to her best medical judgment
and in accordance with federal law. But for those
restrictions, Plaintiff would be able to provide a wider range
of mifepristone-related services to a larger number of
patients at lower cost, including by providing flexible

telehealth services to patients and by delegating some tasks related to medication abortion care to non-physician colleagues. Plaintiff would be subject to direct criminal, civil, and administrative penalties under North Carolina law if she were to violate its provisions.

**ANSWER:** The writings and legal opinion cited in Paragraph 34 speak for themselves and serve as the best evidence of their own contents. Defendant lacks knowledge or information sufficient to form a belief about Plaintiff's practice of medicine and the costs she may incur. Otherwise, the allegations of Paragraph 34 state legal conclusions to which no response is required.


35. Plaintiff's claims are ripe because the challenged North Carolina laws are currently in effect and enforceable and are presently impacting her ability to provide and offer medical advice regarding mifepristone to her patients according to her best medical judgment and in accordance with federal law.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the impact that North Carolina laws may have on Plaintiff's practice of medicine.

Otherwise, the allegations of Paragraph 35 state legal conclusions to which no response is required.

## FACTUAL ALLEGATIONS

### A.    Statutory and Regulatory Background

36.  Under the FDCA, no drug manufacturer, or "sponsor," can introduce its drug into interstate commerce unless and until that sponsor first obtains marketing approval from FDA. 21 U.S.C. §§ 321(p), 331(d), 355(a).

**ANSWER:**  The allegations of Paragraph 36 state legal conclusions to which no response is required.  The statutes cited in Paragraph 36 speak for themselves and serve as the best evidence of their own contents.

37.  To seek approval under the FDCA, a drug sponsor must undertake a lengthy development program that typically includes, as it did in this case, significant clinical trial data, as well as extensive engagement with FDA in meetings and through written and oral feedback.  The drug sponsor then submits a new drug application ("NDA") seeking FDA's authorization to sell and market the drug.

**ANSWER:**  The FDCA speaks for itself and serves as the

24

best evidence of its own contents.

38.  FDA reviews NDAs to ensure that they include adequate safety data and substantial evidence of efficacy, among other things.  FDA may not approve an NDA unless it determines that the data and information included in the NDA demonstrate that the drug is both safe and effective "for use under the conditions prescribed, recommended, or suggested in the proposed labeling thereof."  21 U.S.C. § 355(d); 21 C.F.R. § 314.125(b).

**ANSWER:**  Defendant lacks information and knowledge sufficient to form a belief regarding the FDA's review of NDAs.  The other allegations of Paragraph 38 state legal conclusions to which no response is required.  Furthermore, the statutes cited in Paragraph 38 speak for themselves and serve as the best evidence of their own contents.

39.  Because all drugs have the potential for adverse effects, demonstrating safety necessary for approval does not require showing that a drug has no potential adverse effects, but rather that the drug's benefits outweigh its risks.  *See Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 476 (2013).

**ANSWER:** Defendant lacks information and knowledge sufficient to form a belief as to whether all drugs have the potential for adverse effects. The other allegations of Paragraph 39 state legal conclusions to which no response is required. Furthermore, the case cited in Paragraph 38 speaks for itself and serves as the best evidence of its own contents.

40. Congress created REMS as a risk management tool, codifying FDA's authority with respect to drugs that are expected to provide substantial benefits, but which FDA determines also pose risks that would otherwise result in FDA denying an application to sell or market those drugs. *See* Food and Drug Administration Amendments Act of 2007 ("FDAAA"), Pub. L. No. 110-85, § 901, 121 Stat. 823, 926 (enacting 21 U.S.C. § 355-1); 21 U.S.C. § 355-1(a)(2) (extending the REMS authority to already-approved drugs). Within a REMS, FDA may impose requirements, including requiring information for patients and imposing restrictions on prescribers and distribution, that go above and beyond those that FDA is able to require in the absence of a REMS.

**ANSWER:** The allegations of Paragraph 40 state legal

26

conclusions to which no response is required. Furthermore, the statutes cited in Paragraph 40 speak for themselves and serve as the best evidence of their own contents.

41. In enacting the REMS provision, Congress required FDA to consider both the risks associated with the drugs and the burden of imposing various requirements, and to choose the least restrictive set of requirements sufficient to ensure a positive benefit-risk profile, *i.e.*, ensuring safe use of the drug by managing identified safety risks while also maximizing patient access to the drug and minimizing burdens on the healthcare system. *See, e.g.*, 21 U.S.C. § 355-1(a)(1), (f)(2), (f)(5), (g)(2)(C), (g)(4)(B); *see also* FDA, No. FDA-2018-D-4628, Draft Guidance for Industry: REMS Assessment: Planning and Reporting at 13 (Jan. 2019) ("REMS Assessment Draft Guidance")[2] (REMS with ETASU "shall, considering the risk, not be unduly burdensome on patient access, and, to the extent practicable, minimize the burden on the health care delivery system").

**ANSWER:** The allegations of Paragraph 41 state legal

_____

[2] *Available at* https://www.fda.gov/regulatory-information/search-fda-guidance-documents/rems-assessment-planning-and-reporting.

conclusions to which no response is required. Furthermore, the statutes and REMS Assessment Draft Guidance cited in Paragraph 41 speak for themselves and serve as the best evidence of their own contents.

42. Congress provided a series of tools that FDA can incorporate in a particular REMS to strike the right balance between ensuring safe use and avoiding undue burdens on patient access or the healthcare delivery system. For instance, a REMS may include a medication guide or patient package insert, *see* 21 U.S.C. § 355-1(e)(2); a communication plan, including letters to healthcare providers, *see id.* § 355-1(e)(3); and/or packaging and disposal requirements, *see id.* § 355-1(e)(4).

**ANSWER:** The allegations of Paragraph 42 state legal conclusions to which no response is required. Furthermore, the statutes cited in Paragraph 42 speak for themselves and serve as the best evidence of their own contents.

43. In addition to these relatively more modest requirements, a REMS can also include ETASU that FDA determines are necessary for the drug to be approved. *See* 21

28

U.S.C. § 355-1(f)(1). These additional elements may require that healthcare providers who prescribe the drug have particular training or experience or be specially certified; that pharmacies, practitioners, or health care settings that dispense the drug be specially certified; that the drug be dispensed to patients only in certain health care settings; that the drug be dispensed to patients with evidence or other documentation of safe-use conditions, such as laboratory test results; or that patients be subject to monitoring or be enrolled in a registry. *Id.* § 355-1(f)(3).

**ANSWER:** The allegations of Paragraph 43 state legal conclusions to which no response is required. Furthermore, the statutes cited in Paragraph 43 speak for themselves and serve as the best evidence of their own contents.


44. Because ETASU requirements have the potential to unduly restrict access to drugs with meaningful therapeutic benefits, Congress imposed strict limitations on their use. Any ETASU imposed by FDA must be "commensurate with" a specific serious identified risk of the drug. 21 U.S.C. § 355-1(f)(2)(A). They must "not be unduly burdensome on patient access to the drug." *Id.* § 355-1(f)(2)(C). And they

must be designed "to minimize the burden on the health care delivery system" of complying with the requirements. *Id.* § 355-1(f)(2)(D). In considering burdens on patient access, Congress directed FDA to give particular consideration to "(i) patients with serious or life-threatening diseases or conditions, (ii) patients who have difficulty accessing health care (such as patients in rural or medically underserved areas), and (iii) patients with functional limitations." *Id.* § 355-1(f)(2)(C)(i)-(iii).

**ANSWER:** The allegations of Paragraph 44 state legal conclusions to which no response is required. Furthermore, the statutes cited in Paragraph 44 speak for themselves and serve as the best evidence of their own contents.


45. When FDA imposes ETASU requirements, Congress requires the Agency to seek input from patients, physicians, pharmacists, and other healthcare providers about how to design those requirements so as not to be unduly burdensome on patient access to the drug and to minimize the burden on the healthcare delivery system. 21 U.S.C. § 355-1(f)(5)(A).

**ANSWER:** The allegations of Paragraph 45 state legal conclusions to which no response is required. Furthermore,

the statutes cited in Paragraph 45 speak for themselves and serve as the best evidence of their own contents.

46. Congress also charged FDA with continued monitoring and periodic re-assessment of REMS and ETASU to ensure that they continue to reflect the least restrictive set of requirements necessary to ensure safety while protecting patient access, in light of the Agency's evolving understanding of a particular drug's risks and benefits. Every REMS thus includes a timetable for periodic assessments of the effectiveness of the risk mitigation strategy. *See* 21 U.S.C. § 355-1(c)(1), (d). FDA must "periodically evaluate" ETASU requirements to assess whether they are necessary to assure safe use, are not unduly burdensome on patient access to the drug, and minimize the burden on the healthcare delivery system; and the Agency must "modify" those requirements "as appropriate" in light of those evaluations and input received from patients, physicians, pharmacists, and other healthcare providers. 21 U.S.C. § 355-1(f)(5)(B), (C). Further, Congress obligated FDA to institute a REMS review and initiate modification of a REMS if at any time the Agency determines that the REMS should be modified to

"minimize the burden on the health care delivery system of complying with the strategy." *Id.* § 355-1(g)(4)(B).

**ANSWER:** The allegations of Paragraph 46 state legal conclusions to which no response is required. Furthermore, the statutes cited in Paragraph 46 speak for themselves and serve as the best evidence of their own contents.

47. FDA guidance states that the process of identifying and minimizing potential burdens on the healthcare system and barriers to patient access "should begin during the REMS design phase," when drug sponsors must demonstrate that they have considered and attempted to minimize potential burdens and barriers; and should continue during the post-approval implementation phase, when sponsors are required, as part of their periodic REMS assessments, to use metrics, data sources, and analytical tools "to assess REMS burdens" and "barriers to patient access." REMS Assessment Draft Guidance at 13-15.

**ANSWER:** The allegations of Paragraph 47 state legal conclusions to which no response is required. Furthermore, the REMS Assessment Draft Guidance referenced in Paragraph 47 speaks for itself and serves as the best evidence of its

32

own contents.

48.  Because REMS with ETASU are the most restrictive approach available for ensuring safe use of approved drugs, they are imposed on a very limited number of drugs.  Of the more than 20,000 prescription drugs FDA has approved,[3] FDA's website lists only 56 currently approved REMS with ETASU.[4]

**ANSWER:**  Defendant lacks information and knowledge sufficient to form a belief as to the number of prescription drugs FDA has approved or whether REMS with ETASU are the most restrictive approach available for ensuring safe use of approved drugs.  Furthermore, the website cited in Paragraph 48 speaks for itself and serves as the best evidence of its own contents.

B.  **FDA's Approval of Mifepristone and the Mifepristone REMS**

49.  Mifepristone is used in medication abortion in a

_____

[3] *See Fact Sheet: FDA at a Glance*, FDA.gov (Nov. 2021), https://www.fda.gov/about-fda/fda-basics/fact-sheet-fda-glance ("There are over 20,000 prescription drug products approved for marketing.").

[4] *See Approved Risk Evaluation and Mitigation Strategies (REMS)*, FDA.gov (2023), https://www.accessdata.fda.gov/ scripts/cder/rems/index.cfm.

regimen with misoprostol.  Typically a patient first takes
mifepristone, which works by blocking the hormone
progesterone, without which the pregnancy cannot continue;
followed by misoprostol 24 to 48 hours later, which causes
uterine contractions similar to an early miscarriage.
Medication abortion typically involves cramping, pain, and
bleeding; more serious complications are extremely rare,
"occurring in no more than a fraction of a percent of
patients." Nat'l Acads. of Scis., Eng'g, & Med., The Safety
and Quality of Abortion Care in the United States 55 (2018),
*available at* http://nap.nationalacademies.org/24950.  These
risks "are both low and similar in magnitude to the reported
risks of serious adverse effects of commonly used
prescription and over-the-counter medications," such as pain
relievers like aspirin and ibuprofen and common antibiotics.
*Id.* at 58.

   **ANSWER:**  Defendant admits, on information and belief,
that mifepristone is used to terminate intrauterine
pregnancies in a two-drug regimen with misoprostol.  The
writing referenced in Paragraph 49 speaks for itself and
serves as the best evidence of its own contents.

50.  FDA initially approved mifepristone in 2000 under the trade name Mifeprex (an abbreviated new drug application for a generic version of mifepristone was approved in 2019). FDA-approved product labeling specified that mifepristone was approved for the medical termination of intrauterine pregnancy, in a regimen with misoprostol.  Mifeprex (mifepristone) Prescribing Information (2000) ("2000 Prescribing Information"), attached as Ex. B.

**ANSWER:**  Defendant admits, on information and belief, that the FDA approved mifepristone in 2000 under the trade name Mifeprex.  Defendant further admits, on information and belief, that the FDA approved a generic version of mifepristone in 2019.  The Prescribing Information referenced in Paragraph 50 speaks for itself and serves as the best evidence of its own contents.

51.  Since its initial approval in 2000, FDA has closely monitored mifepristone and has made updates to the mix of regulatory controls FDA has imposed on the drug — including changes to the approved labeling, the risk mitigation plan, and the REMS — in 2004, 2005, 2009, 2016, 2019, 2021, and

2023.[5]  In so doing, FDA has approved lifting or otherwise modifying certain of the REMS elements and ETASU when it determined that a particular ETASU or other REMS element was unduly burdensome or no longer necessary to maintain a favorable benefit-risk profile for the drug.

**ANSWER:**  Defendant admits, on information and belief, that the FDA has repeatedly revised its regulatory controls for mifepristone and has eliminated certain requirements for the provision of mifepristone as part of those revisions. The Mifepristone REMS, labels, and risk mitigation plan speak for themselves and serve as the best evidence of their own contents.


52.  Each REMS modification reflects FDA's exercise of its congressionally mandated responsibility to continue to consider scientific evidence regarding the safe and effective use of mifepristone as well as burdens on patient access and the health care delivery system, and to adjust and refine the federal regulatory balance based on such consideration.

**ANSWER:**  The allegations of Paragraph 52 state legal
_____

[5] *See Drugs@FDA: NDA 020687*, FDA.gov, https://www.accessdata. fda.gov/scripts/cder/daf/index.cfm?event=overview.process&Appl No=020687.

36

conclusions to which no response is required.

### 1. FDA's Initial Approval of Mifepristone in 2000

53.  In initially considering whether to approve the Mifeprex NDA, FDA determined that medication abortion provides a meaningful therapeutic benefit to some patients. *See* 21 C.F.R. § 314.500; NDA 020687, Approval Letter from FDA to Sandra P. Arnold, Population Council at 1 (Sept. 28, 2000) ("Mifeprex Approval Letter"), attached as Ex. C (noting that the application was "approved under 21 CFR 314 Subpart H"); Memorandum from FDA to NDA 20-687 MIFEPREX (mifepristone) Population Council at 6 (Sept. 28, 2000) ("Mifeprex Approval Memorandum"), attached as Ex. D. It has never deviated from that determination. As FDA has recognized, "[p]regnancy can be a serious medical condition in some women" and is associated with numerous health risks, including preeclampsia and eclampsia; an increased risk of thromboembolic complications, including deep vein thrombophlebitis and pulmonary embolus; disseminated intravascular coagulopathy (a rare but serious complication); amniotic fluid embolism; life-threatening hemorrhage associated with placenta previa, placenta accreta, placental abruption, labor and delivery, or

surgical delivery; postpartum depression; and exacerbation or
more difficult management of preexisting medical conditions
(*e.g.*, diabetes, lupus, cardiac disease, hypertension).
Letter from Janet Woodcock, M.D., Dir., Ctr. for Drug
Evaluation & Rsch. to Donna Harrison, M.D., *et al.*, Denying
Citizen Petition Asking FDA to Revoke Approval of Mifeprex at
4 (Mar. 29, 2016), attached as Ex. E. FDA further observed
that continued pregnancy carries a significant risk that a
patient may require a major surgical procedure and
anesthesia, as well as endure depression, anxiety, and other
conditions. *Id.* at 4-5.

**ANSWER:** The writings referenced in Paragraph 53 speak
for themselves and serve as the best evidence of their own
contents.


54. In reviewing the NDA for Mifeprex, FDA determined
that distribution restrictions were necessary in order to
approve Mifeprex. The approved NDA for Mifeprex thus included
a risk mitigation plan that included distribution
restrictions under the regulations that predated the 2007
REMS statute. *See* 21 C.F.R. § 314.520; Mifeprex Approval
Letter at 2 (Ex. C); Mifeprex Approval Memorandum at 6,

(Ex. D).

    **ANSWER:**  The writings referenced in Paragraph 54 speak for themselves and serve as the best evidence of their own contents.

    55.  FDA's initial 2000 approval required that Mifeprex could only be "provided by or under the supervision of a physician" who had signed a Prescriber Agreement Form. Mifeprex Approval Letter at 2 (Ex. C). The Prescriber Agreement Form specified the qualifications that FDA had determined were necessary for a physician to become certified to prescribe mifepristone, including the ability to (a) assess duration of pregnancy (although, as described in the Mifeprex 2000 Prescribing Information (Ex. B), an ultrasonographic scan need only be used if the duration of pregnancy is uncertain or if ectopic pregnancy is suspected); (b) diagnose ectopic pregnancies; (c) provide surgical intervention in cases of incomplete abortion or severe bleeding, or have made plans to provide such care through others; and (d) assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary. Mifeprex (Mifepristone) Tablets, 200 mg

Prescriber's Agreement (2000) ("2000 Prescriber Agreement"), attached as Ex. F.

   **ANSWER:** The writings referenced in Paragraph 55 speak for themselves and serve as the best evidence of their own contents.


   56.  The Prescriber Agreement Form required the signatory to have read and understood the prescribing information and to follow guidelines for use, including: (a) providing the patient with a copy of the Patient Agreement Form and the Medication Guide; (b) fully explaining the procedure to each patient; (c) answering any questions the patient had about the procedure; and (d) signing and obtaining the patient's signature on the Patient Agreement Form.  It also required the signatory to report "any hospitalization, transfusion, or other serious [adverse] event" to the drug's sponsor, 2000 Prescriber Agreement at 3 (Ex. F), which in turn was required to report it to FDA, 21 C.F.R. §§ 314.80, 314.81; Mifeprex Approval Letter (Ex. C).

   **ANSWER:** The writings referenced in Paragraph 56 speak for themselves and serve as the best evidence of their own contents.

57. According to FDA, the purpose of the Patient Agreement Form was to make sure that patients "understand the type of regimen they are about to commit to and its risks and benefits." Mifeprex Approval Memorandum at 3 (Ex. D). To that end, the form specified that the patient had been told about the risks and benefits of mifepristone and that she fully understood the treatment and its potential complications. It also included statements regarding the administration of mifepristone, *e.g.*, "I understand that I will take Mifeprex in my provider's office" and "I must return to my provider's office in about 2 weeks (about Day 14) after I take Mifeprex to be sure that my pregnancy has ended and that I am well." Mifeprex (mifepristone) Tablets Patient Agreement (2000), attached as Ex. G.

**ANSWER:** The writings referenced in Paragraph 57 speak for themselves and serve as the best evidence of their own contents.


58. The Prescriber Agreement Form and Patient Agreement Form remain part of the ETASU under the Mifepristone REMS today, with modifications including those described below.

**ANSWER:** The writings referenced in Paragraph 58 speak

41

for themselves and serve as the best evidence of their own
contents.

### 2. FDA's Approval of the Mifepristone REMS in 2011

59. When Congress enacted the statutory REMS provision
in 2007, it expressly deemed certain drugs (including
mifepristone) that had in effect an approved risk mitigation
plan under 21 C.F.R. Subpart H to have approved REMS in
effect, and it required those drugs' sponsors to submit
proposed REMS for approval under the new statute. *See* FDAAA
§ 909(b), 121 Stat. at 950-51; FDA, Identification of Drug
and Biological Products Deemed to Have Risk Evaluation and
Mitigation Strategies for Purposes of the Food and Drug
Administration Amendments Act of 2007, 73 Fed. Reg. 16,313
(Mar. 27, 2008).

**ANSWER:** The writings referenced in Paragraph 59 speak
for themselves and serve as the best evidence of their own
contents.

60. In June 2011, FDA approved the first REMS for
mifepristone under the FDAAA. The 2011 Mifepristone REMS
carried forward the distribution restrictions FDA had

previously imposed on mifepristone and included as ETASU the restrictions previously imposed in the 2000 Mifeprex risk mitigation plan: Physicians were required to be "specially certified" by completing the Prescriber Agreement; mifepristone was to be dispensed "only in certain health care settings, specifically clinics, medical offices, and hospitals"; and it was to be dispensed only with documentation of safe use conditions, including obtaining the patient's signature on the Patient Agreement. Physicians were still required to report "serious" adverse events (in addition to the sponsor's ongoing adverse event reporting requirement). The 2011 REMS also specified as a REMS element that the Medication Guide be provided with each Mifeprex prescription. FDA, NDA 20-687 Mifeprex (mifepristone) Tablets, 200 mg, Risk Evaluation and Mitigation Strategy (REMS) at 1-2 (2011) ("2011 Mifepristone REMS"), attached as Ex. H; *see also* NDA 020687/S-014, Supplement Approval Letter from FDA to Danco Labs., LLC at 1 (June 8, 2011), attached as Ex. I.

**ANSWER:** Defendant admits, on information and belief, that the FDA approved the first REMS for mifepristone in 2011. Otherwise, the writings referenced in Paragraph 60 speak for themselves and serve as the best evidence of their

43

own contents.

### 3. FDA's Modification of the Mifepristone REMS in 2016

61. In 2016, FDA "assessed the current REMS program to determine whether each Mifeprex REMS element remains necessary to ensure that the drug's benefits outweigh the risks" in light of the extensive data and information about clinical practice collected since the original approval 16 years earlier. NDA 020687/S-020, Supplement Approval Letter from FDA to Danco Labs., LLC at 2 (Mar. 29, 2016), attached as Ex. J; *see also* FDA, NDA 020687/S-020, Risk Evaluation and Mitigation Strategy (REMS) Memorandum, REMS Modification at 2 (Mar. 29, 2016) ("2016 REMS Memorandum"), attached as Ex. K; FDA, NDA 020687/S-020, REMS Modification Review at 5, 10 (Mar. 29, 2016) ("2016 REMS Modification Review"), attached as Ex. L; FDA, NDA 020687/S-020, Addendum to REMS Modification Review § 3 (Mar. 29, 2016) ("2016 REMS Modification Review Addendum"), attached as Ex. M.

**ANSWER:** The writings referenced in Paragraph 61 speak for themselves and serve as the best evidence of their own contents.

44

62.  In light of its review, FDA approved several changes
to the Mifepristone REMS that expanded the provision of
medication abortion. *See* FDA, NDA 20-687 Mifeprex
(mifepristone) Tablets, 200 mg, Risk Evaluation and
Mitigation Strategy (REMS) (2016) ("2016 Mifepristone REMS"),
attached as Ex. N. Among other things, the 2016 REMS allowed
qualified healthcare providers other than physicians to
become certified to prescribe mifepristone. *Compare* 2016
Mifepristone REMS, Prescriber Agreement Form (Ex. N) (stating
that "Mifeprex must be provided by or under the supervision
of *a healthcare provider* who prescribes and meets the
following qualifications" (emphasis added)) *with* 2011
Mifepristone REMS, Prescriber's Agreement (Ex. H) (stating
that "Mifeprex must be provided by or under the supervision
of *a physician* who meets the following qualifications"
(emphasis added)).

   **ANSWER:**  Defendant admits, on information and belief,
that the FDA modified the Mifepristone REMS in 2016.
Otherwise, the writings referenced in Paragraph 62 speak for
themselves and serve as the best evidence of their own
contents.

63.  In addition, the 2016 modification revised the
Patient Agreement to no longer state that the patient
understood mifepristone would be *administered* in-person in
the provider's office (while retaining the requirement that
it be *dispensed* in-person in a clinic, medical office, or
hospital).  *Compare* 2016 Mifepristone REMS, Patient Agreement
(Ex. N) (stating simply, "I understand . . . I will take
Mifeprex on Day 1," with no location specified) *with* 2011
Mifepristone REMS, Patient Agreement (Ex. H) (stating, "I
understand that I will take Mifeprex *in my provider's office*"
(emphasis added)); *see also* 2016 Mifepristone REMS § II.A.2
(Ex. N) (continuing to specify locations where mifepristone
could be dispensed); 2016 REMS Memorandum at 1-2 (Ex. K);
2016 REMS Modification Review at 5-7 (Ex. L); 2016 REMS
Modification Review Addendum §§ 2.1.1.1, 2.2.1 (Ex. M).
Consistent with its congressional mandate to assure safe use
without burdening access, FDA concluded that in-person
administration should not be required.  *See* 2016 REMS
Modification Review Addendum § 2.1.1.1 (Ex. M) (noting that
the Patient Agreement was being modified to "revis[e] where
Mifeprex . . . should be taken").  FDA also determined that
in-person follow-up visits should not be required in all

46

cases. *Compare* 2016 Mifepristone REMS, Patient Agreement (Ex. N) (stating, "I should follow up with my healthcare provider") *with* 2011 Mifepristone REMS, Patient Agreement (Ex. H) (stating, "I must return to my provider's office"); *see* Letter from Patrizia A. Cavazzoni, M.D., Dir., Ctr. For Drug Evaluation & Rsch. to Donna Harrison, M.D., *et al.*, Denying Citizen Petition at 13-14 (Dec. 16, 2021) ("AAPLOG Citizen Petition Denial Letter"), attached as Ex. P (noting FDA's conclusion that "appropriate follow-up . . . may be accomplished in multiple ways and not all require an in-clinic visit"). And FDA also determined that prescribers should no longer be required to report adverse events other than death (although they could still report such events voluntarily, and the sponsor continued to be obligated to comply with post-approval reporting requirements). *See* 2016 Mifepristone REMS §§ II.A.1.b.vi, II.B.5 (Ex. N); 21 C.F.R. §§ 314.80, 314.81.

**ANSWER:** The writings referenced in Paragraph 63 speak for themselves and serve as the best evidence of their own contents.

64. In considering the 2016 modifications, FDA also

rejected certain REMS modifications the sponsor requested
because FDA concluded those modifications would be
inappropriate.  For example, FDA did not approve the sponsor's
application to remove the Patient Agreement Form requirement
from the REMS because FDA determined that the form "would not
interfere with access and would provide additional assurance
that the patient is aware of the nature of the procedure, its
risks, and the need for appropriate follow-up care."
Memorandum from Janet Woodcock, M.D., Dir., Ctr. for Drug
Evaluation & Rsch. regarding NDA 020687/S-020 (Mar. 28,
2016), attached as Ex. O.

    **ANSWER:**  The writings referenced in Paragraph 64 speak
for themselves and serve as the best evidence of their own
contents.


        **4.  FDA's Further Modification of the Mifepristone
           REMS in 2023**

    65.  In April 2021, FDA communicated its intent to
exercise enforcement discretion during the COVID-19 public
health emergency regarding the REMS ETASU requiring that
mifepristone be dispensed only in certain healthcare settings
(*i.e.*, the in-person dispensing requirement).  Joint Motion

to Stay Case Pending Agency Review, *Chelius v. Becerra*,
No. 1:17-cv-00493-JAO-RT (D. Haw. May 7, 2021), Doc. 148
("*Chelius* Stay Motion"); *see* AAPLOG Citizen Petition Denial
Letter at 5 (Ex. P).

**ANSWER:** The writings referenced in Paragraph 65 speak
for themselves and serve as the best evidence of their own
contents.


66. Also in 2021, FDA "undertook a full review of the
Mifepristone REMS Program," reviewing multiple sources of
information, including published literature, safety
information submitted to the Agency during the COVID-19
public health emergency, FDA Adverse Event Reporting System
reports, the REMS assessment reports for mifepristone
submitted in April 2020, and information provided by the
sponsors, advocacy groups, and individuals. AAPLOG Citizen
Petition Denial Letter at 6 (Ex. P); *see Chelius* Stay Motion
at 2 ("FDA is reviewing the elements of the REMS for Mifeprex
and its approved generic . . . in accordance with the REMS
assessment provisions of Section 505-1 of the [FDCA]."); *see
also* FDA, NDA 020687 & ANDA 91178, REMS Modification Rationale
Review at 10, 19-36 (Dec. 16, 2021) ("REMS Modification

49

Rationale Review"), attached as Ex. Q.

    **ANSWER:** Defendant lacks information and knowledge sufficient to form a belief regarding what the FDA reviewed as part of its review of the Mifepristone REMS in 2021. The writings referenced in Paragraph 66 speak for themselves and serve as the best evidence of their own contents.

    67. Following that review, on December 16, 2021, FDA sent REMS modification notification letters to the mifepristone drug sponsors. In those letters, FDA stated that "[i]n accordance with section 505-1(g)(4)(B) of the [FDCA], we have determined that your approved REMS for mifepristone must be modified to minimize the burden on the healthcare delivery system of complying with the REMS and to ensure that the benefits of the drug outweigh the risks." NDA 020687, REMS Modification Notification Letter from FDA to Danco Labs., LLC at 1 (Dec. 16, 2021), attached as Ex. R.

    **ANSWER:** The writings referenced in Paragraph 67 speak for themselves and serve as the best evidence of their own contents.

68.  In particular, FDA required that the Mifepristone REMS be modified to (1) remove the in-person dispensing requirement and (2) add a requirement that pharmacies that dispense the drug be specially certified. *Id.* at 1-2. FDA explained that "[r]emoval of the requirement for in-person dispensing" was "necessary" to "minimize the burden on the healthcare delivery system of complying with the REMS," and that the requirement was "no longer necessary to ensure the benefits of mifepristone outweigh the risks." *Id.* at 1-2; *see also* AAPLOG Citizen Petition Denial Letter at 6 (Ex. P) ("Removing the in-person dispensing requirement will render the REMS less burdensome to healthcare providers and patients, and . . . the REMS will continue to ensure that the benefits of mifepristone for medical abortion outweigh the risks.").

**ANSWER:**  The writings referenced in Paragraph 68 speak for themselves and serve as the best evidence of their own contents.


69.  In January 2023, FDA approved a modification of the Mifepristone REMS that effectuated these changes. *See* 2023 Mifepristone REMS (Ex. A); *see also* NDA 020687/S-025,

Supplement Approval Letter from FDA to Danco Labs., LLC (Jan. 3, 2023), attached as Ex. S. Consistent with FDA's 2021 directive, the 2023 modification removed the requirement that mifepristone be dispensed only in certain healthcare settings, specifically clinics, medical offices, and hospitals (*i.e.*, the "in-person dispensing" requirement). It also added a certification requirement for pharmacies that dispense mifepristone in order to "ensure[] that pharmacies are aware of and agree to follow applicable REMS requirements, and [] that mifepristone is only dispensed pursuant to prescriptions that are written by certified prescribers." FDA, NDA 020687/S-025 and ANDA 091178/S-004, Review of proposed Major REMS Modification at 13 (Jan. 3, 2023) ("2023 REMS Modification Review"), attached as Ex. T; *see also id*. at 4, 9. The 2023 modification also updated the REMS goals to add that mifepristone can be dispensed "by or under the supervision of certified prescribers, *or* by certified pharmacies on prescriptions issued by certified prescribers." 2023 Mifepristone REMS at 1 (Ex. A) (emphasis added).

**ANSWER:** Defendant admits, on information and belief, that the FDA modified the Mifepristone REMS in January 2023. Otherwise, the writings referenced in Paragraph 69 speak for

52

themselves and serve as the best evidence of their own contents.

70.  FDA left in place the REMS requirement of healthcare provider certification, while concluding that the "[t]he burden of prescriber certification has been minimized to the extent possible."  2023 REMS Modification Review at 10 (Ex. T); REMS Modification Rationale Review at 14 (Ex. Q). FDA also determined that the Patient Agreement Form remains "an important part of standardizing the medication information on the use of mifepristone that prescribers communicate to their patients." 2023 REMS Modification Review at 11 (Ex. T); REMS Modification Rationale Review at 18 (Ex. Q).

**ANSWER:**  The writings referenced in Paragraph 70 speak for themselves and serve as the best evidence of their own contents.

71.  FDA did not substantively change the prescriber certification requirements, but it did add requirements related to pharmacy certification to facilitate pharmacy dispensing.  For example, for a pharmacy to become certified,

53

the authorized representative must sign a "Pharmacy Agreement
Form" attesting that they have read and understood the
Prescribing Information and that each location of the
pharmacy will be able to receive Prescriber Agreement Forms,
ship mifepristone under certain conditions, and adopt
processes and procedures to fulfill the REMS requirements.
2023 REMS Modification Review at 12-15 (Ex. T); *see also* 2023
Mifepristone REMS at 3-4 & Pharmacy Agreement Form (Ex. A);
REMS Modification Rationale Review at 40-41 (Ex. Q).

    **ANSWER:**  The allegations of Paragraph 71 state legal
conclusions to which no response is required.  Moreover, the
writings referenced in Paragraph 71 speak for themselves and
serve as the best evidence of their own contents.


    72.  FDA explained that the 2023 modifications "will
continue to ensure the benefits of mifepristone for medical
abortion outweigh the risks while minimizing the burden
imposed by the REMS on healthcare providers and patients."
2023 REMS Modification Review at 13 (Ex. T); *see also id*. at
19-20.

    **ANSWER:**  The writings referenced in Paragraph 72 speak
for themselves and serve as the best evidence of their own

contents.

73.  Thus, as it currently stands, FDA's Mifepristone REMS requires (among other things) that: (1) mifepristone can only be prescribed by or under the supervision of a certified provider, *i.e.*, a healthcare provider who has signed and submitted a Prescriber Agreement Form; (2) mifepristone can be provided either directly by or under the supervision of a certified prescriber or through a certified pharmacy to which a certified prescriber has sent a prescription; and (3) the patient must sign a Patient Agreement Form, including an attestation that the prescribing healthcare provider has provided information as necessary to comply with the Mifepristone REMS and that the patient has received a copy of the Medication Guide.

**ANSWER:**  The allegations of Paragraph 73 state legal conclusions to which no response is required.  Moreover, the writings referenced in Paragraph 73 speak for themselves and serve as the best evidence of their own contents.

74.  This means that under federal law, a certified healthcare practitioner (who need not be a physician) can prescribe mifepristone to a patient (either in person or

55

Case 1:23-cv-00077-WO-LPA   Document 90   Filed 08/21/23   Page 55 of 71

through telemedicine), and either she or someone under her supervision can dispense the medication to the patient or she can provide a prescription for the patient to obtain the medication from a certified pharmacy and take the medication at home or another place of her choosing. FDA has concluded that this specific package of regulatory requirements is, in the Agency's view, commensurate with the risks of mifepristone and sufficient to ensure its safe use while not unduly burdening patient access or the healthcare delivery system. *See* 21 U.S.C. § 355-1(f)(2).

**ANSWER:** Defendant lacks sufficient information and knowledge to form a belief regarding the FDA's conclusions. The allegations of Paragraph 74 regarding federal law state legal conclusions to which no response is required. Moreover, the statute referenced in Paragraph 74 speaks for itself and is the best evidence of its contents.


75. On January 22, 2023, President Biden issued a memorandum noting that FDA, "after an independent and comprehensive review of the risks and benefits" of mifepristone pursuant to the REMS statute, had taken "evidence-based action" to modify the Mifepristone REMS to

56

ensure that "healthcare providers and patients can continue to use telehealth to prescribe and receive mifepristone by mail" and that "pharmacies can now choose to become certified to dispense mifepristone to patients." President Biden explained: "These changes seek to reduce the burden on the healthcare delivery system while ensuring the benefits of the medication outweigh the risks. These changes also help ensure that patients can access mifepristone similarly to how they would access other prescribed medications." Memorandum on Further Efforts to Protect Access to Reproductive Healthcare Services (Jan. 22, 2023), https://www.whitehouse.gov/briefing-room/presidential-actions/2023/01/22/memorandum-on -further-efforts-to-protect-access-to-reproductive-healthcare-services/. And the President decried efforts by some state officials to "impose restrictions to limit access to this evidence-based, safe, and effective medication." *Id.*

    **ANSWER:** The writing referenced in Paragraph 75 speaks for itself and serves as the best evidence of its own contents.

C.   **North Carolina Law Imposes Unnecessary and Burdensome Requirements on Plaintiff's Prescribing of Mifepristone that Conflict with the FDA-Approved Regulatory Scheme**

76.   North Carolina's broad web of abortion laws imposes additional restrictions on the prescription and distribution of mifepristone that conflict with the regulatory balance struck by FDA's precisely calibrated REMS.

**ANSWER:**   The allegations of Paragraph 76 state a legal conclusion to which no response is required.

77.   In North Carolina, medication abortion is legal only when performed in compliance with specific, onerous conditions and restrictions imposed by the State. *See* N.C. Gen. Stat. §§ 14-44, 14-45, 14-45.1. On May 16, 2023, the North Carolina legislature overrode the Governor's veto and passed Senate Bill 20 (which thus became Session Law 2023-14), amending North Carolina's laws with respect to surgical abortion and medication abortion with an effective date of July 1, 2023. Session Law 2023-14 carries forward or expands many of North Carolina's pre-existing restrictions on abortion, including restrictions that apply specifically to medication abortion. It also imposes onerous new

58

restrictions on medication abortion.

**ANSWER:** Defendant admits that on May 16, 2023, the North Carolina legislature overrode the Governor's veto and passed Senate Bill 20, which became Session Law 2023-14. Defendant further admits that S.B. 20 amended North Carolina's laws with respect to surgical abortion and medication abortion and that many of those provisions became effective on July 1, 2023. The remaining allegations of Paragraph 77 state legal conclusions to which no response is required. Moreover, the statutes referenced in Paragraph 77 speak for themselves and are the best evidence of their own contents.

78. Among other restrictions, currently operative North Carolina law provides that "[t]he physician prescribing, dispensing, or otherwise providing any drug or chemical for the purpose of inducing an abortion shall be physically present in the same room as the patient when the first drug or chemical is administered to the patient." N.C. Gen. Stat. § 90-21.82(1)(a). Session Law 2023-14 maintains the requirement of in-person administration by a physician. *See* S.L. 2023-14, sec. 1.2, § 21.83A(b)(2)a; *id.* sec. 1.3, § 14-

44.1.[6]  In addition, when the amendments in Session Law 2023-14 take effect, North Carolina law will require the physician prescribing, administering, or dispensing mifepristone to examine the patient in person before providing the drug, schedule an in-person follow-up visit for the patient

---

[6] In addition to requiring that mifepristone be provided in person by a physician, current North Carolina law strictly regulates the locations where such activities can take place. A physician can provide mifepristone only in a facility that the State deems "suitable," which means either a facility physically attached to or operated by a licensed hospital or a freestanding clinic certified by the State to provide abortion services. *See* N.C. Gen. Stat. § 14-45.1(a); 10A N.C. Admin. Code § 14E.0101(2). A hospital must meet numerous requirements to obtain and maintain state licensure, including facility requirements. *See generally* N.C. Gen. Stat. §§ 131E-75 *et seq.* A clinic not attached to or operated by a licensed hospital must likewise meet numerous facility requirements in order to be considered "a suitable facility for the performance of abortions," N.C. Gen. Stat. § 14-45.1(a), including (among other things) plan approval prior to construction, 10A N.C. Admin. Code §§ 14E.0104, .0105; regular facility inspections, *id.* § 14E.0111; N.C. Gen. Stat. § 14-45.1(a1); and specific building code requirements and specifications unnecessary for providing medication abortion, such as elevators, corridors, and doors large enough to accommodate a stretcher (N.C. Admin. Code §§ 14E.0203, .0204, .0205), ventilation and air supply requirements (*id.* § 14E.0206), and a "nourishment station with storage and preparation area for serving meals or in-between meal snacks" (*id.* § 14E.0207(14)). Under Session Law 2023-14, it appears that the facility requirement would not apply to medication abortion, while North Carolina law would still require that the physician be "physically present in the same room as the woman" when mifepristone is administered. S.L. 2023-14, sec. 1.2, § 21.83A(b)(2)a.

approximately seven to 14 days after providing the drug, and
"make all reasonable efforts to ensure that the woman returns
for the scheduled appointment." *Id.* sec. 1.2, §§ 90-
21.83A(b)(4)(*l*), 90-21.83B, 90-21.93(b)(8)-(9).

**ANSWER:** The allegations of Paragraph 78 state legal
conclusions to which no response is required. Moreover, the
statutes and administrative code provisions referenced in
Paragraph 78 speak for themselves and are the best evidence
of their own contents.


79. North Carolina law also imposes onerous counseling
requirements that must be satisfied before a medication
abortion with mifepristone. It requires that a physician or
qualified professional provide specific, state-mandated
information to the patient prior to the abortion, including
statements that are inconsistent with FDA-approved patient
labeling for mifepristone and Plaintiff's expert medical
judgment and irrelevant to the patient's care, and then wait
at least 72 hours before performing the abortion. *See* N.C.
Gen. Stat. §§ 90-21.82, 90-21.90. The amendments in Session
Law 2023-14 will make the counseling requirements even more
onerous, including by requiring that the counseling be

provided in person.  *See* S.L. 2023-14, sec. 1.2, §§ 90-21.83,
90-21.83A, 90-21.90.  When those amendments take effect,
North Carolina law will also mandate an ultrasound
examination and a medically unnecessary blood-type
determination (which may necessitate blood testing) for all
medication abortion patients.  *See id.* sec. 1.2, §§ 90-
21.83A(b)(2)b, 90-21.83B(a)(2), 90-21.93(b)(6).[7]

**ANSWER:**  The allegations of Paragraph 79 state legal
conclusions to which no response is required.  Moreover, the
statutes referenced in Paragraph 79 speak for themselves and
are the best evidence of their own contents.


80.  Further, once Session Law 2023-14 takes effect,
North Carolina will subject mifepristone prescribers to
additional onerous and unreasonable reporting requirements
that FDA has rejected.  For example, the amendments made by
S.L. 2023-14 require physicians to report "any specific
complications" from mifepristone to the State within 15 days
of the patient's last appointment, and to report any "adverse

---

[7] Under current North Carolina law, an ultrasound is required
for abortions performed in a clinic not attached to or
operated by a licensed hospital.  10A N.C. Admin. Code
§ 14E.0305(d).

event" to the State — and to FDA — within three days. S.L. 2023-14, sec. 1.2, § 90-21.93(b)(10), (c). The law defines both "complication" and "adverse event" broadly to encompass any "physical or psychological" conditions that may have arisen "as a primary or secondary result" of the abortion. *Id.* §§ 90-21.81(1b), (2a), 90-21.83(e)(2).

   **ANSWER:** The allegations of Paragraph 80 state legal conclusions to which no response is required. Moreover, the statutes referenced in Paragraph 80 speak for themselves and are the best evidence of their own contents.


   81. For those who fail to comply with these restrictions, North Carolina law threatens myriad and severe consequences, including criminal prosecution. A physician who "[p]roduce[s] or attempt[s] to produce an abortion contrary to law" is subject to disciplinary action by the North Carolina Medical Board, including fines and suspension or revocation of the physician's medical license, N.C. Gen. Stat. § 90-14(a)(2); S.L. 2023-14, sec. 1.2, § 90-21.88A, as well as other potential enforcement action, *see* N.C. Gen. Stat. §§ 14-44, 14-45, 14-45.1; S.L. 2023-14, sec. 1.2, § 90-21.81B. And a physician who performs an abortion in knowing

or reckless violation of those requirements may be subject to a civil action for damages and attorneys' fees. N.C. Gen. Stat. § 90-21.88; S.L. 2023-14, sec. 1.2, § 90-21.88.[8]

**ANSWER:** The allegations of Paragraph 81 state legal conclusions to which no response is required. Moreover, the statutes and administrative code regulations referenced in Paragraph 81 speak for themselves and are the best evidence of their own contents.


82. As explained above, in imposing and administering the Mifepristone REMS and performing its congressionally mandated balancing to ensure safety while minimizing burdens on patient access and the healthcare system, FDA has made a deliberate choice not to impose restrictions on mifepristone that are the same as or highly similar to restrictions imposed by North Carolina. For example, FDA specifically considered, initially imposed, and ultimately rejected requirements that mifepristone be provided in person by physicians in a specific type of medical facility. FDA has concluded that such

---

[8] Failure to comply with the facility certification requirements also may subject a provider to administrative action, including denial, suspension, or revocation of certification. *See* 10A N.C. Admin. Code § 14E.0110.

requirements are not necessary to ensure safety and would unduly burden patient access and the healthcare delivery system. Instead, FDA concluded that it is appropriate for certified physicians, other certified healthcare providers, and healthcare providers operating under their supervision to prescribe mifepristone in any type of facility or by telehealth, after providing the specific counseling information that is listed in the FDA-approved Patient Agreement and Medication Guide and without any waiting period; and for patients to obtain mifepristone directly from a certified prescriber or a healthcare provider working under the supervision of a certified prescriber, or from a certified pharmacy upon prescription of a certified prescriber, and take the medication in a place of the patient's choosing. FDA also has required that pregnancy be assessed by ultrasound only if the duration of the pregnancy is uncertain or an ectopic pregnancy is suspected. And FDA has determined that in light of mifepristone's well-characterized safety profile, prescribers should not be subject to reporting requirements like those North Carolina is now seeking to impose. *See* ¶¶ 50-76, *supra*.

**ANSWER:** The allegations of Paragraph 82 state legal

conclusions to which no response is required.  Defendant
lacks information and knowledge sufficient to form a belief
as to the truth or falsity of the allegations regarding the
FDA's considerations and conclusions.  To the extent the
allegations in Paragraph 82 derive from the Mifepristone
REMS, those writings speak for themselves and serve as the
best evidence of their own contents.

## CAUSE OF ACTION

83.  Plaintiff realleges and incorporates by reference
each of the preceding paragraphs as though set forth fully
herein.

**ANSWER:**  Defendant incorporates by reference and
reasserts his responses to Plaintiff's allegations in all of
the Paragraphs of this Answer, as though fully set forth
herein.


84.  Under the Supremacy Clause of the United States
Constitution, federal laws made under the authority of the
United States are "the supreme Law of the Land," the "Laws of
any State to the Contrary notwithstanding." U.S. Const. art.
VI, cl. 2. Federal law thus preempts state law where state

law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of federal law.

**ANSWER:** The allegations of Paragraph 84 state legal conclusions to which no response is required.


85. The restrictions imposed by North Carolina on the provision of mifepristone —— including the in-person examination, administration, and follow-up requirements; the in-person counseling and 72-hour waiting period requirement; the physician-only requirement; the ultrasound and blood-type requirements; and the physician adverse event reporting requirements —— conflict with and stand as an obstacle to the accomplishment and execution of the full purposes of objectives of federal law, as reflected in the FDCA and FDA's Mifepristone REMS.

**ANSWER:** The allegations of Paragraph 85 state legal conclusions to which no response is required.


86. Congress has directed FDA, when imposing REMS, and in particular REMS with ETASU, to strike a precise and careful balance between managing the risks of a drug and ensuring patient access to the drug. FDA is required to calibrate its

67

restrictions to ensure patient safety while eschewing
unnecessary restrictions that would unduly burden patient
access or the healthcare delivery system.  In exercising that
authority with respect to mifepristone, FDA has crafted, and
regularly revisited and revised, a precise set of regulatory
controls that the Agency views as striking the appropriate
balance between safety and patient access, and has included
only those ETASU that the Agency has deemed to be commensurate
with the drug's risks and not unduly burdensome on patients
or healthcare providers.  In so doing, FDA has concluded that
restrictions of the type imposed by North Carolina are
unnecessary, inappropriate, and unduly burdensome.

   **ANSWER:**  Defendant admits, on information and belief,
that the FDA has repeatedly revised the Mifepristone REMS
and has eliminated certain requirements for the provision of
mifepristone as part of those revisions.  Otherwise, the
allegations of Paragraph 86 state legal conclusions to which
no response is required.  To the extent the allegations in
Paragraph 85 derive from 21 U.S.C. § 355-1, that statute
speaks for itself and serves as the best evidence of its own
contents.

87.  The REMS are not a minimum standard on which states are free to build.  Rather, as Congress instructed, they reflect FDA's expert conclusion as to the appropriate level of regulatory control for drugs that are expected to provide substantial benefits, but which FDA determines also pose risks that would otherwise result in FDA denying an application to sell or market those drugs.  By attempting to impose a different regulatory balance from the one crafted by FDA under its REMS authorities, including by imposing restrictions on the provision of mifepristone that FDA itself has specifically rejected, North Carolina law frustrates Congress's objective of empowering FDA to ensure safety while minimizing burdens on patient access and on the healthcare delivery system; upsets the deliberate and fine-tuned regulatory balance contemplated by federal law; and thus stands as an obstacle to the accomplishment and execution of the full purposes and objectives of federal law.

**ANSWER:**  The allegations of Paragraph 87 state legal conclusions to which no response is required.


88.  Plaintiff is accordingly entitled to a declaratory judgment that North Carolina's restrictions on mifepristone

69

are preempted insofar as they are inconsistent with the federal Mifepristone REMS. Plaintiff is also entitled to an injunction prohibiting Defendants from enforcing those restrictions to prevent Plaintiff from providing mifepristone in accordance with federal law.

**ANSWER:** The allegations of Paragraph 88 state legal conclusions to which no response is required.

## PRAYER FOR RELIEF

Defendant admits that Plaintiff seeks the relief described in the prayer for relief.

## FURTHER DEFENSES

Defendant pleads and reserves the right to assert any further defenses that may become apparent during the course of litigation and discovery.

Dated: August 21, 2023

Respectfully submitted,

JOSHUA H. STEIN
Attorney General

Sarah G. Boyce
Deputy Attorney General and General Counsel
N.C. State Bar 56896

70

sboyce@ncdoj.gov

Sripriya Narasimhan
Deputy General Counsel
N.C. State Bar 57032
snarasimhan@ncdoj.gov

Amar Majmundar
Senior Deputy Attorney General
N.C. State Bar 24668
amajmundar@ncdoj.gov

Stephanie A. Brennan
Special Deputy Attorney General
N.C. State Bar 35955
sbrennan@ncdoj.gov

North Carolina Department of
Justice
P.O. Box 629
Raleigh, NC 27602
Phone: 919-716-6900
Fax: 919-716-6758